**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 378 N. Main Avenue Tucson, AZ 85701; SOUTHWEST ENVIRONMENTAL CENTER, 275 North Downtown Mall Las Cruces, NM 88001; DEFENDERS OF WILDLIFE, 1130 17th Street N.W. Washington, D.C. 20036; and ANIMAL LEGAL DEFENSE FUND, 525 East Cotati Avenue Cotati, CA 94931,      Plaintiffs, v. KIRSTJEN M. NIELSON, in her official capacity as Secretary of the U.S. Department of Homeland Security, 245 Murray Lane S.W. Washington, D.C. 20528; and U.S. DEPARTMENT OF HOMELAND SECURITY, 245 Murray Lane S.W. Washington, D.C. 20528,      Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** Case No.: _____ |

**INTRODUCTION**

    1.    In this action, Plaintiffs Center for Biological Diversity, Southwest Environmental

Center, Defenders of Wildlife, and Animal Legal Defense Fund challenge the issuance of a

waiver on January 22, 2018 by Defendants Kirstjen M. Nielson, Secretary of the U.S. Department of Homeland Security, and the U.S. Department of Homeland Security (collectively, "DHS"), that purports to exempt construction of approximately twenty miles of border walls and associated infrastructure in southern New Mexico ("New Mexico Border Wall Project") from compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., and numerous other statutory requirements.  *See* 83 Fed. Reg. 3,012 (January 22, 2018) ("New Mexico Waiver").

2.      In issuing the New Mexico Waiver, Secretary Nielson invoked the authority purportedly contained in Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended.  As detailed below, the New Mexico Waiver is *ultra vires* and unlawful because it exceeds the limited grant of authority for such waivers contained in IIRIRA Section 102.  Moreover, any interpretation of Section 102 that would sanction the issuance of the New Mexico Waiver would render this statutory provision so broad and unbounded in scope that it would run afoul of the Constitutional principles of Separation of Powers, the Non-Delegation Doctrine, the Presentment Clause and other constitutional provisions.

3.      Section 102 of IIRIRA directed the DHS Secretary to "install additional physical barriers and roads . . . in areas of high illegal entry."  Section 102(a).  Specifically, "in carrying out" this mandate, the DHS Secretary was required to identify and construct a total of not less than 700 miles of "reinforced fencing" where it would be "most practical and effective," as well as to complete construction of 370 miles of these border barriers within "priority areas" by

December 31, 2008.  Section 102(b).  By DHS's own admission, the projects required by Section 102 have long since been completed.

4.      In addition to IIRIRA Section 102(b)'s mandate to build certain barriers by certain dates, Section 102(c) provides that "the DHS Secretary shall have the authority to waive all legal requirements to ensure expeditious construction of the barriers and roads *under this Section*." (Emphasis added).  Invoking this provision, the New Mexico Waiver purports to exempt the New Mexico Border Wall Project from numerous otherwise applicable environmental laws.  However, because the New Mexico Border Wall Project does not fall within the scope of projects mandated by Section 102, the project squarely does not fall "under this section"—and, consequently, the waiver authority under Section 102(c) is inapplicable to the New Mexico Border Wall Project.

5.      Plaintiffs seek a judicial declaration that DHS Secretary Nielsen acted outside her statutory authority by issuing the New Mexico Waiver, thus rendering the Waiver an *ultra vires* agency action that is invalid and ineffective.  Specifically, the waiver provision under Section 102(c) only applies to the measures mandated by Section 102(b), which have already been completed because DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008, as required by Section 102(b)(1)(B), as well as its overlapping duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA Section 102(b)(1)(A).  As such, because the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the purported waiver of NEPA, the ESA, and numerous additional laws under the New Mexico Waiver is an unlawful *ultra vires* act.

6.      In the alternative, even were the Court to determine that the New Mexico Border Wall Project falls within the particular "barriers and roads" authorized under IIRIRA Section 102 and is subject to the waiver of legal requirements under IIRIRA Section 102(c), the New Mexico Waiver is invalid because the Secretary failed to comply with IIRIRA Section 102(b)(1)(C), which mandates that the DHS Secretary consult with stakeholders regarding the waiver. Secretary Nielsen failed to comply with this requirement, thereby rendering the New Mexico Waiver both in facial violation of IIRIRA Section 102(b)(1)(c) and an *ultra vires* agency action.

7.      Additionally or in the alternative, Plaintiffs seek declaratory relief that the New Mexico Waiver, and the waiver authority provided by IIRIRA Section 102(c) generally, violate the U.S. Constitution in several respects, including the Take Care Clause, the Separation of Powers Doctrine, the Non-Delegation Doctrine, and the Presentment Clause.

## JURISDICTION

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346, 5 U.S.C. §§ 701 to 706, and 8 U.S.C. § 1103 note.  The causes of action arise under the laws of the United States and the U.S. Constitution.  The relief requested is authorized pursuant to 28 U.S.C. §§ 1651 and 2201 to 2202, and 5 U.S.C. §§ 701 to 706.

## VENUE

9.      Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring in this district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by the Defendants, and/or failure(s) to act by the Defendants.

## PARTIES

10.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law.  The Center has more than 1.5 million members and online activists.  The Center is headquartered in Tucson, Arizona, and has offices in New Mexico and Washington, D.C., as well as numerous additional regional offices located throughout the country, and an international office in Baja California Sur, Mexico.

11.     The Center's members and staff live in or regularly visit the U.S.-Mexico borderlands region in New Mexico.  The Center's members and staff regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in New Mexico, including areas impacted by and/or adjacent to the location of the New Mexico Border Wall Project, for hiking, camping, viewing and studying wildlife, photography, and other scientific, vocational and recreational activities.  The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas.  The Center has a long history of environmental advocacy within the borderlands region generally and New Mexico borderlands region specifically.  The Center's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

12.     The Center has worked for nearly two decades to oppose environmentally harmful border fencing and other injurious border security projects along the U.S.-Mexico border generally, and the New Mexico region specifically.  The Center also has a long history of advocating for the protection of rare wildlife habitat and specific species that could be impacted

by the New Mexico Border Wall Project, including the Mexican gray wolf, Aplomado falcon, Bighorn sheep, mountain lion, bobcat, bison, and mule deer.

13.     The Center and its members' interests are harmed by DHS's violations of law and the U.S. Constitution.  The proposed New Mexico Border Wall Project includes the replacement of existing vehicle barriers and some pedestrian fencing with bollard wall that is more impermeable than currently existing border fencing.  Moreover, the proposed New Mexico Border Wall Project will entail the construction of roads as well as associated noise, lighting, and other impacts, which will all likely necessitate new land clearing, grading, staging, and other associated activities impacting the surrounding environment.  The construction—which will occur without the benefit of compliance with NEPA, the ESA and other laws—will negatively impact the wildlife habitat and imperiled species described above, which will injure the Center and its members' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests in those habitats and species.  These injuries would be redressed by the requested relief, as absent the New Mexico Waiver, the harmful construction either would not occur or would only occur after compliance with the requirements of NEPA, the ESA and other laws, which are designed to eliminate, reduce and/or mitigate the negative environmental consequences of federal agency actions.

14.     Plaintiff SOUTHWEST ENVIRONMENTAL CENTER ("SWEC') is a non-profit conservation organization dedicated to the protection and restoration of native wildlife and their habitats in the Southwest.  SWEC has more than 10,000 members and online activists. SWEC is headquartered in Las Cruces, in southern New Mexico.

15.     SWEC's members and staff live in or regularly visit the U.S.-Mexico borderlands region in New Mexico.  SWEC's members and staff regularly use the myriad federal, state, and

local protected lands along the U.S.-Mexico border in New Mexico, including areas impacted by and/or adjacent to the location of the New Mexico Border Wall Project, for hiking, camping, viewing and studying wildlife, photography, hunting, horseback riding and other scientific, vocational and recreational activities.  SWEC's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas. SWEC has a long history of environmental advocacy within the borderlands region generally and New Mexico borderlands region specifically.  SWEC's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

16.     SWEC has worked for more than a decade to oppose environmentally harmful border fencing and other injurious border security projects along the U.S.-Mexico border generally, and the New Mexico region specifically.  SWEC also has a long history of advocating for the protection of rare wildlife habitat and specific species that could be impacted by the New Mexico New Mexico Border Wall Project, including the Mexican gray wolf, jaguar, Aplomado falcon, Bighorn sheep, mountain lion, bobcat, bison, and mule deer.

17.     SWEC and its members' interests are harmed by DHS's violations of law and the U.S. Constitution.  The proposed New Mexico Border Wall Project includes the replacement of existing vehicle barriers and some pedestrian fencing with bollard wall that is more impermeable than currently existing border fencing.  Moreover, the proposed New Mexico Border Wall Project will entail the construction of roads as well as associated noise, lighting, and other impacts, which will all likely necessitate new land clearing, grading, staging, and other associated activities impacting the surrounding environment.  The construction which will occur without the benefit of compliance with NEPA, the ESA and other laws will negatively impact the

wildlife habitat and imperiled species described above, which will injure SWEC and its members' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests in those habitats and species.  These injuries would be redressed by the requested relief, as absent the New Mexico Waiver, the harmful construction either would not occur or would only occur after compliance with the requirements of NEPA, the ESA and other laws which are designed to eliminate, reduce and/or mitigate the negative environmental consequences of federal agency actions.

18.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit organization with hundreds of thousands of members across the nation, including nearly 3,500 members in New Mexico.  Defenders' mission is to preserve wildlife and emphasize appreciation and protection for all species in their ecological role.  Through advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend.  Defenders has been closely involved in policy and litigation matters associated with border wall construction along the United States-Mexico border for more than a decade.  Defenders has field offices across the country, including in Santa Fe, New Mexico.

19.     Defenders has organizational and membership-based interests in the preservation and conservation of the borderlands of the Southwestern United States that will be harmed by the construction of barriers and roads at issue in this case.  For more than two decades, Defenders has worked for the protection of borderland wildlife and ecosystems.  Defenders has played a leading role in efforts to educate the public and advocate for better integration of environmental considerations into immigration policy generally, and into border security efforts specifically.

20.     Defenders' members live near and regularly visit the borderlands near New Mexico for wildlife observation, recreation, and other uses.  Defenders' members also live in

other areas along the New Mexico border adversely impacted by the border wall projects being constructed throughout the area. These members have aesthetic, educational, professional, health, and spiritual interests that will be harmed by the environmental impacts that will result from the DHS Secretary's decision to waive multiple laws, and consequently eliminate the procedural and substantive protections that would have otherwise been provided by these laws.

21.     Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit 501(c)(3) organization with more than 200,000 members and supporters, approximately 1,100 of whom live in New Mexico, and nearly 200 of whom live in El Paso County, Texas, near the border area at issue in this case. ALDF represents its members interests by working to protect the lives of animals, including wildlife, through the legal system. ALDF is headquartered on Cotati, California, with regional offices in Los Angeles and Portland, Oregon.

22.     ALDF has an organizational and membership-based interest in ensuring the letter and spirit of wildlife- and wildland-protection statutes are fully upheld and the constitutional principles enabling these laws' implementation are respected. ALDF pursues its purpose of safeguarding animal welfare in part by persistently advocating for government adherence to wildlife-protection laws such as NEPA, the ESA and the Migratory Bird Treaty Act (to name a few)—each of which has been waived by the DHS Secretary in conjunction with the New Mexico Border Wall Project. ALDF has expended significant organizational resources on advocacy and public education efforts to improve environmental protections for wildlife living on protected lands such as the borderlands at issue here, and will continue to do so if the border wall is built without adherence to the laws the DHS Secretary is attempting to waive.

23.     ALDF's members live in or regularly visit the U.S.-Mexico borderlands region in New Mexico. ALDF's members regularly use the myriad federal, state, and local protected

lands along the U.S.-Mexico border in New Mexico—including areas impacted by and/or adjacent to the location of the New Mexico Border Wall Project—for hiking, camping, wildlife viewing and photography, and other vocational and recreational activities.  ALDF's members derive recreational, educational, and aesthetic benefit from their activities in these areas.  ALDF's members have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

24.     ALDF has an established track record of active participation in the oversight of government activities and decision-making, particularly with regard to laws and policies affecting wildlife.  ALDF expends considerable organizational resources in doing so, including costs associated with litigation and educating the public.  ALDF regularly represents its members' interests in this regard by filing lawsuits, training law students and professionals, and publishing and disseminating informational materials to its members.

25.     ALDF and its members are harmed by DHS's issuance of the New Mexico Waiver, in that the DHS Secretary's decision to waive the procedural and substantive protections of multiple laws in order to expedite the construction of barriers and roads associated with the New Mexico Border Wall Project pose an imminent impact on the local ecosystems, including wildlife populations.  These impacts will directly harm ALDF's members' aesthetic and recreational interests in their continued enjoyment of the New Mexico borderlands, and will additionally harm ALDF as an organization due to the forced diversion of ALDF resources to protect the wild animals affected by the illegal border wall construction in fulfillment of its mission.

26.     Defendant KIRSTJEN M. NIELSEN, Secretary of the U.S. Department of Homeland Security, is sued in her official capacity.  Secretary Nielsen is the official ultimately

responsible under federal law for ensuring that the actions and management decisions of the Department, including its component agency the U.S. Customs and Border Protection ("CBP") comply with all applicable laws and regulations.   On January 22, 2018, Secretary Nielsen invoked the IIRIRA Section 102(c) waiver authority to issue the New Mexico Waiver in relation to the New Mexico Border Wall Project.

27.     Defendant U.S. DEPARTMENT OF HOMELAND SECURITY is an agency within the executive branch of the U.S. government.  The Department is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements.

## STATUTORY BACKGROUND

**A.     Section 102 of The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")**

28.     Congress initially enacted IIRIRA in 1996 to, for the first time, provide federal agencies with specific direction regarding the location and extent of specific border barriers to be constructed.   P.L. 104-208, div. C., codified at 8 U.S.C. § 1103 note.   Prior to IIRIRA's enactment, the authority to construct border barriers derived from the general statutory responsibility of the Attorney General (now the DHS Secretary) to "guard the boundaries and borders of the United States against the illegal entry of aliens."   Immigration and Nationality Act, §103(a)(5), 8 U.S.C. §1103(a)(5).  That authority continues to exist independent of IIRIRA.

29.     While it has been amended several times, IIRIRA Section 102 remains the primary federal statutory provision addressing border barriers.   Section 102(a) remains substantively the same as originally enacted in 1996, providing the U.S. Attorney General (now the DHS Secretary) with the general policy direction to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."

11

30.     At the time Section 102(a) was enacted, Congress also provided that "to the extent the Attorney General determines necessary to ensure *expeditious construction of the barriers and roads under this Section*" (emphasis added), the requirements of the ESA and NEPA may be waived.

31.     As originally enacted, IIRIRA Section 102(b) "carr[ied] out subsection (a)" by identifying specific border barriers to be constructed, establishing specific deadlines for the construction of such barriers, and other requirements.  The only border fence segment initially mandated by Congress under IIRIRA Section 102(b) was the construction of fencing in San Diego, California—specifically, the fortification of a 14-mile long "primary" border fence that was completed in 1993.  As originally enacted, IIRIRA did not mention construction related to the New Mexico border.

32.     The modifier "under this Section" in IIRIRA Section 102(c) refers solely to the specific border fencing required under IIRIRA Section 102(b), which by its plain language "carries out" DHS's general authority to ensure the "expeditious construction" of "additional physical barriers and roads" under IIRIRA Section 102(a).

**B.     The 2005 REAL ID Act Amendments to IIRIRA Section 102(c)**

33.     Enacted in 2005, Section 102 of the REAL ID Act amended the Section 102(c) IIRIRA waiver provision in two primary ways.  P.L. 109-13, div. B.

34.     First, the REAL ID Act amendment expanded the IIRIRA Section 102(c) waiver authority beyond NEPA and the ESA to permit the DHS Secretary "to waive *all legal requirements* [that] such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section" (emphasis added). This amendment did not specify the laws that Congress authorized the Secretary to waive.

35.     Second, Section 102 of the REAL ID Act amended the waiver authority under IIRIRA Section 102(c) to restrict judicial review concerning any waiver decision in the following respects: (i) purporting to limit "all causes or claims" arising from any waiver determination made by the DHS Secretary to alleged constitutional violations only; (ii) requiring any such constitutional challenge to be filed not later than 60 days after the Secretary's determination, effective upon being published in the Federal Register; and (iii) eliminating appellate court review of the district court's decision on the alleged constitutional violations and instead only permitting review upon a writ of certiorari to the U.S. Supreme Court.

36.     Congress intended the REAL ID Act's amendment and expansion of the 102(c) waiver authority, like the IIRIRA Section 102(c) waiver authority as originally enacted in 1996, to apply to the specific border barrier and road requirements at IIRIRA Section 102(b), which "carries out" the general border barrier policy direction at IIRIRA Section 102(a).  At that time, the only specific border barriers required under Section 102(b) remained the 14-mile San Diego, California fence proposals, with no mention of fencing in any other state, including New Mexico.  Congress's intent—that the expansion of the IIRIRA Section 102(c) waiver authority under Section 102 of the REAL ID Act be limited to the specific San Diego border barriers mandated by IIRIRA Section 102(b)—is evidenced by the bill's plain language, as well as statements by the bill's author and co-sponsors during the limited House Floor debate.

37.     Indeed, the bill's official title made clear that Congress's intent in expanding the IIRIRA Section 102(c) waiver authority was specific to the border barrier segments identified under Section 102(b): "To establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum

laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, *and to ensure expeditious construction of the San Diego border fence*." (Emphasis added).

38.     The intended limitation of the IIRIRA Section 102(c) waiver authority to the San Diego double and triple layered fence specified under IIRIRA Section 102(b) was also repeatedly emphasized by the bill's supporters on the House Floor.   As stated by the bill's author:

> [T]he REAL ID Act will waive Federal laws *to the extent necessary to complete gaps in the San Diego border security fence*, which is still stymied 8 years after congressional authorization.

151 Cong. Rec. H454 (daily ed., Feb. 9, 2005)(Statement of Rep. Sensenbrenner)(emphasis added); *see also* Cong. Rec. H471 ("H.R. 418 provides the Secretary of Homeland Security with authority to waive environmental laws, *so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed*.")(daily ed., Feb. 9, 2005)(Statement of Rep. Hoekstra)(emphasis added).   No legislation or legislative history mentions the application of IIRIRA Section 102(c) waiver authority to apply to any border wall construction in New Mexico.

**C.     The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)**

39.     President George W. Bush signed the Secure Fence Act on October 26, 2006. P.L. 109-367.

40.     Section 3 of the Secure Fence Act ("Construction of Fencing and Security Improvements in Border Area from Pacific Ocean to Gulf of Mexico") significantly expanded upon IIRIRA Section 102(b).   Under the Secure Fence Act amendments to IIRIRA Section 102(b), Congress removed the provisions referring specifically to the 14-miles of fencing in San Diego and instead directed DHS to "provide for at least 2 layers of reinforced fencing [and] the

installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border totaling approximately 850 miles.  Former IIRIRA §102(b)(1)(A)(i)-(v).

41.     Section 3 of the Secure Fence Act further amended IIRIRA Section 102(b) to add the specific requirement that two of these segments—the California and Arizona segment and one Texas segment—be considered "priority areas," with construction deadlines of May 30, 2008 and December 31, 2008.  Former IIRIRA § 102(b)(1)(B)(i)-(ii).  The New Mexico segment was not categorized as a priority area.

42.     Congress did not specifically address the impact of the Secure Fence Act amendments on the scope of the IIRIRA Section 102(c) waiver.

**D.     The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102(b)**

43.     Just over a year after enactment of the Secure Fence Act, President George W. Bush signed the 2008 Consolidated Appropriations Act on December 26, 2007.  P.L. 110-161, div. E.

44.     In a third and final amendment to date, Section 564 of the 2008 Consolidated Appropriations Act amended Section 102(b) of the IIRIRA to scale back DHS's duties with respect to border barriers and roads as defined under the 2006 Secure Fence Act amendments. These modifications—which remain the law to date—include: (i) eliminating the requirement that border barriers be built in any specific locations, and instead specifying that such barriers be placed "along not less than 700 miles of the southwest border where fencing would be most practical and effective"; (ii) eliminating the requirement of double-layered fencing; (iii) amending the "priority areas" requirement to direct that DHS identify and construct 370 miles of border barriers by December 31, 2008.  IIRIRA § 102(b)(1)(A)-(B).

45.     The 2008 Appropriations Act also added a new consultation requirement to IIRIRA Section 102(b), mandating the DHS Secretary to consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites where" border barriers are constructed.  IIRIRA § 102(b)(1)(C).

46.     There have been no amendments to IIRIRA Section 102 since the 2008 Appropriations Act amendment was signed into law.

**E.     IIRIRA Section 102, As Amended**

47.     The relevant Sections of IIRIRA Section 102, codified at 8 U.S.C. § 11103 note, in its current version to date provide:

> **(a) In general.--**The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.
> **(b) Construction of fencing and road improvements along the border.—**
> **(1) Additional fencing along southwest border.—**
> **(A)   Reinforced fencing.--**In carrying out subsection (a) [of this note], the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.
> **(B)   Priority areas**.--In carrying out this Section [Pub. L. 104-208, Div. C, Title I, § 102, Sept. 30, 1996, 110 Stat. 3009-554, which amended this Section and enacted this note], the Secretary of Homeland Security shall—
> (i)     identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

16

   (ii)  not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

  (C) **Consultation.**

   (i)  **In general.--**In carrying out this Section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed

   (ii)  **Savings provision.--**Nothing in this subparagraph may be construed to—

    (I)  create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

    (II)  affect the eminent domain laws of the United States or of any State.

  (D) **Limitation on requirements.--**Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

     *      *      *

**(c) Waiver.—**

 **(1)** **In general.--**Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

 **(2) Federal court review.—**

  **(A)** **In general.--**The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

  **(B)** **Time for filing of complaint.--**Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland

Security. A claim shall be barred unless it is filed within the time specified.

(C) **Ability to seek appellate review.--**An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

## FACTUAL BACKGROUND

A.    **Past Construction of Border Barriers and Use of the Waiver Authority Under IIRIRA**

48.    Since IIRIRA was enacted in 1996, the federal government has spent billions of dollars to implement the statute and create the many roads and barriers and undertake other measures that Congress has specifically directed in amended versions of Section 102(b).  Over the course of the projects undertaken pursuant to Section 102(b), DHS has relied on the Section 102(c) waiver authority several times, for projects in San Diego (70 Fed. Reg. 55,622 (Sept. 22, 2005), on the Barry M. Goldwater Range in Arizona (72 Fed. Reg. 2,535 (Jan. 19, 2007)), in the San Pedro Riparian National Conservation Area in Arizona (72 Fed. Reg. 60,870 (Oct. 26, 2007)), in Hidalgo County, Texas (73 Fed. Reg. 19,077 (April 3, 2008)), and in various Areas in New Mexico, Texas, Arizona, and California. 73 Fed. Reg. 18,293 (April 3, 2008), as amended, 73 Fed. Reg. 19,078 (April 8, 2008).

49.    Collectively, from 2005 to 2008, DHS waived numerous laws that otherwise would have applied to approximately a total of 624.5 miles of border barrier and related road construction.  As of February 2017, DHS has constructed 654 miles of "primary" border barriers and approximately 5,000 miles of roads along the U.S.-Mexico border.

50.    Clearly, DHS has taken aggressive action to comply with Congress's IIRIRA mandates in order to "ensure expeditious construction" of the specific barriers and roads

mandated by IIRIRA Section 102(b), identified by Congress as necessary to carry out DHS's general authority to construct border barriers and roads.

51.     Consequently, DHS has fulfilled its statutory responsibilities to construct the specific "fencing and road improvements along the border" as currently defined by IIRIRA Section 102(b).

52.     In particular, DHS has met its specific mandate to identify and construct 370 miles of border fencing in "priority areas . . . where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(B).

53.     Separately, DHS has also met its specific mandate to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(A).  In addition to the 654 miles of primary fencing constructed by DHS, the agency has constructed an additional 37 miles of double-layered fencing and 14 miles of triple-layered fencing, totaling 705 miles of reinforced border fencing, exceeding the 700-mile minimum under IIRIRA Section 102(b)(1)(A).

54.     As summarized recently by the GAO:

> From fiscal years 2005 through 2015, CBP increased the total miles of primary border fencing on the southwest border from *119 miles to 654 miles*—including 354 miles of primary pedestrian fencing and 300 miles of primary vehicle fencing.  With 654 miles of primary fencing currently deployed, CBP officials have stated that CBP is in compliance with its legal requirements for the construction of the southwest border fencing on the substantial discretion provided to the Secretary of Homeland Security to determine the appropriate placement of fencing.

GAO Report, at p. 8.  (Emphasis added)

55.     Further, there have been no amendments to IIRIRA Section 102 since the 2008 Amendment was signed into law authorizing any legal waivers for additional construction

projects outside those projects specifically authorized and contemplated when it was enacted. The proposed New Mexico Border Wall Project includes the replacement of vehicle fencing in areas that were *not* identified as "priority" areas before the 2008 completion date set forth in IIRIRA Section 102.

**B.       The January 22, 2018 IIRIRA Section 102(c) Waiver**

56.      On January 25, 2017, President Donald J. Trump issued Executive Order No. 13767, entitled "Border Security and Immigration Enforcement Improvement" ("Executive Order"), which directed DHS to construct a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000 mile-long U.S.-Mexico border.   Prior to the Executive Order, *all* previous waivers invoked under Section 102(c) of IIRIRA were for projects *required* under Section 102(b).   Subsequent to the Executive Order, the DHS Secretary has issued three waivers—all for projects *outside* the scope of Section 102(b).   Two of those waivers concern projects in California and are subject to ongoing litigation, while the third and most recent is the New Mexico Waiver.

57.      On January 22, 2018, Secretary Nielsen issued a Determination in the Federal Register purporting to invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA and numerous additional laws otherwise applicable to "the construction of roads and physical barriers" in the "project area," which is defined as "an approximately twenty mile segment of the border that starts at the Santa Teresa Land Port of Entry and extends westward" to Border Monument 10.  83 Fed. Reg. at 3,013.

58.      In the New Mexico Waiver, Secretary Nielsen purportedly waived "in their entirety" the following  federal statutes with respect to the New Mexico Border Wall Project:

　　　　　　　　i.      National Environmental Policy Act, 42 U.S.C. § 4231 *et seq*.;

   ii.     Endangered Species Act, 16 U.S.C. 1531 *et seq*;

   iii.    Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

   iv.    National Historic Preservation Act, Pub. L. 89-665;

   v.     Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

   vi.    Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

   vii.   Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

   viii.  Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*

   ix.    Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

   x.     Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

   xi.    Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

   xii.   Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

   xiii.  Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*,

   xiv.  Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*;

   xv.   Archaeological and Historic Preservation Act, 54 U.S.C. § 320301 *et seq.*;

   xvi.  Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

   xvii.  Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. § 3201-320303 & 320101-320106;

  xviii.  Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

   xix.  Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

   xx.   National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a *et seq.*;

   xxi.  Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

     xxii.     Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.;

     xxiii.    Eagle Protection Act, 16 U.S.C. § 668 *et seq*.;

     xxiv.    Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq*.; and

     xxv.    American Indian Religious Freedom Act, 42 U.S.C. § 1996.

**C.**    **The New Mexico Border Wall Project**

59.    Secretary Nielsen's New Mexico Waiver purports to waive the application of NEPA, the ESA and numerous other laws to the proposed construction of the New Mexico Border Wall Project, which will involve the replacement of existing fencing, the majority being vehicle barriers, which are generally compatible with wildlife movement, with bollard-style walls, which are an almost complete obstructive barrier to wildlife movement, in an approximately twenty-mile segment starting at the Santa Teresa Land Port of Entry and extending west to Border Monument 10.  83 Fed. Reg. at 3,013.

60.    The New Mexico Border Wall Project will have numerous negative impacts on the wildlife, plants, and the sensitive biological habitats on and near the proposed site of the project.  The project site is in the Chihuahuan desert, which is considered to be one of the most biologically diverse deserts in the world due to the abundance of species present that are not found elsewhere.  The project area and surrounding region is home to dozens of rare species and other wildlife, including the Mexican gray wolf, Aplomado falcon, bighorn sheep, mountain lion, bison, bobcat, and mule deer.

61.    The replacement construction of bollard-style walls, as well as the construction of roads, gates, bridges, and staging areas, and excavation and site preparation, will inevitably disrupt the desert ecosystem and wildlife habitat.  It will cause the permanent loss of wildlife and

their habitat, and will harm vegetation communities, especially at the sites of the staging areas. By failing to conduct any NEPA or ESA review, DHS has not and will not properly consider these myriad negative environmental impacts of the project, including considering whether there are reasonable alternatives that might mitigate such impacts.

62.     In addition to disturbances of wildlife habitat, the Project's proposed bollard-style wall will harm critical migration of species that rely on habitat on both sides of the U.S.-Mexico border.  While the existing vehicle barriers consist of low vertical posts placed several feet apart, the New Mexico Border Wall Project involves a bollard-style wall that, on information and belief, will consists of tall vertical posts spaced closely together, which will impede wildlife movement.  This will serve to obstruct the natural migration of both flying and non-flying wildlife.

63.     In short, the New Mexico Border Wall Project is a major construction project that poses significant negative threats to wildlife, their habitats, and the greater surrounding ecosystem.  By exempting the New Mexico Border Wall Project from NEPA and other environmental laws, as well as the consultation requirements under IIRIRA Section 102(b)(1)(C), DHS is cutting the public out of this important decision-making process and short-circuiting well-established federally processes designed to safeguard our environment and its natural resources.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### *Ultra Vires* Violations under IIRIRA Section 102(c)

64.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

65.     Secretary Nielsen's New Mexico Waiver cites Section 102 of IIRIRA as authority for construction of the New Mexico Border Wall Project.

66.     IIRIRA Section 102(c) provides the DHS Secretary with "the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section." 8 U.S.C. § 1103 note.

67.     The scope of the IIRIRA Section 102(c) authority, granted to the DHS Secretary, to waive laws "under this Section" is limited to the specific border barriers and roads required to be constructed pursuant to IIRIRA Section 102(b).   While IIRIRA Section 102(a) provides general policy direction to the DHS Secretary to construct border barriers and roads in "areas of high illegal entry" into the United States, IIRIRA Section 102(b) identifies the specific "construction of fencing and road improvements along the border" necessary to "carry[] out subsection (a)."

68.     At the time of the original 1996 enactment of IIRIRA, as well as its 2005 amendment by Section 102 of the REAL ID Act, the specific border barrier construction required under IIRIRA Section 102(b) was limited solely to the San Diego 14-mile double and triple layer border fence.

69.     Congress subsequently amended IIRIRA Section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act.   The 2006 Secure Fence Act amended IIRIRA Section 102(b) to require DHS to construct five specific segments of double-layered border fencing totaling approximately 850 miles.   One year later, with the enactment of the 2008 Consolidated Appropriations Act, Congress again amended IIRIRA Section 102(b) to its current version, which requires that DHS identify and construct 370 miles of border barriers *by December 31, 2008*, and that the agency construct border barriers "along not less than 700 miles of the southwest border where fencing would be most practical and effective."

70.     DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008 as required by IIRIRA Section 102(b)(1)(B), as well as its duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA Section 102(b)(1)(A).  In addition to the 654 miles of primary fencing constructed by DHS, the agency has constructed an additional 37 miles of double-layered fencing and 14 miles of triple-layered fencing, totaling 705 miles of reinforced border fencing, exceeding the 700-mile minimum under IIRIRA Section 102(b)(1)(A).

71.     Because the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the purported waiver of NEPA, the ESA, and numerous additional laws under the New Mexico Waiver is an unlawful *ultra vires* act.

72.     Due to fact that the New Mexico Border Wall Project is not subject to the scope of the IIRIRA Section 102(c) waiver authority, DHS Secretary Nielsen's purported waiver of laws under the New Mexico Waiver is an unlawful *ultra vires* act, which the Court should vacate.

## SECOND CLAIM FOR RELIEF
### In the Alternative, Violation of IIRIRA Section 102(b)(1)(C)
### as a Requirement to Using Waiver Authority under IIRIRA Section 102(c)

73.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

74.     In the alternative, to the degree the Court finds that the New Mexico Border Wall Project constitutes "barriers and roads" under IIRIRA Section 102, and are thus subject to waiver of legal requirements under IIRIRA Section 102(c), Plaintiffs challenge Secretary Nielsen's New Mexico Waiver as invalid because the Secretary failed to conduct necessary prerequisites for

exercising the waiver authority for expedited construction as set forth in provision IIRIRA Section 102(b)(1)(C).

75.     IIRIRA Section 102(b)(1)(C) requires the DHS Secretary, prior to taking actions to carry out IIRIRA, to:

> consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

76.     IIRIRA Section 102 itself is not included among the statutes waived by the Secretary in the New Mexico Waiver.  Rather, Section 102(c)(1) authorizes the DHS Secretary to waive all legal requirements "[n]otwithstanding any *other* provision of law" (emphasis added). IIRIRA Sections 102(b) is not an "other provision[s] of law" but rather part of the same law as the Section 102(c) waiver authority.

77.     The restriction on judicial review in IIRIRA Section 102(c)(2)(A) also only applies to "any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph [102(c)](1)."

78.     The requirements of IIRIRA Section 102(b), in fact, are *prerequisites* to Secretary Nielsen using the waiver authority of Section 102(c).  The requirement that the Secretary must undergo consultation with key stakeholders regarding the effects of the waiver demonstrate that such a requirement must be satisfied *prior* to the waiver issuance—and not after.

79.     The New Mexico Waiver is invalid because the Secretary has failed to fulfill the consultation requirement under IIRIRA Section 102(b)(1)(C).  On information and belief, the DHS Secretary has not consulted with any or all of the entities required by Section 102(b)(1)(C) prior to issuing the New Mexico Waiver.

80.     The Secretary's decision to issue the New Mexico Waiver facially violates the requirements under IIRIRA Section 102 and is thus *ultra vires* because it is in excess of the Secretary's delegated powers by approving the waiver prior to completing at least the prerequisite consultation mandated in Section 102(b)(1)(C).   In addition or in the alternative, DHS's failure to comply with the requirements of Section 102(b)(1)(C) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law, in violation of the Administrative Procedure Act, and is actionable thereunder.  5 U.S.C. §§ 701-706.

**THIRD CLAIM FOR RELIEF**
<u>**Constitutional Violation**</u>
<u>**Violation of the Take Care Clause of the U.S. Constitution**</u>
<u>**Article II, Section 3**</u>

81.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

82.     Under IIRIRA Section 102(c), and subject to the *ultra vires* restrictions described in the First Claim for Relief, once the DHS Secretary invokes the waiver authority, the "only cause or claim" that may be brought arising from the waiver is one "alleging a violation of the Constitution of the United States."  IIRIRA Section 102(c) further  provides that "[t]he district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any" such action, which "shall be filed not later than 60 days after the date of action or decision" at issue."  IIRIRA § 102(c)(2)(A)-(C).

83.     Article II of the U.S. Constitution provides that "The executive Power shall be vested in a President," and that he or she "shall take Care that the Laws be faithfully executed." U.S. Constitution Article II, § 3.

84.     Among the laws that the Take Care Clause mandates be "faithfully executed" are the conditions and limitations of IIRIRA Section 102 itself.   Among the conditions and

27

limitations of IIRIRA Section 102 are the geographical and temporal restrictions for barrier construction, along with the requirements for consultation with affected entities under Section 102(b), and the restriction on waiver authority under Section 102(c) to the "expeditious construction of the barriers and roads" otherwise authorized by the statute under Section 102(b).

85.     DHS Secretary Nielsen's purported waiver of NEPA, the ESA and numerous additional laws under the New Mexico Waiver failed to comply with the requirements and limitations of IIRIRA Section 102, a law that the Executive Branch is required to "faithfully execute."  Accordingly, the New Mexico Waiver decision violates the U.S. Constitution.  U.S. Constitution Article II, § 3.

### FOURTH CLAIM FOR RELIEF
#### Constitutional Violation
#### Violation of the Non-Delegation and Separation of Powers Doctrine
#### Article I, Section 1

86.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

87.     "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

88.     Article I, Section 1 of the U.S. Constitution directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."

89.     Article II, Section 1 of the U.S. Constitution directs that "[t]he executive Power shall be vested in a President of the United States of America."

90.     Under these constitutional provisions, Congress may not delegate legislative authority to an executive branch agency, or in the case of IIRIRA Section 102(c), may not delegate legislative authority to an individual executive branch official.  *Loving v. U.S.*, 517 U.S., 748, 758 (1996).

91.     As part of the fundamental doctrine of the Separation of Powers, the Supreme Court "has invalidated attempts by Congress to exercise the responsibilities of other Branches or to reassign powers vested by the Constitution in either the Judicial Branch or the Executive Branch." *Mistretta*, 488 U.S. at 380.

92.     IIRIRA Section 102(c) unconstitutionally delegates to the Executive Branch, namely the DHS Secretary, the legislative power to waive the application of any Congressionally-enacted law to construction on the U.S.-Mexico border.

93.     The only guidance Congress provided to the Executive Branch was that the waiver should be exercised to the extent the DHS Secretary "determines necessary to ensure expeditious construction of the barriers and roads under this Section." Thus, Section 102(c) permits the DHS Secretary to make legislative decisions without an intelligible general policy to guide her decision-making.

94.     Therefore, IIRIRA violates Article I, Section 1 of the U.S. Constitution and the Non-delegation Doctrine and Separation of Powers Doctrine, thereby rendering DHS's reliance on IIRIRA to support its New Mexico Waiver decision unconstitutional.

**FIFTH CLAIM FOR RELIEF**
**Constitutional Violation**
**Violation of the Presentment Clause**
**Article I, Section 7**

95.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

96.     Article I, § 7 of the Constitution provides that any federal statute must pass both houses of Congress, and "before it become a Law, be presented to the President of the United States: If he[/she] approve he shall sign it, but if not he shall return it, with his Objections to that House it which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."

97.     The "[a]mendment and repeal of statutes, no less than enactment," must conform with the presentment and bicameralism requirements of Article I.  *INS v. Chadha*, 462 U.S. 919, 954 (1983).  Specifically, the Supreme Court has stated that the Executive Branch cannot void any law without Congress passing a law voiding the previous law and presenting it to the President for signature. *Clinton v. City of New York*, 524 U.S. 417 (1998).

98.     IIRIRA Section 102(c), as written, is facially invalid because it vests unilateral power in the DHS Secretary to waive the application of any laws in areas along the border for purposes of building border walls without Congress passing a law to void the specific laws at issue or limit their application, and presenting it to the President, as required by Article I, Section 7 of the U.S. Constitution.

99.     Separately, the statute is also invalid as applied to this case.  The New Mexico Waiver purported to waive NEPA, the ESA and numerous other laws that would otherwise apply to the New Mexico Border Wall Project at issue in this litigation.  In so doing, Secretary Nielsen chose which laws to waive and which laws to obey, without an act of Congress specifying which particular law or set of laws could be waived and without the presentation of said Congressional act to the President.

100.    The IIRIRA Section 102(c) waiver authority generally, and DHS Secretary Nielsen's New Mexico Waiver specifically, are unconstitutional infringements upon the lawmaking procedures required under Article I, § 7 of the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Center for Biological Diversity, Southwest Environmental Center, Defenders of Wildlife, and Animal Legal Defense Fund pray that this Court:

1.     Declare that DHS Secretary Nielsen's New Mexico Waiver is *ultra* vires;

2.      Declare that DHS Secretary Nielsen lacked the authority under IIRIRA Section 102(c) to waive NEPA, the ESA, and other laws in the New Mexico Waiver;

3.      Declare that the New Mexico Waiver specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution's Take Care Clause;

4.      Declare that the New Mexico Waiver specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution's fundamental Separation of Powers and Non-Delegation Doctrine principles;

5.      Declare that the New Mexico Waiver specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution's Presentment Clause;

6.      Set aside and vacate the New Mexico Waiver;

7.      Enjoin DHS from implementing the New Mexico Border Wall Project until and unless it complies with all laws that would apply absent the unlawful waiver;

8.      Retain jurisdiction to ensure compliance with the Court's Orders;

9.      Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

10.     Grant such other and further relief as the Court may deem just and proper.


DATED: March 22, 2018                    Respectfully submitted,

                                         */s/ Anchun Jean Su*
                                         ANCHUN JEAN SU (DC Bar No. CA285167)
                                         HOWARD M. CRYSTAL (DC Bar No. 446189)
                                         CENTER FOR BIOLOGICAL DIVERSITY
                                         1411 K Street N.W., Suite 1300
                                         Washington, D.C. 20005
                                         Telephone:    (202) 849-8399
                                         Email:        jsu@biologicaldiversity.org
                                                       hcrystal@biologicaldiversity.org

BRIAN SEGEE (DC Bar No. 492098)
CENTER FOR BIOLOGICAL DIVERSITY
111 W. Topa Topa Street
Ojai, CA 93023
Telephone:    (805) 740-8852
Email:        bsegee@biologicaldiversity.org

JOHN P. ROSE (CA Bar No. 285819)*
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017-3464
Telephone:    (213) 785-5406
E-mail:        jrose@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Southwest Environmental Center*

JASON RYLANDER (DC Bar No. 474995)
DEFENDERS OF WILDLIFE
1130 Seventeenth Street, NW
Washington, D.C. 20036
Telephone:    (202) 682-9400
Email:        jrylander@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*

ANTHONY T. ELISEUSON (IL Bar No. 6277427)*
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, Illinois 60606
Telephone:    (707) 795-2533
Email:        aeliseuson@aldf.org

*Attorney for Plaintiff Animal Legal Defense Fund*

*(application *for pro hac vice* admission pursuant to L.R. 83.2 pending)