## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,                      *Plaintiffs*,<br><br>v.<br><br>KIRSTEN M. NIELSEN, *et al.*,<br><br>                    *Defendants*. | Civil Action No. 1:18-00655 (KBJ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF EXHIBITS ............................................................................................... ii

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION....................................................................................................... 1

BACKGROUND ........................................................................................................ 1

I.      Statutory Framework ..................................................................................... 1

II.     The Secretary's Exercise of Waiver Authority ............................................ 4

III.    Procedural History......................................................................................... 6

ARGUMENT .............................................................................................................. 7

I.      The Court Lacks Jurisdiction to Review Plaintiffs' *Ultra Vires* Claims ...................... 7

II.     Plaintiffs' Ultra Vires Claims Fail As a Matter of Law ............................. 14

       A.     Plaintiffs Have Not Established That They Have Statutory Rights to Vindicate Through Litigation ................................................. 14

       B.     DHS Has Not Violated A Clear Statutory Prohibition ........................ 16

            1.     The Secretary's Broad Authority Under the IIRIRA is Not Limited to the Projects Specified in Section 102(b)................................ 16

            2.     The Secretary Has Not Violated the IIRIRA's Consultation Requirement ...................................................................... 25

                  a.    This Requirement is Not Privately Enforceable, Including by *Ultra Vires* Review ................................................. 25

                  b.    This Requirement Does Not Apply to the Determination to Waive Legal Requirements.......................................... 26

                  c.    DHS Has Complied With the Consultation Requirement............. 28

III.    The Statute Does Not Violate the Non-Delegation Doctrine ..................... 30

IV.    The Waiver Does Not Violate the Take Care Clause.................................. 34

V.     The Statute Does Not Violate the Presentment Clauses ............................. 36

CONCLUSION ......................................................................................................... 38

# TABLE OF EXHIBITS

Legislative History Documents ........................................................................................... 1

      A.     H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.)

      B.     H.R. Rep. 109-72 (May 3, 2005) (Conf. Rep.)

      C.     H.R. 1268 (109th Cong.) (engrossed in House, Mar. 16, 2005)

      D.     142 Cong. Rec. H11076 (Sept. 25, 1996)

      E.     150 Cong. Rec. H8899 (Oct. 8, 2004)

      F.     151 Cong. Rec. H453-471 (Feb. 9, 2005)

      G.     151 Cong. Rec. H553-559 (Feb. 10, 2005)

      H.     152 Cong. Rec. S9870 (Sept. 21, 2006)

*Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment:  Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*, 110th Cong. (2008) (excerpts) .................... 2

CBP Finding of No Significant Impact for Infrastructure (Nov. 19, 2003) ................................... 3

Cong. Research Serv., RL33659, *Border Security: Barriers Along the U.S. Int'l Border* (Mar. 16, 2009) ................................................................................................................ 4

Pls.' Opening Br., Doc. No. 35, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Oct. 27, 2005) ........................................................................................................... 5

Defs.' Motion to Dismiss, Doc. No. 36, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Nov. 11, 2005) ................................................................................................... 6

Cert. Petition, *Defenders of Wildlife & Sierra Club v. Chertoff*, No. 07-1180 (S. Ct. Mar. 2008) ............................................................................................................................... 7

Cert. Opposition, *Defenders of Wildlife & Sierra Club v. Chertoff*, No. 07-1180 (S. Ct. May 2008) ............................................................................................................................... 8

Declaration of Paul Enriquez (June 14, 2018) ........................................................................ 9

      A.     Coordination Letters

      B.     Biological Research Plan (April 6, 2018)

      C.     Cultural Resources Report (Jan. 4, 2018)

D.      Waters of the United States Determination (Dec. 2017)

E.      Environmental Stewardship Plan (Apr. 2018)

# TABLE OF AUTHORITIES

Pages

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)............................................................................................... 30

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)................................................................................................. 8

*Abtew v. DHS*,
   808 F.3d 895 (D.C. Cir. 2015) ............................................................................... 22

*Acree v. Republic of Iraq*,
   370 F.3d 41 (D.C. Cir. 2004) ........................................................................... 23, 36

*AFL-CIO, Local 3669 v. Shinseki*,
   709 F.3d 29 (D.C. Cir. 2013) ................................................................................. 24

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
   321 F.3d 1166 (D.C. Cir. 2003) ............................................................................. 13

*Am. Soc'y of Anesthesiologists v. Shalala*,
   90 F. Supp. 2d 973 (N.D. Ill. 2000) ....................................................................... 10

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003)............................................................................................... 18

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*,
   502 U.S. 32 (1991).............................................................................. 8, 10, 13, 14

*Block v. Community Nutrition Inst.*,
   467 U.S. 340 (1984)................................................................................................. 7

*Bowen v. Michigan Acad. of Family Physicians*,
   476 U.S. 667 (1986)................................................................................................. 7

*Cal. Wilderness Coal., v. U.S. Dep't of Energy*,
   631 F.3d 1072 (9th Cir. 2011) ............................................................................... 28

*Califano v. Sanders*,
   430 U.S. 99 (1977)................................................................................................... 7

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ................................................................................. 8

iv

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ........................................................................................... 35, 37

*Connecticut Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ................................................................................................. 10

*County of El Paso v. Chertoff*,
   No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008) ......................................... 4, 30-31

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................................. 35

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988) ......................................................................... 12, 13

*DCH Regional Med. Ctr. v. Price*,
   257 F. Supp. 3d 91 (D.D.C. July 6, 2017) ............................................................. 16

*Defenders of Wildlife v. Chertoff*,
   527 F. Supp. 2d 119 (D.D.C. 2007) ............................................................... *passim*

*Dep't of Transp. v. Ass'n of Am. R.R.s*,
   135 S. Ct. 1225 (2015) ........................................................................................... 30

*Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.*,
   239 F.R.D. 9 (D.D.C. 2006) .................................................................................. 22

*Estep v. United States*,
   327 U.S. 114 (1946) ................................................................................................. 7

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ................................................................................................. 7

*Friedman v. Sebelius*,
   686 F.3d 813 (D.C. Cir. 2012) ......................................................................... 23-24

*FTC v. Tarriff*,
   584 F.3d 1088 (D.C. Cir. 2009) ............................................................................ 18

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ............................................................................................... 15

*Griffith v. FLRA*,
   842 F.2d 487 (D.C. Cir. 1988) .............................................................................. 30

*Gunn v. Minton*,
  568 U.S. 251 (2013) ............................................................................................ 6

*In re Border Infrastructure Envtl. Litig.*,
  284 F. Supp. 3d 1092 (S.D. Cal. 2018) .................................................. 4, 6, 22, 30

*In re NSA Telecomm. Records Litig.*,
  671 F.3d 881 (9th Cir. 2011) ............................................................................ 36-37

*Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*,
  839 F.2d 809 (D.C. Cir. 1988) ............................................................................ 16

*J.W. Hampton, Jr. Co. v. United States*,
  276 U.S. 394 (1928) ............................................................................................ 31

*Kucana v. Holder*,
  558 U.S. 233 (2010) ............................................................................................ 7

*Law Office of John H Eggertsen P.C. v. C.I.R.*,
  800 F.3d 758 (6th Cir. 2015) ............................................................................. 22

*Lee v. United States Agency for Int'l Dev.*,
  859 F.3d 74 (D.C. Cir. 2017) ............................................................................. 26

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ......................................................................................... 8, 14

*Lindahl v. OPM*,
  470 U.S. 768 (1985) ........................................................................................... 13

*Loving v. United States*,
  517 U.S. 748 (1996) ........................................................................................... 30

*Marshall v. Honeywell Tech. Sys. Inc.*,
  828 F.3d 923 (D.C. Cir. 2016) ........................................................................... 22

*McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders*,
  264 F.3d 52 (D.C. Cir. 2001) ......................................................................... 13, 15

*Mingo Logan Coal Co. v. EPA*,
  70 F. Supp. 3d 151 (D.D.C. 2014) ..................................................................... 22

*Mistretta v. United States*,
  488 U.S. 361 (1989) ....................................................................................... 31, 33

*Molly-Butcher v. U.S. Dep't of Commerce*,
  12 F.3d 249 (D.C. Cir. 1994) ............................................................ 7

*Moore v. Dist. of Columbia*,
  907 F.2d 165 (D.C. Cir. 1990) .......................................................... 23

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
  437 F.3d 1256 (D.C. Cir. 2006) ................................................... 14, 15

*Nat'l Cable Television Ass'n v. United States*,
  415 U.S. 352 (1974) ........................................................................ 30

*New York v. FERC*,
  535 U.S. 1 (2002) ............................................................................ 23

*NLRB v. United Food & Commercial Workers Union*,
  484 U.S. 112 (1988) ........................................................................ 12

*Nyunt v. Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009) ....................................................... 8, 16

*Otsuka Pharm. Co. v. Burwell*,
  No. 15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) ..................... 18

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  586 U.S. 639 (2012) ........................................................................ 18

*Public Citizen, Inc. v. Rubber Mfrs. Ass'n*,
  533 F.3d 810 (D.C. Cir. 2008) ..................................................... 10, 22

*Ralls Corp. v. Comm. on Foreign Investment in the U.S.*,
  926 F. Supp. 2d 71 (D.D.C. 2013) ..................................................... 8

*Ralpho v. Bell*,
  569 F.2d 607 (D.C. Cir. 1977) ........................................................... 7

*Republic of Iraq v. Beaty*,
  556 U.S. 848 (2009) ........................................................................ 36

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) ............................................................. 7

*Save Our Heritage v. Gonzalez*,
  533 F. Supp. 2d 58 (D.D.C. 2008) .............................................. *passim*

*Schwegmann Bros. v. Calvert Distillers Corp.*,
   341 U.S. 384 (1951).................................................................. 24

*Sidney Coal Co. v. SSA*,
   427 F.3d 336 (6th Cir. 2005) ................................................. 18

*Cal. v. Sierra Club*,
   451 U.S. 287 (1981).................................................................. 26

*Smith v. Fed. Reserve Bank of N.Y.*,
   280 F. Supp. 2d 314 (S.D.N.Y. 2003)................................... 38

*Stark v. Wickard*,
   321 U.S. 288 (1944).................................................................... 8

*Switchmen's Union v. Nat'l Mediation Bd.*,
   320 U.S. 297 (1946).......................................................... 7, 8, 14

*Texas Border Coal. v. Napolitano*,
   614 F. Supp. 2d 54 (D.D.C. 2009) ....................................... 25

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979).................................................................. 25

*United States v. Meeks*,
   366 F.3d 705 (9th Cir. 2004) ................................................. 24

*Watervale Marine Co., Ltd. v. DHS*,
   55 F. Supp. 3d 124 (D.D.C. 2014) ....................................... 19

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001).................................................................. 33

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).................................................................. 35

**STATUTES**

5 U.S.C. § 701(a)(1) ......................................................................... 26

5 U.S.C. § 8347(c) ............................................................................ 13

6 U.S.C. § 202(a)(1)-(2).................................................................... 1

8 U.S.C. § 1226a(b)(1)...................................................................... 9

8 U.S.C. § 1443 ............................................................................................................ 18

10 U.S.C. § 2667(g)(3) ................................................................................................. 28

12 U.S.C. § 1818(i)(1) ............................................................................................ 10, 12

16 U.S.C. §§ 1531 *et seq.* ............................................................................................. 5

22 U.S.C. § 6450 ............................................................................................................ 9

25 U.S.C. § 3406 .......................................................................................................... 37

28 U.S.C. §§ 1331, 1346(a)(2) ...................................................................................... 7

33 U.S.C. § 2326(a)(1)(A), (f) ..................................................................................... 17

42 U.S.C. §§ 4321 *et seq.* ............................................................................................. 5

42 U.S.C. § 4332(C) ..................................................................................................... 28

50 U.S.C. § 1885a ........................................................................................................ 37

50 U.S.C. app. § 2412 .................................................................................................. 13

42 U.S.C. § 18352 ........................................................................................................ 18

Immigration and Nationality Act of 1952,
   Pub. L. No. 82-414 § 103, 66 Stat. 163, 174 (June 27, 1952)
   (codified, as amended, at 8 U.S.C. § 1103) ........................................................... 19

Omnibus Consolidated Appropriations Act, 1997,
   Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996)
   (codified at 8 U.S.C § 1103 note) ........................................................... 1, 2, 3, 19

International Religious Freedom Act of 1998,
   Pub. L. No. 105-292, § 410, 112 Stat. 2787 (Oct. 27, 1998) ................................... 9

The Homeland Security Act of 2002,
   Pub. L. No. 107-296, 116 Stat 2135 (Nov. 25, 2002) ............................................. 2

Real ID Act of 2005,
   Pub. L. No. 109-13, Div. B, Title I §102, 119 Stat. 231, 302, 306 (May 11, 2005) ............. 1, 23

Deficit Reduction Act of 2005,
   Pub. L. No. 109-171, § 5107(a)(2), 120 Stat. 42 (Feb. 6, 2006) ............................. 37

Secure Finance Act of 2006,
   Pub. L. No. 109-367, 120 Stat 2638 (Oct. 26, 2006) ....................................................... 1, 2, 20

Consolidated Appropriations Act, 2008,
   Pub. L. No. 110-161, 121 Stat 1844 (Dec. 26, 2007) ....................................................... *passim*

Department of Homeland Security Appropriations Act, 2015,
   Pub. L. No. 114-4, 129 Stat 39 (Mar. 4, 2015) ......................................................... 20

Consolidated Appropriations Act, 2017,
   Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 434 (May 5, 2017) ...................... 5, 20, 27

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005,
   70 Fed. Reg. 55622 (Sept. 22, 2005) ......................................................................... 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005 and as
   Amended by the Secure Fence Act of 2006,
   72 Fed. Reg. 2535 (Jan. 19, 2007) ............................................................................ 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996 as Amended by Section 102 of the REAL ID Act of 2005 and as
   Amended by the Secure Fence Act of 2006,
   72 Fed. Reg. 60870 (Oct. 26, 2007) .......................................................................... 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996, as Amended,
   73 Fed. Reg. 19077 (Apr. 8, 2008) ........................................................................... 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996, as Amended,
   73 Fed. Reg. 19078 (Apr. 8, 2008) ........................................................................... 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996, as Amended,
   82 Fed. Reg. 35984 (Aug. 2, 2017) ...................................................................... 4, 19

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996, as Amended,
   82 Fed. Reg. 42829 (Sept. 12, 2017) ......................................................................... 4

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
   Responsibility Act of 1996, as Amended,

83 Fed. Reg. 3012 (Jan. 22, 2018) .......................................................................................... 4, 5

## INTRODUCTION

Plaintiffs oppose Congress's decision to prioritize border infrastructure construction, as expressed in the language of § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  Congress determined that expeditious completion of such construction can be important enough to outweigh compliance with other laws—including environmental laws and others that can lead to protracted litigation.  Congress also sought to expedite construction by barring all legal challenges to such waiver determinations, except for constitutional claims.  The Court should reject Plaintiffs' attempt to evade the jurisdictional bar here, along with their various attempts to neuter § 102 and overturn Congress's exercise of legislative judgment.

## BACKGROUND

## I.    STATUTORY FRAMEWORK

Among its responsibilities, DHS is responsible for border security and the detection and prevention of illegal entry into the United States.  *See, e.g.*, 6 U.S.C. § 202(a)(1)-(2).  Congress has ordered DHS to achieve and maintain operational control of the international land border.  *See* Secure Fence Act of 2006, Public Law 109-367, § 2(a), 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. § 1701 note).  "Operational control" means "prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband."  *Id.* § 2(b).  Consistent with that mandate, the President has directed DHS to take immediate steps to prevent all unlawful entries into the United States, including the immediate construction of physical infrastructure to prevent illegal entry.  *See* Exec. Order 13767 §§ 2(a), 4(a), 82 Fed. Reg. 8793 (Jan. 25, 2017).

Among the statutory authorities provided to DHS to carry out its border security mission is the IIRIRA.  *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009-554 (Sept. 30, 1996).

Codified at 8 U.S.C § 1103 note (and included as an appendix at the end of this memorandum), IIRIRA § 102 has been amended several times.  *See* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006); REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I §102, 119 Stat. 231, 302, 306 (May 11, 2005).  The IIRIRA directs the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104-208, Div. C., Title I § 102(a), as amended.[1]

In § 102(b), Congress provided certain requirements for implementing the broad mandate laid out in § 102(a).  These requirements have varied over the years.  For example, in 1996, Congress specified that, in "carrying out subsection (a), the [agency] shall provide for the construction . . . of second and third fences, in addition to the existing reinforced fence, and for roads between the fences" in a 14-mile section near San Diego.  Pub. L. No. 104-208, Div. C., Title I § 102(b)(1).  In 2006, Congress struck the reference to San Diego and required construction of "at least 2 layers of reinforced fencing, [and] the installation of additional physical barriers, roads, lights, cameras, and sensors" in five specified locations along the southern border, with deadlines for certain of the projects.  Pub. L. No. 109-367, § 3.  In the most recent amendment, Congress removed the specifications set out in 2006 and instead required "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border" but gave the Secretary discretion to determine "where fencing would be most practical and effective" with the goal "to

---

[1] In 1996, responsibility for border enforcement lay with the Attorney General.  The Homeland Security Act of 2002, Pub. L. No. 107-296, created DHS and transferred border enforcement authority to it.  In 2005, IIRIRA § 102 was amended to refer to the DHS Secretary.  *See* H.R. Rep. 109-72 at 171 (May 3, 2005) (Conf. Rep.).

gain operational control of the southwest border." Pub. L. No. 110-161, Div. E, Title V § 564.

Section 102(c) seeks to ensure expeditious construction pursuant to the mandate set forth in § 102(a) in two ways.  First, it permits waiver of legal impediments:

> Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section.   Any such decision by the Secretary shall be effective upon being published in the Federal Register.

*Id.* § 102(c)(1).  This provision had originally been limited to the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"), *see* Pub. L. No. 104-208, Div. C, Title I § 102(c), but the REAL ID Act expanded it to its current breadth.  *See* H.R. Rep. 109-72, at 171-72 (May 3, 2005) (Conf. Rep.) (explaining "Congress' intent that the Secretary's discretionary waiver authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure"); *see also* H.R. Rep. 104-828, at 200 (Sept. 24, 1996) (Conf. Rep.) (explaining that the original waiver of two environmental laws was intended "to facilitate a uniform construction of necessary fences and roads").[2]

Second, § 102(c) provides for limited and streamlined judicial review of the Secretary's exercise of this waiver authority.  Federal district courts have "exclusive jurisdiction" to hear such claims, and the only "cause of action or claim" that may be brought is one "alleging a violation of the Constitution of the United States" that is filed within sixty days of the Secretary's action.  *Id.* § 102(c)(2)(A)-(B).  The only appellate review is a certiorari petition to the U.S. Supreme Court. *Id.* § 102(c)(2)(C).  This provision was adopted by the conference committee for the appropriations

---

[2] For the Court's convenience, the relevant conference reports, bills, and excerpts from the Congressional Record are compiled as Exhibit 1.

bill of which the REAL ID Act was a part.  The House bill would have entirely barred judicial review, *see* 109th Cong., H.R. 1268, Div. B § 102 (engrossed in House, Mar. 16, 2005), but some had expressed concern about the constitutionality of such a total bar on review.  *See, e.g.*, 151 Cong. Rec. H553, 556-57 (Feb. 10, 2005) (statement of Cong. Farr) (introducing Congressional Research Service letter observing that Congress does not clearly have "authority to prevent courts . . . from addressing and remedying issues arising under the United States Constitution").  Ultimately, the conference report explained that Congress was providing "federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution," and that the strict limits on judicial review reflected the "Conferees' intent [] to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver."  H.R. Rep. 109-72 at 172.

## II.    THE SECRETARY'S EXERCISE OF WAIVER AUTHORITY

Pursuant to the IIRIRA, the Secretary has issued waiver determinations as necessary to ensure expeditious construction of barriers and roads along the border.  *See* 82 Fed. Reg. 42829 (Sept. 12, 2017); 82 Fed. Reg. 35984 (Aug. 2, 2017); 73 Fed. Reg. 19078 (Apr. 8, 2008); 73 Fed. Reg. 19077 (Apr. 8, 2008); 72 Fed. Reg. 60870 (Oct. 26, 2007); 72 Fed. Reg. 2535 (Jan. 19, 2007); 70 Fed. Reg. 55622 (Sept. 22, 2005).  Every judicial challenge to these determinations has been dismissed.  *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018), *on appeal*, No. 18-55474 (9th Cir.); *County of El Paso v. Chertoff*, No. 08-196, 2008 WL 4372693 (W.D. Tex. 2008), *cert. denied*, 557 U.S. 915 (2009); *Save Our Heritage v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007), *cert. denied*, 554 U.S. 918 (2008); *Sierra Club v. Ashcroft*, No. 04-272, 2005 U.S. Dist. LEXIS 44244 (S.D. Cal. Dec. 13, 2005).

On January 22, 2018, DHS published an additional waiver determination under the IIRIRA. It concerns a twenty-mile stretch of border in New Mexico in the U.S. Border Patrol's El Paso Sector.  *See* 83 Fed. Reg. 3012 (Jan. 22, 2018).  In support of her determination, the Secretary made three factual determinations:

- that the project area "is an area of high illegal entry,"
- that there is "a need to construct physical barriers and roads . . . in the vicinity of the border of the United States to deter illegal crossings in this Project Area," and
- that exercise of waiver authority under the IIRIRA was necessary "to ensure the expeditious construction of the barriers and roads in the Project Area."

*Id.*  Accordingly, the Secretary announced the waiver of certain laws "with respect to the construction of roads and physical barriers . . . in the Project Area," including the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*  83 Fed. Reg. at 3012.

The project involves replacement of the existing vehicle barrier and replacing it with bollard wall.  *See* 83 Fed. Reg. at 3012; Ex. 9, Declaration of Paul Enriquez ("Enriquez Decl.") ¶ 9.  The project is funded by an existing appropriation.  *See* Enriquez Decl. ¶ 12; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 434 (May 5, 2017) (appropriating $341 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border . . . and to add gates to existing barriers" and $77 million "for new border road construction").  Construction began April 9, 2018 and is expected to be completed in March 2019.  *See* Enriquez Decl. ¶ 11.

Even where the Secretary has waived environmental and other laws, U.S. Customs and Border Protection ("CBP") still consults with relevant stakeholders pursuant to § 102(b)(1)(C).  As CBP explained at a congressional hearing, it does not "turn[] its back on environmental stewardship or continued consultation with stakeholders."  Ex. 2, *Walls & Waivers: Expedited*

*Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment: Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*, 110th Cong. 25 (2008) (statement of Ronald D. Vitiello, CBP Chief Patrol Officer, Rio Grande Valley Sector).   Here, CBP not only relied on prior environmental analyses it had conducted, but also met with representatives from the Department of the Interior, U.S. Fish & Wildlife Service, and Bureau of Land Management at the project site and conducted a variety of surveys before issuing the waiver.   Enriquez Decl. ¶¶ 13-15, 17.   Before conducting geotechnical testing at the site, CBP consulted with relevant Native American tribes and the New Mexico State Historic Preservation Officer.   *Id.* ¶ 16.   And approximately two months before the start of construction, CBP consulted regarding mitigation efforts with four Native American tribes, two New Mexico state agencies, the local county manager, USFWS, BLM, and the U.S. Army Corps of Engineers.   *Id.* ¶ 19.   CBP incorporated changes to its reports based on feedback from the stakeholders, and published an Environmental Stewardship Plan for the project.   *Id.* ¶¶ 21-22.

## III.   PROCEDURAL HISTORY

On March 22, 2018, the Center for Biological Diversity and three other environmental organizations filed the instant complaint.   *See* Compl., ECF No. 1.   Three of the four plaintiff organizations are also pursuing challenges to two separate DHS waiver determinations regarding projects in California.   *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018), *on appeal*, No. 18-55474 (9th Cir.).   Plaintiffs filed a motion for summary judgment on May 10, 2018, ECF No. 16, and the Court granted the government's motions to extend the deadlines for the government to file a consolidated motion to dismiss and opposition to plaintiffs' motion for summary judgment.   *See* Minute Orders, June 7 & May 17, 2018.

**ARGUMENT**

**I.   THE COURT LACKS JURISDICTION TO REVIEW PLAINTIFFS' *ULTRA VIRES* CLAIMS**

It is axiomatic that federal courts "are courts of limited jurisdiction possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotation marks omitted).[3] Accordingly, "district courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). The general grants of jurisdiction on which plaintiffs rely, such as 28 U.S.C. §§ 1331 and 1346(a)(2), Compl. ¶ 8, ECF No. 1, are "subject . . . to preclusion-of-review statutes created or retained by Congress." *Robbins v. Reagan*, 780 F.2d 37, 42 (D.C. Cir. 1985) (quoting *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

Plaintiffs attempt to satisfy their burden of demonstrating jurisdiction by relying on "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). Congress, however, is free to leave district courts without jurisdiction to review non-constitutional claims against an agency. *See Estep v. United States*, 327 U.S. 114, 120 (1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."); *Ralpho v. Bell*, 569 F.2d 607, 622 & n.101 (D.C. Cir. 1977) (observing that nothing "prevent[s] [Congress] from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated.").[4] The presumption of judicial review is

---

[3] Hereinafter, internal quotation marks, alterations, and citations are omitted from quotations unless otherwise noted.

[4] *See also Bowen*, 476 U.S. at 672-73 ("Subject to constitutional constraints, Congress can, of course, make exceptions to the historic practice whereby courts review agency action."); *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("This presumption, like all presumptions used in interpreting statutes, may be overcome . . . ."); *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1946) ("All constitutional questions aside, it is for Congress to determine how the rights which it creates will be enforced.").

merely an "interpretive guide" that is "dislodge[d]" when Congress provides "clear and convincing evidence" that it intends to preclude judicial review. *Kucana v. Holder*, 558 U.S. 233, 251 (2010); *see also Molly-Butcher v. U.S. Dep't of Commerce*, 12 F.3d 249, 252 (D.C. Cir. 1994) ("The clarity with which Congress has spoken makes it unnecessary to invoke a presumption of reviewability as petitioner urges.").

*Ultra vires* review, while "normally available" even when judicial review of the merits of agency decisions is prohibited, *see Chamber of Commerce*, 74 F.3d at 1328, is subject to the same analysis. It is simply an application of "the familiar proposition that 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*, 502 U.S. 32, 44 (1991) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). It depends on the observation that courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Leedom v. Kyne*, 358 U.S. 184, 190 (1958). Thus, courts lack jurisdiction to conduct *ultra vires* review when Congress clearly intends to preclude it. *See, e.g., Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 305 (1943) (holding that the Railway Labor Act—by providing judicial review for certain other matters but only administrative review of an agency's certification of a collective bargaining representative— impliedly precluded *ultra vires* review because congressional "intent seems plain" that "[t]here was to be no dragging of the controversy into other tribunals of law").[5]

---

[5] The view that *ultra vires* review is a matter of the courts' inherent authority is irreconcilable with *MCorp Financial*'s explanation that such review is grounded in the rebuttable presumption of congressional intent to permit such review. *See* 502 U.S. at 44; *see also Kyne*, 358 U.S. at 190 (rooting *ultra vires* review in the "inference . . . that Congress intended the statutory provisions governing the general jurisdiction of those courts to control."). The D.C. Circuit has explained that while courts are "normally available" to correct ultra vires action, Congress can "preclude[] non-statutory judicial review." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also id.* at 1327 (noting that such review has been described as "a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction" (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944))); *Ralls Corp.*

*Ultra vires* review, whether under *Kyne* or other standards, does not apply where "Congress has spoken clearly and directly" to preclude review. *MCorp Fin.*, 502 U.S. at 44. Indeed, the D.C. Circuit has held that the *Kyne* exception "applies . . . only where . . . the statutory preclusion of review is implied rather than express." *Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Here, the statutory text is plain enough to dispose of the question. Congress has expressly withdrawn district court jurisdiction to review non-constitutional challenges to the Secretary's exercise of waiver authority:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court *shall not have jurisdiction* to hear any claim not specified in this subparagraph.

IIRIRA § 102(c)(2)(A) (emphasis added). This statutory language is emphatic and comprehensive in several respects. First, it expansively encompasses "*all* causes or claims arising from *any* action undertaken, or *any* decision made" pursuant to § 102(c)(1)'s waiver authority. *Id.* Second, it expressly identifies the sort of suits that may be brought: "only . . . alleging a violation of the Constitution." *Id.* Third, it expressly removes district court jurisdiction over "any claim not specified in this subparagraph." *Id.* Indeed, courts in this district have found § 102(c) straightforward, declaring that it "allows the district courts to consider only those claims that allege a violation of the Constitution." *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 122 (D.D.C. 2007); *see also Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58, 60 (D.D.C. 2008) ("The only claims permitted under the REAL ID Act's waiver provision are those 'alleging

---

*v. Comm. on Foreign Investment in the U.S.*, 926 F. Supp. 2d 71, 87 (D.D.C. 2013), *rev'd on other grounds*, 758 F.3d 296 (D.C. Cir. 2014) ("In *Reich*, the D.C. Circuit recognized that even where non-statutory judicial review is normally available, Congress might expressly preclude such review[.]").

a violation of the Constitution.'" (quoting § 102(c)(2)(A)).[6]

Congressional intent to prohibit *ultra vires* review is at least as clear here as it was in *MCorp Financial*.  In *MCorp Financial*, the relevant statute stated that "except as otherwise provided in this section or under [two other sections] of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section."  12 U.S.C. § 1818(i)(1); *see* 502 U.S. at 44.  The Supreme Court held that *ultra vires* review under *Kyne* was unavailable because "the clarity of the congressional preclusion of review" in this statute stood in marked contrast to the statute at issue in *Kyne*, in which it had only been argued that a judicial review statute "implied, by its silence, a preclusion of review of the contested determination."  502 U.S. at 44.  Section 102 of the IIRIRA, like 12 U.S.C. § 1818(i)(1), is an express preclusion provision rather than an implied one.  The only avenue for challenging agency action here is a constitutional claim.  Indeed, it is difficult to imagine how Congress could have been any more comprehensive or what Plaintiffs would accept as sufficient evidence of intent to bar *ultra vires* claims.  As another court has noted, the presumption in favor of judicial review cannot shift the balance "where, as here, Congress has been so *explicit* in stating a prohibition against judicial review—federal courts are not, after all, superlegislatures entitled to invoke a generalized presumption to trump an express 'hands off' direction from Congress."  *Am. Soc'y of Anesthesiologists v. Shalala*, 90 F. Supp. 2d 973, 975 (N.D. Ill. 2000), *aff'd*, 279 F.3d 447 (7th Cir. 2002) (addressing 42 U.S.C. § 1395w–4).

---

[6] There are many other examples of Congress using similarly unambiguous "shall not have jurisdiction" formulations to partially or completely bar judicial review.  *See, e.g.*, 8 U.S.C. § 1226a(b)(1) (providing for "mandatory detention of suspected terrorist" but strictly limiting judicial review: "Judicial review of any action or decision relating to this section . . . is available exclusively in habeas corpus proceedings consistent with this subsection. Except as provided in the preceding sentence, no court shall have jurisdiction to review, by habeas corpus petition or otherwise, any such action or decision."); 22 U.S.C. § 6450 ("No court shall have jurisdiction to review any Presidential determination or agency action under this chapter or any amendment made by this chapter." (adopted by the Int'l Religious Freedom Act of 1998, Pub. L. No. 105-292, § 410, 112 Stat. 2787 (Oct. 27, 1998))).

In sum, the plain meaning of the Act should be the end of the matter. *Public Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816 (D.C. Cir. 2008) ("[Courts] must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992))).  But if the Court were to find any ambiguity in the text, the legislative history and statutory context also support the government's reading.  The limitation on judicial review was adopted as part of the REAL ID Act of 2005.  The underlying bill passed by the House of Representatives would have gone farther and entirely barred judicial review.  *See* 109th Cong., H.R. 1268, Div. B § 102 (engrossed in House, Mar. 16, 2005).[7]  The Senate's substitute bill did not include any provision regarding IIRIRA § 102, and the final text was adopted by a conference committee.  *See* H.R. Rep. No. 109-72 (May 3, 2005) (Conf. Rep.).  The conference report supports the plain text in two respects.  First, it makes clear that the House's complete bar on judicial review was modified only to permit judicial review of constitutional claims.  *See* H.R. Rep. No. 109-72 at 171-72 (noting that the House bill "would prohibit judicial review" and explaining that the committee had "revised the House provision in the following respects," including "provid[ing] federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution").  Standing alone, this express provision for constitutional review but no other review indicates that *ultra vires* review was intentionally excluded.  Second, it establishes that strictly limited judicial review was fundamental to the statutory scheme.  *See id.* at 172 (explaining that "[t]he Conferees' intent is to ensure that judicial review of actions or decisions of the Secretary not delay the

---

[7] "[N]o court, administrative agency, or other entity shall have jurisdiction—(A) to hear any cause or claim arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1); or (B) to order compensatory, declaratory, injunctive, equitable, or any other relief for damage alleged to arise from any such action or decision."

expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver").  The purpose of the waiver authority is the "expeditious completion" of necessary construction, § 102(C)(2)(A), and Congress was expressly concerned with litigation delays.  *See* H.R. Rep. 109-72 at 171 (May 3, 2005) (Conf. Rep.) ("Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border[.]").[8] Accordingly, the text cannot be interpreted to permit non-constitutional review that would frustrate the congressional goal to prevent litigation delays.  *Cf. NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 130-133 (1988) (holding that "prosecutorial" decisions of the General Counsel of the NLRB are not subject to judicial review, in part because review "would involve lengthy judicial proceedings in precisely the area where Congress was convinced that speed of resolution is most necessary").[9]

Neither of Plaintiffs' arguments against the plain reading of the statutory language is meritorious.  First, they argue that § 102(c)(2)(A)'s reference to "any decision made . . . pursuant to paragraph (1)" demonstrates an intent to permit ultra vires judicial review of whether the waiver was authorized by § 102.  Pls.' Br. at 33.  But they identify no support for their aggressive interpretation of "pursuant to."  Instead, the phrase is naturally read to merely identify the basis on

---

[8]  *See also* 151 Cong. Rec. H471 (Feb. 9, 2005) (statement of Cong. Hoekstra) ("Authorized by Congress in 1996, [the San Diego barrier] has yet to be completed because of on-going environmental litigation."); 151 Cong. Rec. H554 (Feb. 9, 2005) (statement of Cong. Sensenbrenner) (referencing "endless litigation against plugging the hole in the fence south of San Diego" and noting that "[w]e were able to win World War II quicker than we were able to complete this fence").

[9]  Indeed, until last year all prior challengers to the exercise of § 102(c) waiver authority—including Plaintiff Defenders of Wildlife—accepted as a given that the only available legal challenges are constitutional claims.  *See, e.g.*, Ex. 7, Cert. Petition at 2, *Defenders of Wildlife v. Chertoff*, No. 07-1180 (S. Ct. Mar. 2008) ("[T]here is no judicial review to determine whether the Secretary's waiver decision accords with the statutory standard."); *id.* at 5 ("The provision also precluded all judicial review of any claim that a waiver under Section 102 exceeded the scope of the Secretary's delegated authority."); *id.* at 13 ("Section 102 . . . unequivocally precludes all judicial review[.]").

which the Secretary took an action or made a decision.  It is parallel to the language of the statute at issue in *MCorp Financial*:  a "notice or order *under this section*."  12 U.S.C. § 1818(i)(1) (emphasis added).  Nothing in the text demonstrates an intent to narrow the jurisdiction-limiting provision.

Second, Plaintiffs improperly seek to extrapolate congressional intent from cases involving substantially different limits on judicial review.  *See* Pls.' Br. at 33-34.  Two of the cases on which Plaintiffs rely are distinguishable because they address finality clauses.  In *Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988), the statute provided that certain orders and decisions of the Secretary of Commerce "shall be final and is not subject to judicial review," 50 U.S.C. app. § 2412(c)(1); and *Lindahl v. OPM*, 470 U.S. 768, 773 (1985), similarly addressed a provision making certain agency "decisions . . . final and conclusive and are not subject to review," 5 U.S.C. § 8347(c).  Such language is generally construed to be focused on shielding only the merits of the decisions from judicial review.  *See, e.g.*, *Dart*, 848 F.2d at 227 (concluding that finality clauses "suggest[] that Congress was mainly concerned about prolonged appeals of claims on the merits"); *McBryde v. Comm. to Review Cir. Council Conduct & Disability Orders*, 264 F.3d 52, 63 (D.C. Cir. 2001) (explaining that  "*Dart* stands for the exceedingly narrow proposition that a statute precluding review is limited by its language").  As *Lindahl* explains, "when Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive than" such finality clauses.  *Lindahl*, 470 U.S. at 779-80.  Other cases relied on by Plaintiffs are distinguishable because they address statutes barring Administrative Procedure Act ("APA") review.  *See Dart*, 848 F.2d at 224 (addressing 50 U.S.C. app. § 2412(a), which provides that the "functions exercised under this Act are excluded from the operation of [the APA]"); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172 (D.C. Cir. 2003) (addressing 39

13

U.S.C. § 410(a), which provides that "no federal law . . . including the provisions of [the APA], shall apply to the exercise of the powers of the Postal Service").  *Dart* found this "indirect approach" significant because it did not "directly bar[] review of all . . . decisions" and thus left in place the *ultra vires* review available "[p]rior to the APA's enactment."  848 F.2d at 224.  Here, by contrast, Congress did not adopt a finality provision or merely prohibit APA review, but instead "has spoken clearly and directly," *MCorp Fin.*, 502 U.S. at 44, to expressly strip jurisdiction for review of all non-constitutional claims.

 In sum, Plaintiffs' *ultra vires* challenges to the waiver determination must be dismissed for lack of jurisdiction.

## II.  PLAINTIFFS' ULTRA VIRES CLAIMS FAIL AS A MATTER OF LAW

In the alternative, to the extent the Court determines that—despite the plain meaning of the statute and Congress' clear intent—courts retain jurisdiction to determine whether a waiver determination is *ultra vires*, the Secretary's decision here must be upheld.  Under the extraordinarily deferential *ultra vires* review standard, the Court must conclude that the Secretary did not exceed her statutory authority.

*Ultra vires* review requires Plaintiffs to show both that the challenged action is "contrary to a specific [statutory] prohibition which is clear and mandatory," and "that barring review by the district court would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights."  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).  Plaintiffs have made neither showing.

### A.  Plaintiffs Have Not Established That They Have Statutory Rights to Vindicate Through Litigation

Beginning with *Switchmen's Union*, courts have emphasized that non-statutory *ultra vires* review is appropriate only as a last resort to protect statutory rights.  *See MCorp Fin.*, 502 U.S. at

43 (explaining that the fact that the plaintiff would have been "wholly deprive[d] . . . of a . . . means of *vindicating its statutory rights*" was "central to our decision in *Kyne*" (emphasis added)); *Kyne*, 358 U.S. at 189 (engaging in judicial review where agency action "deprived the professional employees of *a 'right' assured to them by Congress*" (emphasis added)); *Switchmen's Union*, 320 U.S. at 300 (observing that there would be a strong inference of jurisdiction "[i]f the absence of jurisdiction . . . meant a sacrifice or obliteration of a *right which Congress had created*" (emphasis added)).  Thus, this form of review does not permit the public to challenge every alleged legal error of an agency.  *See, e.g.*, *MCorp Fin.*, 502 U.S. at 43 (rejecting Fifth Circuit conclusion that *Kyne* authorizes "judicial review of any agency action that is alleged to have exceeded the agency's statutory authority"); *McBryde*, 264 F.3d at 63 ("*Dart* cannot mean that statutory insulation of a specific type of "order" from review is automatically ineffective whenever the complainant asserts legal error.").

The vindication prong requires plaintiffs to identify more than a "statutory obligation" for the agency, but instead requires them to identify a "statutory right" by which Plaintiffs are entitled to vindication.  *See Calif. Sportfishing Protection Alliance v. U.S. Bureau of Reclamation*, No. 15-912, 2015 WL 6167521, at *11 & n.8 (E.D. Cal. Oct. 20, 2015).  Analyzing whether a statute creates individual rights is familiar from several contexts, including § 1983 cases and private right of action cases.  *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) ("Section 1983 provides a remedy only for the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.  Accordingly, it is rights, not the broader or vaguer benefits or interests, that may be enforced under the authority of that section.").  Thus, it is well established that for a statutory right to exist, the statute itself must direct its benefits to individuals, not merely to the aggregated public or by commands to the agency.  *See id.* at 287 (holding that

"the provisions entirely lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights" because "they have an aggregate, not individual, focus, and they serve primarily to direct the Secretary of Education's distribution of public funds"). Because Plaintiffs here have identified no statutory right in the text of § 102, it would be an unwarranted extension of *ultra vires* review to apply it to the circumstances here.   Because Plaintiffs here have identified no statutory right in the text of § 102, it would be an unwarranted extension of *ultra vires* review to apply it to the circumstances here.

### B.   DHS Has Not Violated A Clear Statutory Prohibition

Plaintiffs have failed to show that the Secretary's waiver determination is "contrary to a specific [statutory] prohibition which is clear and mandatory." *Nat'l Air Traffic Controllers Ass'n*, 437 F.3d at 1263.  The *ultra vires* standard "requires a plaintiff to establish a patent violation of agency authority." *DCH Regional Med. Ctr. v. Price*, 257 F. Supp. 3d 91, 94 (D.D.C. July 6, 2017) (noting that a patent violation is "obvious or apparent").  Thus, a court's jurisdiction under the *Kyne* exception is "one of the narrowest known to the law." *Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines*, 839 F.2d 809, 811 (D.C. Cir. 1988); *see also Nyunt*, 589 F.3d at 449 (holding that "extreme error" is required to rely on the *Kyne* exception, and that this is a "very stringent standard" under which a claim "rarely succeeds").  Plaintiffs have not carried that burden.

### 1.   The Secretary's Broad Authority Under the IIRIRA is Not Limited to the Projects Specified in Section 102(b)

Plaintiffs argue that § 102(c) waiver authority is limited to "those Congress specifically called for under § 102(b)."  Pls.' Br. at 18.  Their proposed interpretation is contrary to the plain reading of the statutory text, is contrary to DHS's consistent interpretation of the statute, and has previously been rejected by a court in this district.

When faced with the same argument Plaintiffs make—that § 102(a) serves only as a

purpose clause and that § 102(b) identifies every way that Congress intends § 102(a) to be implemented—a court in this district held that "[t]he statute's explicit language does not support such an interpretation." *Save Our Heritage Org.*, 533 F. Supp. 2d at 61 (rejecting the notion that "the 2006 amendment to section 102(b) . . . narrow[ed] the Secretary's authority [under § 102(a)]"). Judge Lamberth found "that section 102(a), on its face, authorizes construction of barriers such as the San Diego Barrier in areas that the Secretary determines are areas of high illegal entry" regardless of whether § 102(b) also identified the location as a priority. 533 F. Supp. 2d at 61. Plaintiffs do not acknowledge, let alone address, this decision.

Judge Lamberth's decision is plainly correct. The most straightforward reading is that § 102(a) provides a general mandate to take action, and that § 102(b) identifies particular congressional priorities to be pursued:

> (a) In general. The Secretary . . . shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.
>
> (b) Construction of fencing and road improvements along the border.
>
>> (1) Additional fencing along southwest border
>>
>>> (A) Reinforced fencing. In carrying out subsection (a), the Secretary . . . shall construct reinforced fencing along not less than 700 miles of the southwest border . . . .
>>>
>>> (B) Priority areas. In carrying out this section, the Secretary . . . shall—(i) identify the 370 miles . . . where fencing would be most practical and effective; and (ii) not later than December 31, 2008, complete construction of reinforced fencing along [those] miles[.]

IIRIRA § 102.[10] This reading is supported by the natural import of § 102(a)'s broad language

---

[10] Plaintiffs do not look to the text of § 102(c)(1) because, by its plain terms, the waiver authority extends to any construction "under this section," upon determinations made in the Secretary's "sole discretion." IIRIRA § 102(c)(1). The reference to "this section" in § 102(c)(1) cannot reasonably be read to refer exclusively to subsection 102(b). Instead, the waiver authority plainly includes actions pursuant to any part of § 102 that meet § 102(c)(1)'s criteria. *See*

calling for action to "deter illegal crossings in areas of high illegal entry to the United States." *Id.* § 102(a). Congress provided flexibility for DHS to address dynamic changes in the patterns of illegal entry. This reading is also supported by the contrast between this broad language and the specific details in § 102(b) which are to be applied "in carrying out" the general mandate. *Id.* § 102(b). In effect, Congress said to DHS: "However else you apply this mandate, make sure you complete the projects we have identified in § 102(b)." Indeed, Congress, with some regularity, has organized statutes with a similar fashion—a general mandate followed by specific guidance "in carrying out" that grant of authority. *See, e.g.*, 33 U.S.C. § 2326(a)(1)(A), (f) (giving Secretary of the Interior general responsibility to "develop . . . regional sediment management plans" and specifying that "[i]n carrying out this section, the Secretary shall give priority to [projects] in the vicinity of [eleven specific locations]").[11]

Plaintiffs' argument that § 102(a) "simply stat[es] a general purpose," Pls.' Br. at 18, must be rejected for three textual reasons. First, when Congress identifies certain specific applications of a general grant of authority, those specific requirements cannot generally be understood to prohibit all other applications of the general authority. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."). Arguments similar to plaintiffs' are routinely rejected. *See, e.g.*, *FTC v. Tarriff*, 584 F.3d 1088,

---

*NLRB v. SW General, Inc.*, 137 S. Ct. 929, 938-39 (2017) (explaining that when Congress directs that a particular provision applies to actions "under this section," that the provision applies to the entire section rather than just "a particular subsection or paragraph"); *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018) (explaining that the "natural reading" of a statutory reference to "this section" is that it refers to the section "as a whole").

[11] *See also* 8 U.S.C. § 1443 (requiring Attorney General to "broadly distribute information concerning the benefits of [naturalization]" and specifying that "[i]n carrying out this subsection, the Attorney General shall seek the assistance of . . . relevant organizations"); 42 U.S.C. § 18352 (giving NASA general responsibility to "maximize the productivity and use of the [International Space Station]" and specifying that "[i]n carrying out subsection (a), NASA shall, at a minimum, undertake the following [three specific tasks]").

1091 (D.C. Cir. 2009) (rejecting argument "that the term 'shall' is a mandate not only to do one

thing but to cease and refrain from doing all others" as a claim that "borders on sophistry"); *Otsuka*

*Pharm. Co. v. Burwell*, No. 15-852, 2015 WL 1962240, at *7 (D. Md. Apr. 29, 2015) ("[Plaintiff]

ignores the critical fact that [the statutory provision] sets forth circumstances where FDA cannot

*deny* approval for a labeling carve-out; it does not, as [plaintiff] contends, address situations where

FDA can or cannot *grant* approval."); *Sidney Coal Co. v. SSA*, 427 F.3d 336, 348 (6th Cir. 2005)

("[T]he statute's explicit reference to two types of employment need not preclude [the agency

from] adding another to the list.").[12]

Second, the specific terms of the IIRIRA as originally enacted cut sharply against

Plaintiffs' reading.  Under their reading, Congress had specified the only location for which the

entirety of § 102 could be employed:  constructing "second and third fences" "along the 14 miles

of the international land border . . . starting at the Pacific Ocean."  Pub. L. No. 104-208, Div. C,

Title I § 102(b)(1).  It is not apparent how the broad mandate to "install additional physical barriers

and roads . . . to deter illegal crossings in areas of high illegal entry," § 102(a), could be fulfilled

by that narrow instruction.[13]  Instead, § 102(a) would be rendered largely superfluous.  *See*

*Watervale Marine Co., Ltd. v. DHS*, 55 F. Supp. 3d 124, 145 (D.D.C. 2014) (relying on "one of

the most basic interpretive canons," that "a statute be construed so that no provision is rendered

inoperative or superfluous, void or insignificant").  And § 102(a)'s broad mandate to identify

---

[12] Plaintiffs' citation of *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 586 U.S. 639 (2012) is misplaced.  Judge Lamberth's and DHS's interpretation would not cause "a specific provision [to be] swallowed by the general one," or permit the agency to do under § 102(a) "precisely what [another clause] proscribes."  586 U.S. at 645.  Instead, this reading gives full effect to both the authority granted in § 102(a) and the minimum actions required in § 102(b)(1).

[13] Defendants do not dispute that Executive Branch authority to build border infrastructure could be implied from more general laws, such as the Immigration and Nationality Act of 1952, Pub. L. No. 82-414 § 103, 66 Stat. 163, 174 (June 27, 1952) (codified, as amended, at 8 U.S.C. § 1103).  Indeed, the barriers to be replaced pursuant to the waiver determinations here were constructed in the "early 1990s," 82 Fed. Reg. at 35985, 42830, prior to the passage of § 102. Section 102(a) serves both to make that authority express and to instruct the Executive Branch to take such action wherever necessary.

"areas of high illegal entry" would not only become empty, but also create substantial confusion.

Third, Congress, after identifying only the San Diego project as a priority from 1996 thru 2005, decided to identify many more priorities in 2006 and 2007.  These subsequent amendments to § 102(b)(1), adopting significantly different requirements within a fourteen-month span, *see supra*, Background § I (discussing shift from specifying specific locations to most recently specifying aggregate minimum thresholds), further demonstrate that this subsection merely identifies Congress' shifting priorities.  While Plaintiffs argue that § 102 simply becomes "dormant" whenever there is no unfinished § 102(b) project, *see* Pls.' Br. at 2,[14] the plain reading suggests that § 102(a) remains available to address locations not prioritized by Congress. Attempting to show that Defendants' approach "leads to absurd results," Plaintiffs turn to wild hypotheticals about DHS attempting to "construct border wall . . . through the Bering Sea."  Pls.' Br. at 27-28.[15]  But at bottom, Plaintiffs are simply incredulous that Congress could have meant what the plain text of the statute indicates—ongoing authority to "bypass any laws for any border [infrastructure] construction," Pls.' Br. at 28, where necessary to ensure expeditious construction to deter illegal entry.  Because that plain meaning is not absurd or inconsistent with the purpose and structure of the statute, the Court cannot conclude—especially under *ultra vires* review's highly deferential standard—that Plaintiffs' interpretation is mandatory.

Plaintiffs err in suggesting that the "time-sensitivity" evoked by the word "expeditious" in § 102(c)(1) and the alleged "de facto sunset date" in 2008 prove that the authority Congress

---

[14] Plaintiffs' claim that "DHS has completed all of the construction [specified] . . . under its several amendments to § 102(b)," Pls.' Br. at 10, is irrelevant because DHS does not ground its waiver determination in § 102(b).  Defendants do not concede that these requirements have no current significance, but do not address the matter further here because nothing turns on it.

[15] Plaintiffs also look to the study provisions of the Secure Fence Act.  *See* Pls.' Br. at 28 n.33 (citing Pub. L. No. 109-367, §4, 120 Stat. 2638, 2639 (2006)).  In a law concerned with "achiev[ing] and maintain[ing] operational control over the entire international land and maritime borders of the United States," Pub. L. No. 109-367, § 2(a), the provision directing a study of the northern border does not speak to the scope of § 102.

provided is limited to actions taken "shortly after the law's enactment." Pls.' Br. at 20-21.  Instead, "expeditious construction" refers to the need to complete construction promptly after the need for "additional barriers and roads" has been identified by the Secretary.  *See* IIRIRA § 102(a), (c)(1). This acknowledges the dynamic nature of cross-border migration and contraband patterns and the need for DHS to adapt to meet the challenges.  Indeed, as long as Congress continues to appropriate money for such projects, it stands to reason that DHS should seek to ensure expeditious construction of them pursuant to the terms of § 102.[16]  That is not to say that *all* border infrastructure construction requires a waiver.  But § 102(c)(1) means at least that waivers can be issued when "expeditious construction" of projects identified by the Secretary or Congress may not occur in the absence of a waiver.  And the 2008 deadlines provided in the 2007 amendment were intended to ensure that the highest priority projects were completed within one year, not to prevent the construction of other projects under § 102(b)(1),[17] let alone projects selected by the Secretary under § 102(a).  *See* IIRIRA § 102(b)(1)(B).

Plaintiffs are simply mistaken in claiming that DHS has ever advanced an interpretation of the statute at odds with the one advanced here.  To the contrary, DHS has consistently explained that § 102(a) provides a "clearly delineated general policy" and that § 102(b)(1) simply provides "a required method of achieving [§ 102(a)'s] important goal in one geographic area: the construction of fencing and road improvements in the border area near San Diego."  Ex. 6, Defs.'

---

[16] *See, e.g.*, Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 434 (May 5, 2017) (appropriating $341 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border . . . and to add gates to existing barriers" and $77 million "for new border road construction"); DHS Appropriations Act, 2015, Pub. L. No. 114-4, 129 Stat. 39, 42 (Mar. 4, 2015) (appropriating $382 million "[f]or expenses for border security fencing, infrastructure, and technology").

[17] Because Congress provided a deadline for completion of 370 miles of infrastructure but no deadline for completion of the other 330 miles (or more) "where fencing would be most practical and effective," *id.* § 102(b)(1)(A), the plain implication is that this construction could be completed after 2008.

Motion to Dismiss at 6-7, Doc. No. 36, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Nov. 11, 2005).[18]  Plaintiffs take out of context one passage in that 2005 brief which was explaining that "[t]he Waiver Legislation's text, legislative history, and clear purpose warrant its application to this pending suit." *Id.* at 16.  DHS argued both that Congress had the *Sierra Club* suit in mind for use of the new waiver authority and that the "sole purpose" of the Secretary's 2005 "Waiver" (the Secretary's decision, not, as plaintiffs read it, the statutory decision) "would be frustrated" if it could not be used to waive the pending suit. *Id.* at 15.[19]  In any event, judicial estoppel should not be applied against the government here,[20] where different parties are

---

[18]  DHS has never countenanced the narrow reading proposed by Plaintiffs; even though San Diego was the only location listed in § 102(b) until 2006, DHS constructed border infrastructure in locations other than San Diego prior to 2006 and referenced its IIRIRA authority in doing so.  *See, e.g.*, Ex. 3, CBP Finding of No Significant Impact for Infrastructure (Nov. 19, 2003) (explaining that "the proposed border infrastructure system [for Cochise County, Arizona] has been planned in compliance with the IIRIRA"); Ex. 4, Cong. Research Serv., RL33659, *Border Security: Barriers Along the U.S. Int'l Borde*r at 19 (Mar. 16, 2009) (noting that appropriations for fiscal years 1998-2000 included "fencing, light, and road projects in El Centro, Tucson, El Paso, and Marfa").  *See also* Defs.' Reply Mem. in Supp. Mot. to Dismiss at 2-3, ECF No. 9, *Save Our Heritage Org. v. Gonzalez*, No. 1:07-00308 (D.D.C. filed May 21, 2007) ("The authority under Section 102(a) exists independent of the specific Congressional mandates for barriers in certain areas identified in section 102(b)."); Ex. 8, Cert. Opp'n at 2-4 & n.1, *Defenders of Wildlife v. Chertoff*, No. 07-1180 (S. Ct. May 2008) (relying on § 102(a) for Secretary's authority and noting that the 2006 amendment to § 102(b) simply "expand[ed] the number of places where Congress expressly directed that the Secretary erect border fencing").

[19] Plaintiffs argue that the *Sierra Club* decision adopted their reading of the interaction between § 102(a) and (b).  Pls.' Br. at 19-20.  But in that case, not even plaintiffs' proffered a reading making § 102(B) exclusive.  *See, e.g.*, Ex. 5, Pl.'s Opening Br. at 8 n.3, Doc. No. 35, *Sierra Club, et al. v. Ashcroft, et al.*, No. 04-0272 (S.D. Cal. Oct. 27, 2005) ("The roads and barriers are those in the vicinity of the U.S. border generally, and along the San Diego-Tijuana border in particular." (citing § 102(a) & (b))).  Even if the *Sierra Club* court misunderstood DHS's argument and read § 102(b) exclusively, without the benefit of briefing on the subject, that conclusion was not essential to its reasoning applying the Nondelegation Doctrine and should be rejected as mistaken. *Cf. Save Our Heritage Org.*, 533 F. Supp. 2d at 61 (finding *Sierra Club*'s reasoning applicable while rejecting an exclusive reading of § 102(b)); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1119 ("[T]he Sierra Club case is not as helpful as Plaintiffs propose.").

[20] *See Mingo Logan Coal Co. v. EPA*, 70 F. Supp. 3d 151, 174 (D.D.C. 2014) (finding judicial estoppel inappropriate, in part because it "is well settled that the Government may not be estopped on the same terms as any other litigant"); *Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.*, 239 F.R.D. 9, 24 (D.D.C. 2006) ("[J]udicial estoppel . . . is generally unavailable as to government litigants."); *see also Law Office of John H Eggertsen P.C. v. C.I.R.*, 800 F.3d 758, 766 (6th Cir. 2015) ("[T]ere is a high bar to estopping the federal government from enforcing the correct interpretation of a law[.]").

involved,[21] where the alleged change involves a pure issue of law not fact,[22] and there is no evidence of playing "fast and loose with the courts." *Marshall v. Honeywell Tech. Sys. Inc.*, 828 F.3d 923, 933 (D.C. Cir. 2016).

Finally, to the extent that the Court wishes to look beyond the plain meaning of the statutory text, the legislative history is of no help to Plaintiffs' interpretation. As a matter of statutory construction, "[w]hen the words of a statute are unambiguous . . . judicial inquiry is complete." *Public Citizen*, 533 F.3d at 816. In any event, Plaintiffs can do no more than show that the expansion of the waiver authority was catalyzed by, and intended to address, the delay in completion of the San Diego fence. *See* Pls.' Br. at 24-25. It is no surprise that the sponsors and proponents of the bill talked about San Diego. *See id.* (collecting citations). But the catalyst for Congressional action often does not define the outer limits of that action. *See New York v. FERC*, 535 U.S. 1, 21 (2002) ("Even if [the prior case] catalyzed the enactment of the [Federal Power Act], [it] does not define the outer limits of the statute's coverage."); *Acree v. Republic of Iraq*, 370 F.3d 41, 64 (D.C. Cir. 2004) (Roberts, concurring) ("The fact that Congress may have been focused primarily on removing barriers to the flow of aid to Iraq does not mean that the statute refers exclusively to such barriers"). Here, Congress could easily have crafted language that simply mandated the relevant construction near San Diego.[23] Instead, Congress adopted a far

---

[21] *See Abtew v. DHS*, 808 F.3d 895, 900 (D.C. Cir. 2015) (rejecting application of judicial estoppel where plaintiff was "citing other litigation with other parties, not a past phase of this case").

[22] *See Law Office of John H Eggertsen*, 800 F.3d at 766 ("Judicial estoppel also does not usually apply to shifting legal arguments; it typically applies to shifting factual arguments."); 18B Wright & Miller, *Federal Practice & Procedure* § 4477 (2d ed., Apr. 2018 Update) ("It is difficult to imagine circumstances that would justify an invocation of judicial estoppel to preclude inconsistent positions as to a matter of pure law[.]").

[23] Indeed, the 2004 predecessor bill, an amendment to the 9/11 Recommendations Implementation Act, would have adopted a very specific approach—"the tracts of land described in subsection (b) shall be exempt from the requirements of the [statutory] provisions listed in subsection (c)." 150 Cong. Rec. H8898 (Oct. 8, 2004). This suggests that Congress, by not carrying forward 2004's narrow approach, deliberately adopted the language it chose in 2005.

broader approach by establishing a general mandate in § 102(a) that was not limited to a single project and by extending § 102(c)'s waiver authority to any actions or decisions "under this section." The conference report—the best evidence of legislative intent after the text, *see Moore v. Dist. of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990)—confirms that § 102 applied beyond San Diego by explaining that it "provides for construction and strengthening of barriers *along U.S. land borders*." H.R. Rep. 109-72 at 170 (May 3, 2005) (emphasis added); *see also id.* at 171 (describing both the original and amended waiver authority as "ensur[ing] expeditious construction of barriers and roads" and "the expeditious construction of security infrastructure along the border").[24] The breadth of § 102(c) was repeatedly noted by opponents of the bill and was not contradicted by its sponsors. *See, e.g.*, 151 Cong. Rec. H459 (Feb. 9, 2005) (statement of Cong. Jackson-Lee) ("[The waiver provision is] so broad that it would not just apply to the San Diego border fence that is the underlying reason for this provision. It would apply any other barrier or fence that may come about in the future.").[25] These observations, repeated by opponents at least five times in two days, were not merely "fears and doubts of the opposition" that can be dismissed, *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394-95 (1951) (cited by Pls.' Br. at 25), but evidence that the broad import of the plain text was understood during the legislative debate. From this record one simply cannot conclude that the triggering events for passage of the

---

[24] Plaintiffs' citation of the title of the House bill, Pls.' Br. at 23, which was not carried over into the final legislation, *see* Pub. L. No. 109-13 (May 11, 2005), is irrelevant because it does not represent the intent of Congress as a whole. *See also Friedman v. Sebelius*, 686 F.3d 813, 821 (D.C. Cir. 2012) ("[T]he title of a statute . . . cannot limit the plain meaning of the text[.]").

[25] *See also* 151 Cong. Rec. H554 (Feb. 10, 2005) (statement of Cong. Harman) ("[T]he reach is beyond the San Diego border. According to the language in this legislation, it is all areas along and in the vicinity of our international borders with both Mexico and Canada."); *id.* H559 (statement of Cong. Udall) (objecting to bill because "the language of the bill is not limited to the construction of a fence in [San Diego]" but instead includes "all laws for all U.S. borders"). Indeed, members of Congress similarly noted that the 1996 version of § 102(c) also extended beyond San Diego. *See* 142 Cong. Rec. H11076 (Sept. 25, 1996) (statement of Rep. Saxton) ("[T]he way this section is written, the exemption applies to the entire border of the United States, not just the California-Mexico border near San Diego.").

waiver provision—litigation delaying San Diego border infrastructure construction—should be interpreted to limit the otherwise plain text of the Act. *See AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 35 (D.C. Cir. 2013) ("Legislative history cannot create ambiguity in a clear statutory text.").

### 2.      The Secretary Has Not Violated the IIRIRA's Consultation Requirement

In 2007, Congress added the requirement that "[i]n carrying out" § 102, DHS "shall consult with" two cabinet departments, along with "States, local governments, Indian tribes, and property owners" regarding "minimiz[ing] the impact" of construction "on the environment, culture, commerce, and quality of life for the communities and residents located near the sites." § 102(b)(1)(C).  Congress sought to ensure that relevant stakeholders had an opportunity to discuss mitigation efforts for construction that had already been determined to be necessary, while making the provision exclusively enforceable by Congress, not private litigants.  For numerous reasons, this provision cannot provide a basis to vacate the Secretary's determination here.

### a.      This Requirement is Not Privately Enforceable, Including by *Ultra Vires* Review

As an initial matter, § 102(c)(2)(A)'s jurisdictional bar applies with even greater force where a plaintiff alleges that a waiver determination failed to comply with the consultation requirement.  In two ways, Congress emphasized that it intended no judicial review of this provision, regardless of whether a waiver was employed.  First, Congress expressly provided that "[n]othing in this subparagraph may be construed to—(I) create . . . any right of action for a State, local government, or other person or entity affected by this subsection."  *See* IIRIRA § 102(b)(1)(C)(ii); *Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 63 (D.D.C. 2009) (concluding that "no private right of action or private remedy has been created" to enforce the consultation provision).  Second, Congress demonstrated that it would enforce the provision

through its appropriations power.  In the same law that adopted the provision, Congress made access to the appropriated funds contingent on compliance with the provision.  *See* Pub. L. No. 110-161, Div. E, Title V § 564(b), 121 Stat. 1844, 2091 (Dec. 26, 2007) (providing that "[n]o funds appropriated" for border infrastructure "may be obligated unless the Secretary of Homeland Security has complied with" § 102(b)(1)(C)(i)).  Together with the jurisdictional bar, these provisions leave no doubt that Congress intended no private enforcement of this provision, regardless of the cause of action.  *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action."); *Cal. v. Sierra Club,* 451 U.S. 287, 293 (1981) ("[T]he ultimate issue is whether Congress intended to create a private right of action."); *Lee v. United States Agency for Int'l Dev.*, 859 F.3d 74, 78 (D.C. Cir. 2017) (text, structure, and legislative history all indicate no private right of action).[26]

### b.   This Requirement Does Not Apply to the Determination to Waive Legal Requirements

Moreover, Plaintiffs' argument that consultation is a prerequisite "not just for the construction of barriers and roads but also for issuance of the waiver itself," Pls.' Br. at 30, is contrary to the text and the logic of the statute.

First, nothing in the waiver provision is expressly or implicitly dependent on completion of the consultation requirement.  Instead, § 102(c)(1) permits the Secretary to waive legal

---

[26] Plaintiffs' complaint alleges that the consultation provision can be enforced not only through the *ultra vires* cause of action but also the APA.  *See* Compl. ¶ 80.  Their summary judgment motion, however, abandons this alternative theory.  *See* Pls.' Br. at 29-32; *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F.Supp.2d 71, 83 (D.D.C. 2013) (claims in complaint abandoned when not raised in summary judgment briefs).  At any rate, to the extent plaintiffs seek to use the consultation provision to challenge a waiver determination, APA claims are clearly barred.  *See* § 102(c)(2)(A); 5 U.S.C. § 701(a) ("This chapter applies . . . except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.").  Not only does § 102(c)(1) expressly preclude review of waiver determinations on non-constitutional grounds, but also the waiver determination is committed to the Secretary's "sole discretion."  *See* IIRIRA § 102(c)(1), (2)(A).

provisions in her "sole discretion" upon determining that a waiver is necessary to expedite construction.  Nor would consultation with the listed entities be likely to inform the decision whether waiver of a given legal requirement is necessary.[27]  Thus, failure to satisfy the consultation requirement cannot be treated as a condition precedent that can be the basis for overturning a waiver on *ultra vires* review.

Second, the consultation provision does not make the waiver determination itself a subject of the intended consultation.  Instead, the provision most naturally refers to mitigation efforts after projects have been selected.  Congress takes it as a given that the "sites at which such fencing is to be constructed" are already known, and directs consultation on the subject of "minimiz[ing] the impact" of the construction.  IIRIRA § 102(b)(1)(C)(ii).  *See also* 153 Cong. Rec. S9881 (Sen. Cornyn) ("recognizing that result is nonnegotiable").  Thus, Plaintiffs cannot show that the statute requires DHS to consult specifically regarding the need for infrastructure construction in a given area, or regarding the Secretary's discretionary exercise of her waiver authority.  After all, DHS is the entity with expertise regarding what locations are "areas of high illegal entry" and what sort of infrastructure is "necessary" to "deter illegal crossings."  IIRIRA § 102(a).  Additional evidence of the lack of a connection between the consultation requirement and the Secretary's waiver authority is found in Congress's adoption of two different appropriations restrictions for the 2007 funds—one specific to the waiver authority, *see* Pub. L. No. 110-161, 121 Stat. at 2049 (prohibiting obligation of funds for waiver projects "until 15 days have elapsed" after the notice was published in the Federal Register); and one specific to the consultation requirement, see Pub. L. No. 110-

---

[27] Consultation about the waiver of legal requirements would also be unlikely to be informative.  Presumably, most states and local governments would oppose waiver of any of their own statutes; and even if the entities were not uniformly opposed, they would be unlikely to be in position to assess the likelihood that a given statute would cause excessive delay.  After all, delaying litigation could be initiated by other entities, such as national environmental organizations like most of the Plaintiffs here.

161, 121 Stat. at 2091 (prohibited DHS from obligating funds until it had "complied with" that requirement).[28]  If Congress intended consultation to be a prerequisite to a waiver determination, this approach would be unnecessarily redundant.  Instead, Congress presumed that consultation and the finalization of construction contracts might occur after "the Secretary has exercised [§ 102(c)] waiver authority."  Pub. L. No. 110-161, 121 Stat. at 2049.  In sum, the consultation requirement thus cannot be considered a "clear and mandatory" prerequisite to the Secretary's waiver determinations.

### c.   DHS Has Complied With the Consultation Requirement

Plaintiffs cannot show that the Secretary's application of the requirement here contravenes clear statutory prohibition.  DHS has reasonably initiated consultation before construction to allow its mitigation efforts to be informed by these entities' concerns and information in their possession.  *See* Enriquez Decl. ¶¶ 13-21.  Even if it were assumed that "shall consult" gives rise to a mandatory obligation, Plaintiffs have not shown that DHS's approach violated the statute because it does not clearly establish (1) *when* such consultation must occur, (2) with *whom* it must necessarily occur, or (3) the *degree* of interaction required to satisfy the requirement.

First, unlike many other statutory provisions, Congress did not require that consultation be completed "before" any specific action.[29]  Instead, the statute simply requires DHS to consult "[i]n carrying out this section," leaving to DHS to determine the appropriate timing in light of the myriad considerations implicated by a particular project.  Even if the definition of "consult" here could be presumed to mean conferring "*before* undertaking a course of action," Pls.' Br. at 31

---

[28] For the appropriation employed here, Congress has not required consultation prior to obligation of funds.  *See* Pub. L. No. 115-31, Division F, Title VI, 131 Stat. 135, 434 (May 5, 2017); Enriquez Decl. ¶ 12.

[29] *See, e.g.*, 10 U.S.C. § 2667(g)(3) ("Before entering into any lease under this subsection, the Secretary shall consult with the [EPA] Administrator[.]"); 42 U.S.C. § 4332(C) ("Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of [certain] Federal agenc[ies].").

(quoting *Cal. Wilderness Coal., v. U.S. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011)),[30] this provision does not expressly identify which course of action it must precede.  For example, Congress's use of appropriations limitations for the 2007 funds to require consultation before contracts were finalized demonstrates that the statute did not inherently include such a timing requirement.  *See* Pub. L. No. 110-161, 121 Stat. at 2091; *see also* GAO Decision B-300480.2 (June 26, 2003) (https://www.gao.gov/decisions/appro/3004802.htm) (explaining that "obligation" of funds occurs when contract is signed).  To the extent "to be constructed" assumes consultation before construction, *see* Pls.' Br. at 31, DHS complied by initiating consultation in February, about two months before the start of construction.  *See* Enriquez Decl. ¶¶ 11, 19.  This is ample time to allow changes to be made if consultation so warrants.

Second, this provision does not unambiguously require anyone to be contacted in every instance.  Instead, it is reasonably understood to call for DHS to assess which entities are "located near the sites at which such fencing is to be constructed" and thus should be consulted.  IIRIRA § 102(b)(1)(C)(i).  For example, it calls for DHS to consult "States" and "Indian tribes," but a given project might implicate only one state, or there might be no tribes with interests in the project area.  Thus, it is reasonable for DHS to determine for each project what entities are stakeholders who may be affected, as it did here.  Plaintiffs cannot show that the state legislature or a city about 40 miles from the project area are mandatory participants in the consultation.  *See* Enriquez Decl. ¶ 20; Pls.' Br. at 30.

Third, Congress did not specify the depth of consultation required.  Accordingly, it would be improper on *ultra vires* review to reject DHS's good faith efforts to give state, local, and tribal

---

[30] Most definitions of the term "consult" are not temporally limited.  *See, e.g.*, *Websters New World College Dictionary* (5th ed. 2014) ("to seek an opinion from; ask the advice of" "to keep in mind while acting or deciding; show regard for; consider"); *American Heritage Dictionary of the English Language* (5th ed. 2011) ("To seek advice or information of" "To take into account; consider").

authorities the opportunity to comment on and suggest additional ways to minimize the relevant impacts. DHS completed a biological resources management plan, a cultural survey report, and a Waters of the United States survey report and shared those with the relevant authorities for their comment. *See* Enriquez Decl. ¶¶ 18-19. DHS has incorporated the resulting feedback into its guidance for its contractors and published an Environmental Stewardship Plan for the project. *See id.* ¶¶ 21-22.

For all of these reasons, the Court cannot conclude that DHS's consultation efforts fall below a clear and mandatory standard provided by the statute. To the contrary, DHS has reasonably complied with the consultation requirement. Even if plaintiffs could show that it is *plausible* to interpret the provision to require more—and they have not—DHS's decision to adopt one plausible interpretation over the other cannot constitute a violation of a clear statutory mandate. *See Griffith v. FLRA*, 842 F.2d 487, 494 (D.C. Cir. 1988) (upholding "colorable" but not "only possible interpretation of the statutory language").

## III.     THE STATUTE DOES NOT VIOLATE THE NON-DELEGATION DOCTRINE

Plaintiffs argue that, if the Secretary's waiver authority under § 102(c) is broad enough to encompass the challenged determination, the waiver authority would amount to an unconstitutional delegation of legislative authority to the Executive Branch. *See* Pls.' Br. at 38. This is a difficult argument for plaintiffs to make, as the Supreme Court has not found a *single delegation* to offend the Constitution since the so-called "sick chicken" case decided over eighty years ago, *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *see also Nat'l Cable Television Ass'n v. United States*, 415 U.S. 352, 352-53 (1974) (Marshall., J., concurring in the result in No. 72-1162 and dissenting in No. 72-948) ("The notion that the Constitution narrowly confines the power of Congress to delegate authority to administrative agencies, which was briefly in vogue in the 1930's, has been virtually abandoned by the Court for all practical purposes[.]");

*see also id.* at 353 (describing the doctrine as "moribund"); *Loving v. United States*, 517 U.S. 748, 771 (1996) ("Though in 1935 we struck down two delegations for lack of an intelligible principle . . . we have since upheld, without exception, delegations under standards phrased in sweeping terms."); *cf. Dep't of Transp. v. Ass'n of Am. R.R.s*, 135 S. Ct. 1225, 1251 (2015) (Thomas, J., concurring in the judgment) (observing that the intelligible principle test "now requires nothing more than a minimal degree of specificity in the instructions Congress gives to the Executive when it authorizes the Executive to make rules having the force and effect of law"). Perhaps more problematic for plaintiffs, *every court* to consider a non-delegation challenge to § 102(c) has rejected the challenge. *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1130-37; *County of El Paso*, 2008 WL 4372693, at *2-4; *Save Our Heritage*, 533 F. Supp. 2d at 63-64; *Defs. of Wildlife*, 527 F. Supp. 2d at 126-29; *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *16-25. This Court should follow this settled guidance and reject plaintiffs' claim.

It is well established that, because Congress could not function without the ability to delegate, Congress may authorize another branch of government to carry out its lawmaking authority so long as it provides "an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr. Co. v. United States*, 276 U.S. 394, 409 (1928). To provide a constitutionally permissible "intelligible principle," Congress need only "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989).[31]

Plaintiffs complain that § 102(c), "as interpreted by Secretary Nielsen, is devoid of intelligible principle [*sic*] because it lacks the requisite 'boundaries of this delegated authority.'"

---

[31] The second requirement—that Congress must specify which agency is authorized to execute the general policy—is obviously satisfied here. *See* IIRIRA § 102(c)(1) ("the *Secretary of Homeland Security* shall have the authority to waive all legal requirements such Secretary . . . determines necessary . . ." (emphasis added)).

Pls.' Br. at 9 (citation omitted).  Plaintiffs are mistaken.  Congress has provided ample guidance about its intended policy, and the Secretary adhered to that guidance in her January 22, 2018, determination.  Section 102(a) delineates a "general policy" of installing infrastructure to "deter illegal crossings in areas of high illegal entry into the United States," which § 102(c) incorporates by tying the waiver authority to "expeditious construction of barriers and roads under this section." IIRIRA, in other words, instructs the Secretary that improving border protection by expediting the construction of necessary barriers and roads is a critical congressional priority.  *See, e.g.*, *Defs. of Wildlife*, 527 F. Supp. 2d at 127 (finding a clearly delineated general policy "to expeditiously 'install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry'"); *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *20 (concluding that § 102's clearly delineated general policy is "improvement of U.S. border protection," which is "a high congressional priority").

Congress also articulated specific boundaries to constrain the authority it delegated to the Secretary.  That authority may only be exercised to "waive all legal requirements [the] Secretary . . . determines necessary to ensure expeditious construction of the barriers and roads under this section."  IIRIRA § 102(c)(1) (emphasis added).  The first boundary is geographic:  waivers may only be issued in connection with construction "in the vicinity of the United States border."  *Id.* § 102(a) (incorporated by the "under this section" cross-reference).[32]  The second boundary is

---

[32] In *Sierra Club*, the plaintiffs were challenging the application of waiver authority to a construction project Congress had specifically instructed be completed—"this particular 14-mile California border Triple Fence." *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *21.  Accordingly, that court found it easy to conclude that the Secretary was not outside the boundaries for exercise of the waiver authority.  *Sierra Club* should not be read to suggest that *only* the projects specified by Congress in § 102(b) are authorized under § 102(a).  Congress's particular identification of the San Diego border area at the time of the *Sierra Club* decision should be considered a *sufficient* basis for rejection of those plaintiffs' non-delegation theory, but not an *essential* one.  *Cf. Defenders of Wildlife*, 527 F. Supp. 2d at 128 (paraphrasing *Sierra Club*'s boundary analysis as involving expeditious completion "of the border fences authorized by IIRIRA in areas of high illegal entry"); *Save Our Heritage*, 533 F. Supp. 2d at 61 (finding no unconstitutional delegation for construction not encompassed by § 102(b) after expressly rejecting argument that "section 102(b) . . . narrow[ed] the Secretary's authority . . . derived from section 102(a)").

temporal necessity:  waivers may only be issued where "necessary to ensure expeditious construction" at those locations.  *Id.* § 102(c)(2); *see also Defs. of Wildlife*, 527 F. Supp. 2d at 127 (concluding that Congress provided a sufficient boundary by instructing that "the Secretary may waive only those laws that he determines necessary to ensure expeditious construction" (citation and internal quotation marks omitted)).  While Plaintiffs contend that prior, unsuccessful non-delegation challenges to § 102(c) concerned "waivers that were issued to construct projects articulated in § 102(b)," Pls.' Br. at 39, nothing in § 102(c) requires Congress to set forth in detail a particular construction project before the Secretary may exercise her waiver authority.  And there can be no serious dispute that the challenged New Mexico project falls within the broad ambit of § 102(a), which encompasses "physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry."

Plaintiffs also argue that the Secretary's interpretation of her authority under § 102(c) is "as broad, if not broader, than prior delegations of legislative authority to the Executive Branch that the Supreme Court has deemed unconstitutional."  Pls.' Br. at 40.  Nonsense.  The *only two cases* in which the Supreme Court struck down a delegation involved vastly more expansive and freewheeling transfers of power from the legislature to the Executive.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) ("In the history of the Court we have found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'").  Conversely, the Supreme Court has upheld delegations where Congress authorized an agency to modify corporate structures to ensure that they are not "unduly or unnecessarily complicate[d] and do not unfairly or inequitably distribute voting power among

33

security holders," and where Congress authorized an agency to fix commodity prices at a level that is "generally fair and equitable" and that effectuates a statutory purpose, and where Congress authorized multiple agencies to regulate in the "public interest." *Id.* at 474. As Justice Scalia once observed, the Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting).

As a fallback, Plaintiffs argue that "judicial faithfulness to the non-delegation doctrine is critical to preserving the separation of powers." Pls.' Br. at 41. *But see* Keith E. Whittington & Jason Iuliano, *The Myth of the Nondelegation Doctrine*, 165 U. Pa. L. Rev. 379 (2017) (finding, based on an exhaustive empirical study, that the non-delegation doctrine never imposed a significant constraint on executive authority, even prior to the New Deal Era). In any event, where Congress set forth a policy and parameters, and where the Secretary's January 22, 2018, determination falls squarely within those parameters, the only proper exercise of this Court's authority is to reject Plaintiffs' meritless non-delegation claim and uphold the challenged action.

## IV. THE WAIVER DOES NOT VIOLATE THE TAKE CARE CLAUSE

Plaintiffs further argue that "Secretary Nielsen's invocation of § 102 violates the Executive's duty to faithfully execute § 102 [and other laws] because it overreaches into the Legislative Branch's lawmaking authority." Pls.' Br. at 42. This peculiar argument appears to be a reformulation of Plaintiffs' meritless non-delegation theory and should be rejected for the reasons discussed immediately above. Secretary Nielsen did not "purport[] to be a lawmaker," *id.* at 43, in making her January 22, 2018, determination; rather, she acted pursuant to lawfully delegated authority and subject to the constraints that Congress imposed on that authority. While certain statutes may be temporarily suspended in the affected area due to the Secretary's exercise of her waiver authority, that is precisely what Congress had in mind when it enacted § 102(c). Far from

34

a "unilateral repeal of Congressionally enacted statutes," Pls.' Br. at 44, the Secretary's determination furthers Congress's intent as set forth in IIRIRA.  The waiver, in other words, is not a breach of any duty to enforce the laws; it is a faithful execution of an Act of Congress.

To the extent that Plaintiffs' Take Care Clause argument could be construed as somehow independent of their non-delegation theory, the argument should be rejected as an improper attempt to transmogrify the Clause into a mechanism whereby private litigants may challenge on constitutional grounds agency actions they believe to be *ultra vires*.  The Supreme Court has rejected the notion that an alleged violation by Executive Branch officials of some statutory command should give rise to a constitutional claim.  "The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is . . . well established."  *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *see also id.* at 473 ("[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims[] subject to judicial review.").  While *Dalton* did not directly address a Take Care Clause theory, its reasoning is highly instructive.  *Dalton* rejected an attempt to apply *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to mean that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  511 U.S. at 472.  Plaintiffs try to extract the same discredited notion from *Youngstown*'s reference to the Take Care Clause.  *See* Pls.' Br. at 43 (quoting *Youngstown*, 343 U.S. at 587). [33]  Yet Plaintiffs take no account of *Dalton* in their brief.  It would be a sweeping and unwarranted novelty for litigants to be permitted to transform a garden-variety *ultra vires* claim into a constitutional one any time they allege that an agency's specific use of a

---

[33] *Youngstown* also does not support Plaintiffs' approach because that case concerned an attempt to harness the Take Care Clause as an independent basis for Executive Branch action where no statute applied.  *See* 343 U.S. at 587.  In rejecting that attempt, the Supreme Court did not treat the Clause as the basis for an *ultra vires* challenge.  Indeed, no court has *ever* held that the Take Care Clause provides a basis for affirmative relief.

statutory authority constitutes failure to comply with a statute.

## V.   THE STATUTE DOES NOT VIOLATE THE PRESENTMENT CLAUSES

Finally, Plaintiffs argue that § 102(c), as interpreted and applied by Secretary Nielsen, violates the bicameralism and presentment requirements that apply to the repeal of congressional statutes, ostensibly because the Secretary "effectively repealed portions of the numerous laws waived" in connection with the challenged project.   Pls.' Br. at 36.   In crafting this absurd argument, Plaintiffs rely almost entirely on *Clinton v. City of New York*, 524 U.S. 417 (1998).   In *Clinton*, the Supreme Court invalidated the Line Item Veto Act, a statute that gave the President authority to "cancel" certain appropriated spending items that had been enacted by Congress.   *Id.* at 438.   The statute failed because cancellation prevented the items "from having legal force or effect," and thus in "both legal and practical effect, the President ha[d] amended two Acts of Congress by repealing a portion of each."   *Id.*; *see also id.* at 447 (holding it improper to give the President "unilateral power to change the text of duly enacted statutes").

The Secretary's exercise of her waiver authority under § 102(c), however, does not amount to amendment or repeal of a statute.   As *Defenders of Wildlife* explained:

> [t]he Secretary has no authority to alter the text of any statute, repeal any law, or cancel any statutory provision, in whole or in part. Each of the [] laws waived by the Secretary . . . retains the same legal force and effect as it had when it was passed by both houses of Congress and presented to the President.

527 F. Supp. 2d at 124.   Under a § 102(c) waiver, the waived statutes are inapplicable only with respect to the construction of barriers and roads along the relevant portion of the border.   The statutes retain their general legal force and effect, because the Secretary's waiver extends to only a tiny fraction of the universe of cases to which NEPA and similar statutes apply.   Plaintiffs have identified no basis to conclude that such a waiver violates the Constitution.   *See Republic of Iraq v. Beaty*, 556 U.S. 848, 861 (2009) ("The [statutory] proviso expressly allow[ing] President to

render certain statutes inapplicable . . . . did not repeal anything, but merely granted the President authority to waive the application of particular statutes to a single foreign nation."); *Acree*, 370 F.3d at 64 n.3 (Roberts, J., concurring) (dismissing constitutional challenge to statute permitting President to make inapplicable to Iraq "any other provision of law that applies to countries that have supported terrorism," because the authorized actions "are a far cry from the line-item veto at issue in *Clinton*, and are instead akin to the waivers that the President is routinely empowered to make in other areas, particularly in the realm of foreign policy").

This waiver authority is similar to an "executive grant of immunity or waiver of claim," which "has never been recognized as a form of legislative repeal." *In re NSA Telecomm. Records Litig.*, 671 F.3d 881, 895 (9th Cir. 2011). In the *NSA Telecommunications Records* litigation, the Ninth Circuit rejected a Presentment Clause challenge to 50 U.S.C. § 1885a, which permits the Attorney General "to immunize from suit telecommunications companies that had cooperated with the government's intelligence gathering." *Id.* at 891. Even though such grants of immunity prevent civil actions to enforce otherwise applicable "law governing electronic surveillance," the court found no constitutional defect because "[t]he law remains as it was when Congress approved it and the President signed it." *Id.* at 894-95. The court supported its conclusion by noting that the authority for executive officials to "trigger a defense or immunity for a third party" is "not uncommon." *Id.* at 895. Here, similarly, the § 102(c) authority in one statute granting authority to waive application of one or more other statutes is not uncommon. *See Defenders of Wildlife*, 527 F. Supp. 2d at 125 & n.5 (collecting some of the "myriad examples of waiver provisions in federal statutes"); *see also, e.g.*, 25 U.S.C. § 3406 (authorizing the "Secretary of each Federal agency providing funds" for program to waive "any statutory requirement, regulation, policy, or procedure promulgated by that agency"); Pub. L. No. 109-171, § 5107(a)(2), 120 Stat. 42 (Feb. 6,

2006) (providing for waiver of "such provisions of law . . . as are necessary to implement [specified statutory provision] on a timely basis").[34]

Nor does § 102(c) raise the same separation of powers concerns that were at issue in *Clinton*. There, the Supreme Court was concerned that the President through his line-item veto was "rejecting the policy judgment made by Congress and relying on his own policy judgment." 524 U.S. at 444. Here, Congress unmistakably expressed its policy judgment that construction of the barriers and roads along the border was of such importance that it justified waiving application of environmental and other laws to the extent those laws threaten expeditious construction. *See* IIRIRA § 102(c)(1). Thus, in sharp contrast with *Clinton*, there is no question that the Secretary is executing (rather than rejecting) the will of Congress. *Cf. Smith v. Fed. Reserve Bank of N.Y.*, 280 F. Supp. 2d 314, 324 (S.D.N.Y. 2003) (upholding waiver where "[u]nlike in *Clinton*" the President "is carrying out, not rejecting, a policy made by Congress").[35]

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed as a matter of law or, in the alternative, the Court should deny Plaintiffs' motion for summary judgment and grant summary judgment to Defendants.

---

[34] Plaintiffs argue that other waiver authorities available to the Executive are either "guided by sufficient Congressional limitations" or "implicate areas of the President's particular expertise." Pls.' Br. at 38 n.37. As discussed in Part III, *supra*, Congress supplied an intelligible principle that easily satisfies the Supreme Court's separation-of-powers jurisprudence. As for executive expertise, the Secretary of Homeland Security (and DHS more broadly) is well-positioned to determine which local, state, or federal laws may impede the construction of border security infrastructure such that narrow waiver of the enforcement of such laws to particular projects is appropriate.

[35] While Plaintiffs rehash their theory that the challenged decision was *ultra vires* because Secretary Nielsen "has refused to limit the application of the § 102(c) waiver authority to the construction mandates in § 102(b)," Pls.' Br. at 37, that theory is meritless for the reasons discussed in Part II.C, *supra*.

Dated:  June 15, 2018

Respectfully submitted,

CHAD READLER
Acting Assistant Attorney General

JESSIE K. LIU
United States Attorney

JOHN R. TYLER
Assistant Director
Civil Division, Federal Programs Branch

*/s/ Rhett Martin*
RHETT MARTIN (Bar # 999272)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 6143
Washington, D.C. 20530
Tel: (202) 305-7538 / Fax: (202) 616-8460
Rhett.martin@usdoj.gov

*Counsel for Defendants*