## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL )
DIVISION, *et al.*, )
)
Plaintiffs, )
)
v. )        No. 18-cv-655 (KBJ)
)
KEVIN McALEENAN, *Acting Secretary* )
*of the Department of Homeland Security*, )
*et al.*, )
)
Defendants. )

## MEMORANDUM OPINION

More than 20 years ago, Congress enacted the Illegal Immigration Reform and

Immigrant Responsibility Act ("the IIRIRA" or "the Act"), an immigration and border-

security reform statute that was intended, in substantial part, "to improve deterrence of

illegal immigration to the United States[.]"  H.R. Rep. No. 104-828, at 1 (1996) (Conf.

Rep.); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996,

Pub. L. No. 104-208, Div. C., Title I, 110 Stat. 3009-546 (1996).  To that end, Congress

expressly authorized the erection of physical barriers and roads "in the vicinity of the

United States border to deter illegal crossings in areas of high illegal entry[,]" Pub. L.

No. 104-208, Div. C., Title I, § 102(a), 110 Stat. 3009-546, 554 (1996), and it

specifically identified the border near San Diego, California, as one such area, *id.*

§ 102(b).  Moreover, in order to facilitate swift construction of these new border

barriers, Congress authorized the Attorney General of the United States to waive

otherwise-applicable provisions of two environmental statutes—the Endangered Species

Act of 1973 ("ESA"), 16 U.S.C. § 1531–44, and the National Environmental Policy Act

of 1969 ("NEPA"), 42 U.S.C. § 4321–4370m-12—to the extent "necessary[,]" as

determined by the Attorney General.  Pub. L. No. 104-208, Div. C., Title I, § 102(c),

110 Stat. 3009-546, 554 (1996).  Significantly for present purposes, in the 23 years that

have transpired since the initial passage of the IIRIRA, Congress has amended the

statute not only to identify additional priority areas for construction, *see* Secure Fence

Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2638–39 (2006); Dep't of

Homeland Sec. Appropriations Act, 2008, Pub. L. No. 110-161, § 564, 121 Stat. 1844,

2090–91 (2008), but also to expand the waiver authority to include *all* laws (not just the

two environmental statutes), and to limit significantly the jurisdiction of the federal

courts to adjudicate challenges to waivers that are issued pursuant to the IIRIRA's

rapid-construction mandate, *see* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B,

Title I, § 102, 119 Stat. 231, 306 (2005).

   The scope of the IIRIRA's waiver authorization and this Court's ability to

consider legal actions that contest the government's waiver of environmental laws to

speed the construction of border barriers are the core legal issues in the instant case.

On January 22, 2018, the Secretary of the Department of Homeland Security ("DHS")

announced that DHS was invoking the IIRIRA to waive the application of 25 laws with

respect to the construction of physical barriers along a 20-mile stretch of the border in

New Mexico (hereinafter "the New Mexico Waiver").  *See* Determination Pursuant to

Section 102 of the IIRIRA, as Amended, 83 Fed. Reg. 3,012, 3,013–14 (Jan. 22, 2018).

Plaintiffs Center for Biological Diversity, Southwest Environmental Center, Defenders

of Wildlife, and Animal Legal Defense Fund ("Plaintiffs") have brought the instant action to contest the DHS Secretary's waiver decision; they claim, primarily, that the Secretary's waiver determination is *ultra vires* and unlawful "because it exceeds the limited grant of authority for such waivers contained in IIRIRA Section 102," (Compl., ECF No. 1, ¶ 2), and that the New Mexico Waiver "will have numerous negative impacts on the wildlife, plants, and the sensitive biological habitats on and near the proposed" project site (*id*. ¶ 60).  Plaintiffs also insist that the IIRIRA's waiver authority is unconstitutional in various ways.  (*See id.* ¶ 2 ("[A]ny interpretation of [IIRIRA] Section 102 that would sanction the issuance of the New Mexico Waiver would render this statutory provision so broad and unbounded in scope that it would run afoul of the [c]onstitutional principles of Separation of Powers, the Non-Delegation Doctrine, the Presentment Clause and other constitutional provisions.").)

Before this Court at present are two dispositive cross-motions that the parties in this matter have filed.  Plaintiffs have moved for summary judgment on their *ultra vires* and constitutional claims, and DHS has moved to dismiss Plaintiffs' claims or, in the alternative, request summary judgment.  (*See* Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 16; Defs.' Mot. to Dismiss & Alternatively Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 21.)  DHS maintains, as a threshold matter, that this Court lacks subject-matter jurisdiction to determine whether the New Mexico Waiver is *ultra vires*, because "Congress has expressly withdrawn district court jurisdiction to review non-constitutional challenges to the [DHS] Secretary's exercise of waiver authority[.]" (Defs.' Opp'n to Pls.' Mot. & Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No.

21-1, at 21.)[1]  In addition, DHS asserts that Plaintiffs' claims are meritless, because the Secretary has not exceeded the agency's statutory authority in issuing the New Mexico Waiver (*see id.* at 26–42), and because the IIRIRA's grant of waiver authority is not so broad as to violate the Constitution (*see id.* at 42–50).  Plaintiffs respond that the Court has jurisdiction to hear their *ultra vires* claims despite the statutory restrictions on judicial review because the New Mexico Waiver was not properly issued pursuant to the IIRIRA (*see* Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), ECF No. 16-1, at 42–45), and they further maintain that they are entitled to summary judgment with respect to their *ultra vires* and constitutional claims (*see id.* at 26–42, 45–54).

For the reasons explained fully below, this Court concludes that Congress has unambiguously precluded all non-constitutional legal challenges to the exercise of the DHS Secretary's waiver authority, including *ultra vires* claims.  Adding a belt to these suspenders, Congress has further removed this Court's subject-matter jurisdiction over any non-constitutional waiver challenges; therefore, this Court is without power to address the merits of Plaintiffs' *ultra vires* contentions.  The Court also finds that Plaintiffs' constitutional claims cannot proceed, based on the reasoning of a persuasive prior opinion from this district that addresses the constitutionality of the IIRIRA's section 102(c) waiver authority in substantially similar circumstances and holds that Congress has provided sufficient limitations to the agency's exercise of power to comport with Constitution's separation-of-powers requirements.  Consequently, Plaintiffs' motion for summary judgment will be **DENIED**, and Defendants' cross-

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

motion will be **GRANTED**, insofar as both the *ultra vires* and the constitutional claims will be dismissed.  A separate Order consistent with this Memorandum Opinion will follow.

## I.      BACKGROUND

### A.      Section 102 Of The Illegal Immigration Reform and Immigrant Responsibility Act

Congress enacted the IIRIRA in 1996, seeking to amend the Immigration and Nationality Act of 1965 ("INA").  As described in the Conference Report, the purpose of the IIRIRA was

> to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes[.]

H.R. Rep. No. 104-828, at 1.  The IIRIRA "marked one of the most significant reforms to immigration since the [INA]," Marshal Garbus, *Environmental Impact of Border Security Infrastructure: How Department of Homeland Security's Waiver of Environmental Regulations Threatens Environmental Interests Along the U.S.-Mexico Border*, 31 Tul. Envtl. L.J. 327, 334 (2018), and it was developed in the midst of a "political shift to increase border security during the Clinton administration's Southwest Border Strategy, which made control of unauthorized immigration a top priority[,]" *id.* at 335.  Leading up to the enactment of the IIRIRA, a measure known as "Operation Gatekeeper was the Clinton administration's initiative to control unauthorized immigration along the San Diego/Tijuana border, which had been one of

the highest traffic locations for unauthorized border crossings."  *Id.*[2]

1.    Congress commands construction of physical barriers in "areas of high illegal entry into the United States"

As originally enacted, section 102(a) of the IIRIRA provided that the Attorney General "shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104–208, Div. C., Title I, § 102(a), 110 Stat. 3009-546, 554 (1996) (codified at 8 U.S.C. § 1103 note).[3]  The statute itself did not delineate what qualifies as an "area[] of high illegal entry," except insofar as section 102(b) provided specifically for "construction of fencing and road improvements in the border area near San Diego, California," *id.* § 102(b) (capitalization altered).[4]

In section 102(b) of the IIRIRA, which is presently entitled "Construction of fencing and road improvements along the border," Congress proceeded beyond section 102(a)'s broad grant of discretion to the Executive Branch with respect to border construction, to specify certain geographical areas along the southwest border where "[a]dditional fencing" must be built, and in this regard, it designated particular stretches of land as "[p]riority areas[.]"  IIRIRA § 102(b)(1)(A), (B).  Congress initially

---

[2] In the four years preceding the IIRIRA's enactment, "Operation Gatekeeper increased the deployment of border patrol officers by 60%, marking an unprecedented level of resources devoted to border security."  Garbus, *Environmental Impact of Border Security Infrastructure*, 31 Tul. Envtl. L.J. at 335.

[3] Because of the numerous amendments to IIRIRA over the years, and because section 102 is codified as a note to 8 U.S.C. § 1103, this Court will cite to the provision only as "IIRIRA section 102," and will identify the year of enactment only when citing to versions other than that currently in effect.

[4] The legislative history of the IIRIRA provides no further indication of Congress's intent with respect to the broad discretion it conferred upon the Attorney General.

pinpointed a 14-mile stretch of the international land border near San Diego, California, "starting at the Pacific Ocean and extending eastward," and mandated construction "of second and third fences, in addition to the existing reinforced fence, and for roads between the fences."  IIRIRA § 102(b)(1) (1996) ("Construction of Fencing and Road Improvements in the Border Area Near San Diego, California").  In 2006, Congress amended section 102(b)(1) to identify five areas along the southern border (no longer including the 14-mile stretch that section 102(b) had previously addressed), and specifically required the DHS Secretary to "provide for at least 2 layers of reinforced fencing, the installation of additional physical barriers, roads, lighting, cameras, and sensors" in those five areas.  *Id.* § 102(b)(1)(A) (2006).[5]

Congress amended section 102(b)(1)(A) again in 2008; it eliminated the specified list of geographical areas and replaced that language with the following statement:  "In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border."  *Id.* § 102(b)(1)(A).  However, Congress remained

---

[5] When Congress enacted the Homeland Security Act of 2002, it transferred responsibility for border security from the now-abolished Immigration and Naturalization Service to the newly created DHS. *See* Pub. L. No. 107-296, 116 Stat. 2135 (2002).  Over time, Congress expressly incorporated this change into the IIRIRA's section 102.  *See* H.R. Rep. No. 109-72, at 171 (2005) (Conf. Rep.) (explaining the replacement of "the reference in current law to the Attorney General by a reference to the Secretary of Homeland Security" in the newly amended section 102(c)); Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638, 2639 (2006) (incorporating "the Secretary of Homeland Security" in amendments to section 102(b)); Dep't of Homeland Sec. Appropriations Act, 2008, Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090 (2008) (amending section 102(a) "by striking 'Attorney General, in consultation with the Commissioner of Immigration and Naturalization,' and inserting 'Secretary of Homeland Security'").

silent with respect to how or why the Secretary was to select "not less than 700 miles" for fencing along the southwest border.  *See, e.g.*, Michael John Garcia, Cong. Research Serv., R43975, *Barriers Along the U.S. Borders: Key Authorities and Requirements*, at 11–12 (2016).

As mentioned previously, through its various amendments to the IIRIRA's section 102, Congress has consistently and unequivocally established that, with respect to the creation of physical barriers and roads, certain spots along the southern border are "[p]riority areas." *Id.* § 102(b)(1)(B).  In 2006, section 102(b)(1)(B) provided specific deadlines for the construction of such barriers in two of the five geographic areas that Congress identified.  *See id.* § 102(b)(1)(B) (2006).  Most recently, in 2008, Congress amended the "[p]riority areas" provision—section 102(b)(1)(B)—to require the Secretary of DHS to "identify the 370 miles, or other mileage determined by the Secretary . . . along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States[.]" *Id.* § 102(b)(1)(B)(i).[6]  The statute further specifies that this "authority . . . shall expire on December 31, 2008," *id.*, and that fencing along those 370 (or other) miles must be completed "not later than December 31, 2008," *id.* § 102(b)(1)(B)(ii).

The 2008 amendments also added a new provision to section 102(b)(1) that required DHS to "consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United

---

[6] Once more, Congress provided no indication within the statute as to how or why the Secretary was to identify 370 (or other) miles, and, as far as this Court can discern, the legislative history contains no such explanation.

States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." *Id.* § 102(b)(1)(C)(i).

> 2. Congress permits waiver of laws that impede construction of border barriers, and limits federal litigation concerning such waivers

Notably, in addition to requiring the construction of physical barriers and roads in highly trafficked areas of the border, Congress also cleared the way for swift execution of the IIRIRA's section 102 border-barrier mandate.   At the time the IIRIRA was enacted, certain environmental statutes were chief among the legal impediments to the rapid construction of the physical barriers and roads that the statute prescribed—specifically, the Endangered Species Act and the National Environmental Policy Act[7] —and Congress expressly addressed its concerns about the delay that enforcement of such environmental mandates might engender in the text of the IIRIRA itself, by authorizing the waiver of the requirements that these two statutes impose.   When enacted in 1996, section 102(c) stated: "[t]he provisions of the [ESA] and the [NEPA] are waived to the extent the Attorney General deems necessary to ensure expeditious construction of the barriers and roads under this section."   IIRIRA § 102(c) (1996).

By 2005, it had become clear that, "[d]espite the existing waiver provision, construction of the San Diego barriers has been delayed due to a dispute involving other laws."   H.R. Rep. No. 109-72 (Conf. Rep.), at 171 (2005). Consequently, Congress

---

[7] For example, under the ESA, before authorizing building projects, federal agencies are required to consult with the Fish and Wildlife Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened [non-marine] species[.]" 16 U.S.C. § 1536(a)(2).   Similarly, under the NEPA, prior to undertaking a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), an agency is required to conduct an extensive evaluation of the environmental consequences of that proposed action.

amended the IIRIRA's waiver provision to permit the DHS Secretary to waive *all* legal requirements that can impede expeditious construction of border barriers, *see* IIRIRA § 102(c)(1); *see also* H.R. Rep. No. 109-72, at 171 (explaining that "[c]ontinued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border[,]" and noting that Congress decided to authorize the waiver of "all laws" rather than "all legal requirements" in order to "clarify[] [its] intent that the Secretary's discretionary waiver authority extends to any local, state[,] or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure").  Thus, section 102(c) now specifies that

> [n]otwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

IIRIRA § 102(c)(1).

Finally, and significantly for present purposes, Congress also specifically addressed—and significantly restricted—the scope of the federal courts' authority to review legal challenges that arise from DHS's implementation of the IIRIRA's waiver provision.  This change occurred as part of the package of amendments that expanded the DHS Secretary's waiver authority in the manner described above.  In its entirety, the provision of the IIRIRA's section 102(c) that addresses federal court review states:

> (2) **Federal court review.—**

>> (A) **In general.**—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims

arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph 1 [*i.e.*, the waiver provision]. A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) **Time for filing of complaint.**—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(C) **Ability to seek appellate review.**—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

*Id.* § 102(c)(2).

Per the above-quoted statutory language, any legal action challenging an act of or determination by DHS Secretary with respect to the waiver of legal requirements in order to facilitate the construction of physical barriers along the border pursuant to subsection 102(c)(1) must allege a constitutional violation, and has to be filed in federal district court within 60 days of the Secretary's notice of such waiver. *See id.* § 102(c)(2)(A), (B). In addition, the federal district court (which has exclusive jurisdiction to hear any such claims) can only entertain such a challenge if the claim alleges a violation of the Constitution. *See id.* § 102(c)(2)(A). Furthermore, the Supreme Court is the only tribunal vested with the authority to review any such district court determination. *See id.* § 102(c)(2)(C). In this way, Congress has made crystal clear that it intends "to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver." H.R. Rep. No. 109-72, at

172.

## B.   Facts Pertaining To The Instant Challenge

Prior to 2017, the Secretary of DHS had issued waivers pursuant to section

102(c) of the IIRIRA on just five occasions.  (*See* Pls.' Mem. at 20; Defs.' Mem. at

16.)[8]  Each of these waivers related to one of the construction projects that Congress

had specifically delineated in section 102(b).  (*See* Pls.' Mem. at 36 & n.32.)  Then, on

January 25, 2017, President Donald Trump issued Executive Order No. 13,767—

entitled "Border Security and Immigration Enforcement Improvements"—which, among

other things, ordered the DHS Secretary to "take all appropriate steps to immediately

plan, design, and construct a physical wall along the southern border[.]"  82 Fed. Reg.

8,793, 8,794 (Jan. 25, 2017).  According to that executive order, the "wall" must be "a

contiguous, physical wall or other similarly secure, contiguous, and impassable physical

barrier."  *Id.*  Pursuant to this mandate, in August and September of 2017, the DHS

Secretary issued two waivers under the IIRIRA's section 102(c).  *See* 82 Fed. Reg.

35,984, 35,984–85 (Aug. 2, 2017); 82 Fed. Reg. 42,829, 42,829–31 (Sept. 12, 2017).[9]

As relevant here, on January 22, 2018, DHS published in the Federal Register the

Secretary's determination that a specified 20-mile stretch of border in New Mexico

---

[8] Those waiver determinations all were made by former DHS Secretary Michael Chertoff, in September of 2005, *see* 70 Fed. Reg. 55,622, 55,622–23 (Sept. 22, 2005); January of 2007, *see* 72 Fed. Reg. 2,535, 2,535–36 (Jan. 19, 2007); October of 2007, *see* 72 Fed. Reg. 60,870, 60,870 (Oct. 26, 2007); and April of 2008, *see* 73 Fed. Reg. 19,077, 19,077–78 (Apr. 8, 2008); 73 Fed. Reg. 19,078, 19,078–80 (Apr. 8, 2008).

[9] These waivers were subsequently challenged in the United States District Court for the Southern District of California and were eventually subject to litigation in the United States Court of Appeals for the Ninth Circuit.  *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221, 1226 (9th Cir. 2019) (finding that the IIRIRA's section 102(c)(2) did not bar the district court or the court of appeals' review of claims "challeng[ing] the scope of the Secretary's authority to build roads and walls under sections 102(a) and 102(b)," as opposed to "the scope of the waiver authority under section 102(c)[,]" and holding that the border projects at issue were "authorized under section 102(a)'s broad grant of authority, which is not limited by section 102(b)").

qualifies as "an area of high illegal entry" under section 102(a) of the IIRIRA; that "[t]here is presently a need to construct physical barriers and roads in the vicinity of the border of the United States to deter illegal crossings in the project area"; and that waiver of 25 statutes "in their entirety," including the ESA and the NEPA, is "necessary" to "ensure the expeditious construction of the barriers and roads in the project area[.]"  83 Fed. Reg. 3,012, 3,013 (Jan. 22, 2018).  According to Plaintiffs, the project area that is the subject of the New Mexico Waiver "is located in the middle of the internationally-renowned Chihuahuan Desert, considered to be one of the world's most biologically diverse deserts due to the presence and abundance of endemic species that exist nowhere else on earth."  (Pls.' Mem. at 23.)  Plaintiffs also maintain that, in additional to several detrimental non-environmental impacts, "[t]he New Mexico Border Wall Project will result in numerous negative impacts on the wildlife, vegetation, and the sensitive biological habitats on and near the proposed Project site."  (*Id.*; *see also id.* at 23–25.)

DHS announced the commencement of its work on the New Mexico Border Wall Project on April 9, 2018.[10]  In a press release, U.S. Customs and Border Protection clarified that, "[a]s part of the President's Executive Order 13767, and at the direction of the Department of Homeland Secretary, construction for a border wall replacement in Santa Teresa with new bollard style wall will begin on Monday, April 9[,]" and that "[c]onstruction is slated to run for approximately 390 days."[11]  During the motions

---

[10] *See Santa Teresa Border Wall Replacement Project to Begin*, U.S. Customs and Border Protection (Apr. 9, 2018), https://www.cbp.gov/newsroom/local-media-release/santa-teresa-border-wall-replacement-project-begin.

[11] *Id.*

hearing this Court held in December of 2018, Defendants' counsel indicated that the New Mexico Border Wall Project's "barrier installation" was completed in October of 2018, and that "the accompanying road" was "expected to be completed in January [of 2019]." (Hr'g Tr., ECF No. 32, at 56:9–11.)[12]  DHS also presently asserts that the agency consulted with "representatives from the Department of the Interior, U.S. Fish & Wildlife Service [('USFWS')], and Bureau of Land Management [('BLM')]" prior to the DHS Secretary's determination that the New Mexico Waiver should be issued (Defs.' Mem. at 18), and that before the April 2008 commencement of construction, DHS consulted with "relevant Native American tribes and the New Mexico State Historic Preservation Officer[,]" as well as "two New Mexico state agencies, the local county manager, USFWS, BLM, and the U.S. Army Corps of Engineers" (*id.*).

## C.      Procedural History

Plaintiffs filed the instant lawsuit on March 22, 2018 (*see* Compl.), claiming that the DHS Secretary's invocation of waiver authority under IIRIRA section 102(c) with respect to the New Mexico Border Wall Project was *ultra vires* and therefore unlawful (*see id.* ¶¶ 64–72 (Count One); *id.* ¶¶ 73–80 (Count Two)), and that the New Mexico Waiver violates three provisions of the Constitution of the United States: the Take Care Clause (*see id.* ¶¶ 81–85 (Count Three)); the Non-Delegation and Separation of Powers Doctrine (*see id.* ¶¶ 86–94 (Count Four)); and the Presentment Clause (*see id.* ¶¶ 95–100 (Count Five)).  Plaintiffs' complaint claims that the Secretary lacked statutory authority to issue the New Mexico Waiver—*i.e.*, that the Secretary acted in an *ultra vires* manner—because, in Plaintiffs' view, section 102(c)'s waiver authority "is *limited*

---

[12] The parties have not updated the Court since the motions hearing as to the status of the construction projects at issue in this matter.

to the *specific* border barriers and roads [that Congress] required to be constructed pursuant to IIRIRA Section 102(b)" (*id.* ¶ 67 (emphasis added)), yet DHS had already fulfilled section 102(b)'s construction requirements at the time that the New Mexico Waiver was issued (*see id.* ¶ 70). Alternatively, Plaintiffs argue that the Secretary impermissibly transcended the agency's statutory authority because DHS "failed to conduct necessary prerequisites for exercising the waiver authority for expedited construction as set forth in provision IIRIRA Section 102(b)(1)(C)." (*Id.* ¶ 74.)

Plaintiffs' complaint further claims that, by issuing the New Mexico Waiver, DHS has violated the Constitution's venerated separation-of-powers principles. First, insofar as the DHS Secretary's issuance of the New Mexico Waiver "failed to comply with the requirements and limitations of IIRIRA Section 102" (*id.* ¶ 85), Plaintiffs maintain that the decision to issue the waiver violated the Take Care Clause of the United States Constitution, which requires that the Executive Branch "'shall take Care that the Laws be faithfully executed[.]'" (*Id.* ¶ 83 (quoting U.S. Const. art. II, § 3).) Second, Plaintiffs assert that the IIRIRA's section 102(c) itself transgresses the constitutional non-delegation doctrine, because the statute "delegates to the Executive Branch, namely the DHS Secretary, the legislative power to waive the application of any Congressionally-enacted law to construction on the U.S.-Mexico border" without "an intelligible general policy to guide [the Secretary's] decision-making." (*Id.* ¶¶ 92, 93.) Third, and finally, Plaintiffs argue that the IIRIRA's section 102(c) violates the Presentment Clause, both on its face and as applied to the circumstances of the instant case, because the statute impermissibly "vests unilateral power in the DHS Secretary to waive the application of any laws in areas along the border for purposes of

building border walls without Congress passing a law to void the specific laws at issue

or limit their application, and presenting it to the President" (*id.* ¶ 98), and because,

with respect to the New Mexico Border Wall Project in particular, the Secretary "chose

which laws to waive and which laws to obey, without an act of Congress specifying

which particular law or set of laws could be waived and without the presentation of said

Congressional act to the President" (*id.* ¶ 99).[13]

In addition to the complaint, Plaintiffs have also filed a motion for summary

judgment that restates and reinforces the assertions that are made in their pleading.

(*See* Pls.' Mot. (filed on May 10, 2018); Pls.' Mem.)  Defendants responded, on June

15, 2018, by filing a motion to dismiss Plaintiffs' complaint, or, in the alternative, for

summary judgment.  (*See* Defs.' Mot.).  In their motion, Defendants argue, as a

threshold matter, that this Court lacks subject-matter jurisdiction to determine whether

the New Mexico Waiver is *ultra vires*, as Plaintiffs claim, because "Congress has

expressly withdrawn district court jurisdiction to review non-constitutional challenges

to the Secretary's exercise of waiver authority[.]"  (Defs.' Mem. at 21; *see also id.*

(quoting IIRIRA § 102(c)(2)(A)); *id.* at 19–26).  Defendants also contend that

Plaintiffs' *ultra vires* claims fail as a matter of law.  (*See, e.g.*, *id.* at 27 (asserting

Plaintiffs have not "identif[ied] a 'statutory right' by which Plaintiffs are entitled to

vindication[,]" as valid *ultra vires* claims allegedly require); *see also id.* at 28–42

(arguing that DHS did not violate any statutory prohibition or requirement when it

---

[13] To remedy the *ultra vires* and constitutional claims identified in the complaint, Plaintiffs seek declaratory relief, and ask this Court to "[s]et aside and vacate the New Mexico Waiver" and to "[e]njoin DHS from implementing the New Mexico Border Wall Project until and unless it complies with all laws that would apply absent the unlawful waiver[.]"  (Compl. at 30–31.)

issued the New Mexico Waiver).  Defendants further insist that the IIRIRA's section

102(c) and the New Mexico Waiver comport with the Constitution.  (*See id.* at 42–50.)

    This Court held a motions hearing on the parties' cross-motions on December 18,

2018.  (*See* Min. Entry of Dec. 18, 2018.)  During the hearing, Defendants represented,

for the first time, that "the Department of Homeland Security and [the DHS Secretary]

had relied on *both* section 102(a) *and* 102(b) of the IIRIRA when issuing the waiver at

issue in this case" (Min. Order of Dec. 19, 2018 (emphasis added)), and the Court

subsequently ordered the parties to file supplemental briefs (at the Plaintiffs' request) to

address the potential implications of this new revelation on the parties' arguments (*id.*).

After the hearing, the Court also acted to consolidate another matter—*Center for

Biological Diversity v. Nielsen*, No. 18-cv-2396—with the instant case.  (*See* Min.

Order of Jan. 9, 2019; *see also* Resp. to Order to Show Cause, 18-cv-2396, ECF No. 9,

at 1 (agreeing that the Court "should consolidate" the two cases because they "involve

many of the same parties and both challenge [the DHS Secretary's] invocation of

Section 102 of [the IIRIRA] to waive dozens of laws that would otherwise apply to the

construction of border wall projects" (footnotes omitted)).)[14]

    The parties filed the aforementioned supplemental briefs by February 28, 2019.

(*See* ECF Nos. 31, 33, 34.)  Thus, the parties' cross-motions are now ripe for this

---

[14] The legal arguments are identical in the instant case and 18-cv-2396, but the facts vary:  whereas the plaintiffs here challenge waivers regarding border construction in New Mexico, the plaintiffs in 18-cv-2396 challenge waivers regarding border construction in Texas.  (*See* Compl., 18-cv-2396, ECF No. 1, ¶ 1.)  On February 4, 2019, Plaintiffs filed a motion for partial summary judgment regarding the waivers at issue in 18-cv-2396.  (*See* Pls.' Partial Mot. for Summ. J. Regarding Texas Waivers, ECF No. 30.)  Because the Court's conclusions with respect to the cross-motions in this Memorandum Opinion also apply to Plaintiffs' partial motion relating to the Tex. Waivers, the Court will not separately address that motion in this Opinion.  Moreover, consistent with this Opinion, the partial motion for summary judgment (ECF No. 30) will be **DENIED**.

Court's review.

## II.   LEGAL STANDARDS

### A.   Cross-Motions For Summary Judgment In Cases Involving *Ultra Vires* Claims And Constitutional Challenges To Agency Action

Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases challenging agency action, "[t]he entire case on review is [ordinarily] a question of law, and only a question of law[,]" *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993), and, therefore, the summary judgment standard functions slightly differently. *Cf. Henry v. Sec'y of Treasury*, 266 F. Supp. 3d 80, 86 (D.D.C. 2017) (explaining that, in the context of the APA, "the reviewing court generally . . . reviews the [agency's] decision as an appellate court addressing issues of law").

Notably, "in the context of *ultra vires* and constitutional separation of powers claims, there are no questions of fact, because whether or not a statute or the Constitution grants the [Executive Branch] the power to act in a certain way is a pure question of law." *Am. Fed. of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 394 (D.D.C. 2018), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019); *see also, e.g.*, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332–39 (D.C. Cir. 1996) (conducting *de novo* review). "The same can be said of any questions of interpretation that a federal court may have to answer in parsing out the meaning of any relevant statutes[.]" *Am. Fed. of Gov't Emps., AFL-CIO*, 318 F. Supp. 3d at 394.

**B.     Defense Motions Styled As "Motions To Dismiss, Or, In The Alternative, For Summary Judgment"**

When a defendant moves for summary judgment under Federal Rule of Civil

Procedure 56 as an alternative to dismissal under Rule 12 (*see, e.g.*, Defs.' Mem. at 50

("Plaintiffs' claims should be dismissed as a matter of law or, in the alternative, the

Court should . . . grant summary judgment to Defendants")), "the decision regarding

whether or not to treat a motion to dismiss as one for summary judgment is committed

to the sound discretion of the trial court[,] which means that this Court need not

necessarily accede to [the defendants'] request regarding how its motion should be

evaluated." *Ross v. U.S. Capitol Police*, 195 F. Supp. 3d 180, 192 (D.D.C. 2016)

(internal quotation marks and citation omitted) (first alteration in original).  Where, as

here, a defendant maintains that the case should be terminated *either* because the

defendant is entitled to judgment as a matter of law under Rule 56, *or* because the

pleadings are insufficient to state a claim or to establish the court's jurisdiction under

Rule 12, the court may review the parties' arguments with respect to both of those

grounds to determine the extent to which the motion can be sustained.  *See, e.g.*, *Smith

v. United States*, 121 F. Supp. 3d 112, 119–26 (D.D.C. 2015) (evaluating certain

arguments under Federal Rule of Civil Procedure 12(b)(6) and others under Federal

Rule of Civil Procedure 56, where defendants' motion sought either dismissal for

failure to state a claim or summary judgment).  However, because such a motion

presents these alleged defects as alternative bases for terminating the action, the court

may also opt to evaluate one basis for termination of the action and not the other.  *See,

e.g.*, *Jones v. Nat'l Council on Disability*, 66 F. Supp. 3d 94, 104 n.8 (D.D.C. 2014);

*ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 77, 83 (D.D.C. 2013); *cf. PDK*

*Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring) (stating where there "is a sufficient ground for deciding th[e] case . . . , the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further").

Notably, here, Defendants have maintained that summary judgment in their favor is warranted as an alternative to their argument that Plaintiffs' complaint must be dismissed prior to judgment, pursuant to either Federal Rule of Civil Procedure 12(b)(1) or Rule 12(b)(6). A defendant may move to dismiss a complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and once such a motion has been filed, it is the plaintiff's burden to establish the court's jurisdiction by a preponderance of the evidence, *see Delta Air Lines, Inc. v. Exp.–Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015). "[I]f the plaintiff fails to do so, the court must dismiss the complaint[.]" *Ross*, 195 F. Supp. 3d at 191.

When considering a motion to dismiss under Rule 12(b)(1), a court must "treat the complaint's factual allegations as true" and "grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Delta Air Lines*, 85 F. Supp. 3d at 259 (internal quotation marks, citation, and alteration omitted). However, the "factual allegations in the complaint" receive "closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* (internal quotation marks and citation omitted). Furthermore, unlike in the Rule 12(b)(6) context, the Court "may consider materials outside the pleadings" in resolving the Rule 12(b)(1) question. *Id.* (internal quotation marks and citation omitted).

A defendant may also move to dismiss a complaint for failure to state a claim, pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  When considering such a motion, a court must assess whether the complaint contains "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]'" *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *i.e.*, whether the complaint's allegations are sufficient to permit a "'reasonable inference that the defendant is liable for the misconduct alleged,'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (quoting *Iqbal*, 556 U.S. at 678)).  In this regard, the "'court must accept as true all of the allegations contained in a complaint[,]'" but need not do the same for legal conclusions. *Harris*, 791 F.3d at 68 (quoting *Iqbal*, 556 U.S. at 678).  "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to survive a motion to dismiss under Rule 12(b)(6).  *Id.* (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678).

Unlike Rule 12(b)(1), Rule 12(b)(6) "places th[e] burden on the moving party" to show that the complaint is legally insufficient. *Cohen v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 819 F.3d 476, 481 (D.C. Cir. 2016) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2015)).  And in contrast to a motion to dismiss brought under Rule 12(b)(1), a court assessing whether a complaint states a claim upon which relief can be granted must limit its analysis to the four corners of the complaint, as well as any "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's

complaint necessarily relies[.]"  *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (internal quotation marks and citations omitted).

## III.   ANALYSIS

Plaintiffs have brought two *ultra vires* claims (the first and second claims for relief) and three constitutional claims (the third, fourth, and fifth claims for relief), each of which challenges DHS's issuance of the New Mexico Waiver, as explained above. For the reasons laid out below, this Court finds that Congress has expressly precluded judicial review of non-constitutional claims that arise from DHS's exercise of IIRIRA's section 102(c) waiver authority, and Plaintiffs have failed to allege facts that are sufficient to sustain their constitutional claims as a matter of law.  Thus, Plaintiffs' entire complaint must be **DISMISSED**.

### A.   Plaintiffs' *Ultra Vires* Claims Cannot Be Adjudicated In Federal Court

Plaintiffs' primary contention is that, "[b]ecause the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the purported waiver of . . . laws under the New Mexico Waiver is an unlawful *ultra vires* act."  (*Id.* ¶ 71.)  In the alternative, Plaintiffs assert that, "by approving the waiver prior to completing at least the prerequisite consultation mandated in Section 102(b)(1)(C)," the DHS Secretary's "decision to issue the New Mexico Waiver facially violates the requirements under IIRIRA Section 102 and is thus *ultra vires* because it is in excess of the Secretary's delegated powers[.]"  (*Id.* ¶ 80.)  Plaintiffs insist that these are legal claims that this Court can, and must, adjudicate, given the "'strong presumption that Congress intends judicial review of administrative action[.]'"  (Pls.'

Opp'n to Defs.' Mot. & Reply in Supp. of Pls.' Mot. ("Pls.' Opp'n"), ECF No. 23, at 14

(quoting *Traynor v. Turnage*, 485 U.S. 535, 542 (1988)).)  But, unfortunately for

Plaintiffs, the language of section 102(c)(2)(A) plainly evidences Congress' intent to

preclude non-constitutional causes of action that assail a DHS section 102(c) waiver

determination, and Congress has also expressly deprived the federal courts of

jurisdiction over non-constitutional claims that challenge DHS's section 102(c) waiver

decisions.  Thus, Congress has made it abundantly clear that Plaintiffs' *ultra vires*

claims cannot proceed in federal court.

> 1. <u>While judicial review of allegedly lawless agency action is ordinarily presumed, clear indicia of congressional intent can overcome that presumption</u>

Courts have long recognized that an aggrieved party can sue in federal court to

challenge agency action as *ultra vires*, even when a statute does not specifically

delineate that right.  *See Bowen v. Mich. Acad. of Fam. Phys.*, 476 U.S. 667, 670 (1986)

("From the beginning our cases have established that judicial review of a final agency

action by an aggrieved person will not be cut off unless there is persuasive reason to

believe that such was the purpose of Congress." (internal quotation marks, citation, and

alteration omitted)).[15]  Moreover, as Plaintiffs here have recognized, there are cases in

which plaintiffs have been able to proceed in federal court with respect to *ultra vires*

claims even when Congress has precluded judicial review of agency action.  *See, e.g.*,

*Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1172–73 (D.C. Cir. 2003); *Railway*

---

[15] "A challenge to agency action on the ground that it is *ultra vires* requires a plaintiff to establish a patent violation of agency authority[.]"  *DCH Reg'l Med. Ctr. v. Price*, 257 F. Supp. 3d 91, 94 (D.D.C. 2017) (internal quotation marks and citation omitted); *see also Fla. Health Scis. Ctr., Inc. v. Sec. of Health & Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) ("A violation is patent if it is obvious or apparent." (internal quotation marks, citation, and alteration omitted)).

*Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 662–63 (D.C. Cir. 1994).  In

authorizing review of *ultra vires* claims under such circumstances, courts appear to

have relied primarily on the well-established "strong presumption that Congress did not

mean to prohibit *all* judicial review[,]" *Dart v. United States*, 848 F.2d 217, 221 (D.C.

Cir. 1988) (emphasis added) (internal quotation marks and citation omitted), as well as

precedents that make clear that "[j]udicial review is *favored* when an agency is charged

with acting beyond its authority[,]" *id.* (emphasis added); *see also Trudeau v. Fed.*

*Trade Comm'n*, 456 F.3d 178, 189–90 (D.C. Cir. 2006); *Aid Ass'n for Lutherans*, 321

F.3d at 227–28.  In other words, even when "Congress ha[s] expressed an unqualified

intent to shut off review," an exception may still exist "on grounds that the legislature

would not be deemed to have barred judicial comparison of agency action with plain

statutory commands unless such a ban was clearly articulated."  *Dart*, 848 F.2d at 222

(internal quotation marks and citation omitted).

Of course, the devil is in the details:  each case involves a statute that must be

interpreted to evaluate the degree to which, via the express preclusion of jurisdiction or

otherwise, Congress also intended to bar even plausible claims of *ultra vires* agency

action.  No less an authority than the United States Supreme Court has reminded lower

courts that "[t]he presumption favoring judicial review of administrative action is just

that—a presumption[,]" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984), and

that the grant of jurisdiction under section 1331 of Title 28 of the United States Code,

which generally "confer[s] jurisdiction on federal courts to review agency action,"

*Califano v. Sanders*, 430 U.S. 99, 105 (1977), is subject to "preclusion-of-review

statutes created or retained by Congress," *id.*  Thus, while Plaintiffs are correct that

there exists "a judicial disinclination to infer that Congress wished to insulate plain statutory violations from review[,]" *Dart*, 848 F.2d at 222 (internal quotation marks and citation omitted)—and, indeed, it is *presumed* that Congress does *not* have such intention—that presumption does not end the matter, because it can be overcome by an unambiguous statutory provision that plainly precludes jurisdiction, or narrowly restricts the available causes of action, or both. *See Block*, 467 U.S. at 349 (explaining that the strong presumption in favor of judicial review "may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent"). Such congressional intent "may also be inferred from contemporaneous judicial construction barring review and the congressional acquiescence in it, . . . from the collective import of legislative and judicial history behind a particular statute, . . . [or] from the statutory scheme as a whole." *Id.* (citations omitted).

As a practical matter, this all means that federal courts "will normally disregard 'basically lawless' agency action *only when clearly instructed to do so*." *Ralpho v. Bell*, 569 F.2d 607, 623 (D.C. Cir. 1977) (emphasis added) (citation omitted); *see also Dart*, 848 F.2d at 221 ("[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review[.]" (internal quotation marks, citation, and alterations omitted)). Thus, in the face of clear statutory language and other indisputable indicia of Congress's intent to prevent federal courts from reviewing even *ultra vires* agency action, it is not enough for a plaintiff to point to a statute that governs agency conduct and to argue merely that Congress *must* have intended for its provisions to be judicially enforced. As the D.C. Circuit has long recognized, the mere fact "[t]hat Congress has imposed strictures [on agencies] does

not, of course, prevent it from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated." *Ralpho*, 569 F.2d at 622 (citing *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943)).

>    2.    <u>Section 102(c)(2) of the IIRIRA strips federal district courts of the power to review any and all non-constitutional claims that arise from the Secretary's exercise of section 102(c)'s waiver authority</u>

With respect to Plaintiffs' ability to bring, and this Court's power to consider, the *ultra vires* claims at issue here, the Court need look no further than the "specific language[,]" *Block*, 467 U.S. at 349, of the IIRIRA, and, in particular, the text of section 102(c)(2)(A).  For the following reasons, this statutory provision plainly compels the conclusion that there is both a cause-of-action restriction and a jurisdictional bar with respect to this Court's consideration of non-constitutional challenges to the DHS Secretary's actions undertaken pursuant to section 102(c)(1), including the *ultra vires* claims that Plaintiffs are asserting.  *Cf. Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." (citations omitted)); *United States v. Cordova*, 806 F.3d 1085, 1098 (D.C. Cir. 2015) ("As always, we begin with the text of the statute." (internal quotation marks and citation omitted)).

The full text of section 102(c)(2)(A) of the IIRIRA reads as follows:

> [t]he district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland

> Security pursuant to [section 102(c)(1)].  A cause of action or claim
> may only be brought alleging a violation of the Constitution of the
> United States.  The court shall not have jurisdiction to hear any claim
> not specified in this subparagraph.

IIRIRA § 102(c)(2)(A).[16]  By its plain terms, this statutory provision applies to the

instant circumstances.  First of all, all of Plaintiffs' claims unquestionably "aris[e] from

an[] action undertaken, or a[] decision made, by the Secretary of Homeland Security

pursuant to [section 102(c)(1)][,]" *id.*, which is section 102's waiver provision (*see,*

*e.g.*, Compl. ¶ 1 ("In this action, Plaintiffs . . . challenge the issuance of a waiver on

January 22, 2018 by [the DHS Secretary] . . . that purports to exempt construction of

approximately twenty miles of border walls and associated infrastructure in southern

New Mexico [] from compliance with the [NEPA], the [ESA], and numerous other

statutory requirements."); *id.* ¶ 2 ("In issuing the New Mexico Waiver, Secretary

Niels[e]n invoked the authority purportedly contained in Section 102 of

[IIRIRA]. . . . [T]he New Mexico Waiver is *ultra vires* and unlawful because it exceeds

the limited grant of authority for such waivers contained in IIRIRA Section 102."); *id.*

¶ 4 ("[B]ecause the New Mexico Border Wall Project does not fall within the scope of

projects mandated by Section 102, . . . the waiver authority under Section 102(c) is

inapplicable to the New Mexico Border Wall Project.")).  This means that, per the

language of section 102(c)(2)(A), "[t]he district courts of the United States . . . have

exclusive jurisdiction to hear" Plaintiffs' claims.  IIRIRA § 102(C)(2)(A).

---

[16] Section 102(c)(2)(B) further requires that "[a]ny cause or claim brought pursuant to [section 102(c)(2)(A)] shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security.  A claim shall be barred unless it is filed within the time specified." IIRIRA § 102(c)(2)(B).  And Section 102(c)(2)(C) limits appellate review:  "An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States."  *Id.* § 102(c)(2)(C).  Neither of these additional provisions is at issue here.

Next, the IIRIRA expressly addresses *both* the ability of a plaintiff to bring a cause of action or claim concerning the Secretary's exercise of that waiver authority *and* the power of the federal district courts to review any such claims—*and it restricts both*, in no uncertain terms.  In rapid succession, section 102(c)(2)(A) provides that "[a] cause of action or claim may *only* be brought alleging a violation of the Constitution of the United States[,]" *id.* (emphasis added), and then states that "[t]he court *shall not have jurisdiction to hear* any claim not specified in this subparagraph[,]" *id.* (emphasis added).  Thus, Congress has not only expressly restricted a plaintiff's right to bring any non-constitutional claim that challenges a DHS waiver determination, but has also limited a court's authority to consider any challenge other than those alleging constitutional violations.  Indeed, the plain language of the statute leaves no doubt that, except for review of alleged violations of the Constitution, Congress intended to preclude *completely* judicial review of agency actions taken, or decisions made, pursuant to section 102's waiver provision, including the contention that a particular waiver decision is not authorized by statute.  *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019) (explaining that the jurisdictional bar applies to *ultra vires* claims that challenge DHS waivers on the grounds that "the waivers themselves were not authorized by the Secretary's authority under section 102(c)(1)"); (*see also* Compl. ¶ 72 (asserting that the DHS Secretary's "purported waiver of laws under the New Mexico Waiver is an unlawful *ultra vires* act" because "the New Mexico Border Wall Project is not subject to the scope of the IIRIRA Section 102(c) waiver authority").)

Given the abundantly clear and specific language that Congress used in IIRIRA section 102(c)(2)(A), *see Block*, 467 U.S. at 349, which plainly blocks non-constitutional claims by preluding such causes of action and also stripping federal courts of the power to consider such claims, it is not necessary for the Court to delve into the IIRIRA's legislative history to determine Congress's intent.  *See Caminetti*, 242 U.S. at 485.  But even a cursory review of the IIRIRA's legislative pedigree supports this Court's conclusions.

As mentioned above, the Conference Report pertaining to the 2005 amendments to the IIRIRA's section 102, which added the judicial review provision (*see supra* Part I.A.2), explains that, despite the Attorney General's then-existing ability to waive the ESA and the NEPA, "[c]ontinued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border[.]"  H.R. Rep. No. 109-72, at 171.[17]  Therefore, according to the Conference Report, it was the vexing litigation delays that motivated Congress to amend section 102 such that it now authorizes the waiver of "*all* laws that [the DHS Secretary] determines, in his or her sole discretion, are necessary to ensure the expeditious construction of the border barriers[,]" and also "prohibit[s] judicial review of a waiver decision or action by the Secretary[.]"  *Id.*  The Conference Report further states that Congress "bar[red] judicially ordered compensatory, declaratory, or injunctive, equitable, or any other relief or other remedy for damage alleged to result from any such decision or action[,]" and "provided federal judicial review [only] for claims alleging that the actions or

---

[17] Recall that Congress also transferred the authority contained in section 102(c)(1) from the Attorney General to the DHS Secretary as part of the 2005 amendments to IIRIRA.  (*See supra* note 5.)

decisions of the Secretary violate the United States Constitution." *Id.* at 171, 172.

Thus, Congress's unmistakable "intent [was] to ensure that judicial review of actions or

decisions of the Secretary not delay the expeditious construction of border security

infrastructure, thereby defeating the purpose of the Secretary's waiver." *Id.* at 172.

Accordingly, both the statutory language of section 102(c)(2)(A), which imposes

restrictions on judicial review of the DHS Secretary's actions taken pursuant to section

102(c)(1) in two different ways, and the legislative history of the enactment of those

restrictions, make crystal clear that Congress intended to eliminate litigation that would

"delay the expeditious construction of border security infrastructure[,]" to the fullest

extent possible, *i.e.*, to the extent constitutionally allowed. *Id.*

> 3.    Plaintiffs' efforts to contradict the clear conclusion that their *ultra vires* claims cannot proceed are not persuasive

Facing an indisputable pattern of congressional actions and statements that

clearly and convincingly establish Congress's intent to preclude litigation over the DHS

Secretary's waiver authority, Plaintiffs have cleverly crafted an "unlawful conduct"

loophole in section 102(c)(2)(A)'s text where one does not exist.  First, they maintain

that "by its plain terms," section 102(c)(2)(A) "simply precludes statutory review of

'any action undertaken, or any decision made, by the [DHS Secretary] *pursuant to*

[section 102(c)(1)][,]'" and, then, Plaintiffs assert that "the [New Mexico Waiver] was

not an action *lawfully made* 'pursuant to' the circumspect waiver authority of

§ 102(c)(1)."  (Pls.' Opp'n at 14 (emphasis in original) (quoting IIRIRA

§ 102(c)(2)(A)); *see also* Pls.' Mem. at 43 ("Plaintiffs' claim here is that the New

Mexico Waiver was *not* properly issued 'pursuant to' IIRIRA § 102(c)(1)." (emphasis

in original)).)  This reading is designed to persuade the Court that Congress "simply"

intended to preclude judicial review of legal claims concerning *lawful* exercises of the DHS Secretary's waiver authority.  (*See, e.g.*, Pls.' Opp'n at 14 (asserting that "the Waiver was not an action *lawfully made* 'pursuant to' the circumspect waiver authority of § 102(c)(1)" (emphasis in original)).)  But the words "lawfully made" appear nowhere in the relevant statutory text.  *See* IIRIRA § 102(c)(2)(A) (limiting judicial review of "*any* action undertaken, or *any* decision made . . . pursuant to paragraph (1)" (emphasis added)).  And, of course, whether or not the New Mexico Waiver was lawful is precisely the contention that this Court would be required to decide if it does, indeed, have the power to review Plaintiffs' *ultra vires* claims.

Thus, Plaintiffs' interpretation of the reach of section 102(c)(2)(A)'s judicial review language assumes the answer to the very question that has to be decided, in a manner that is entirely circular.  That is, Plaintiffs repeatedly maintain that because the statute precludes only the exercise of jurisdiction to consider waivers that have been lawfully issued, Congress did not intend to bar the exercise of this Court's jurisdiction to consider whether the New Mexico Waiver is lawful.  (*See, e.g*, Pls.' Mem. at 43 ("Plaintiffs do not dispute that Congress has limited judicial review of non-constitutional claims regarding a waiver properly issued *pursuant to* IIRIRA § 102(c)(1), as articulated in § 102(c)(2)," but "Plaintiffs' claim here is that the New Mexico Waiver was *not* properly issued 'pursuant to' IIRIRA §102(c)(1).  Accordingly, the *ultra vires* claim is *not* subject to § 102(c)(2)'s judicial review restrictions." (emphasis in original)).)  In other words, Plaintiffs' core contention is that it is the unlawful nature of the DHS Secretary's section 102(c) waiver that allows this Court to proceed to determine the lawfulness of the DHS Secretary's waiver despite the

jurisdictional bar, because the jurisdictional bar applies only to challenges to lawful waivers.  And Plaintiffs further insist that any other conclusion is "untenable" because "DHS would not only hold unfettered discretion to take action under § 102, but would also have unreviewable discretion to determine that any action it takes falls within the section's delegated authority."  (Pls.' Mem. at 44–45.)

Unfortunately for Plaintiffs, it is their argument, and not a plain reading of section 102(c)(2)(A), that leads to a "tautological result[.]"  (*Id.* at 44.)  Rather, with respect to the threshold questions of whether Plaintiffs' *ultra vires* claims are cognizable under the IIRIRA and whether this Court has subject-matter jurisdiction to consider Plaintiffs' claims, this Court must evaluate Congress's intent in light of the language of the statute.  And as explained above, in this Court's view, Congress has made it abundantly clear that claims that challenge the propriety or lawfulness of the Secretary's conduct with respect to the exercise of section 102(c)'s waiver authority will not suffice; only a claim that the DHS waiver at issue is *unconstitutional* will do. Therefore, plaintiffs cannot press *ultra vires* claims in federal court, nor do federal courts have jurisdiction to consider such claims, simply and solely because those claims are not constitutional challenges.

To be sure, "[s]uch a conclusion undermines the 'inherent power of the federal courts to reestablish the [non-constitutional] limits on executive authority through judicial review'" (*id.* at 45 (quoting *Adamski v. McHugh*, 304 F. Supp. 3d 227, 237 (D.D.C. 2015))), which makes it entirely understandable that Plaintiffs are reluctant to accept that Congress would have intended to permit a federal agency to flout its statutory directives.  But, as noted previously, Congress has this right, so long as "the

Constitution is in no wise implicated," *Ralpho*, 569 F.2d at 622, and this Court cannot construe the IIRIRA to provide it with review powers that Congress has plainly precluded.  In other words, however rational Plaintiffs' concerns may be, such matters must be taken up with Congress.  Here, Plaintiffs cannot reasonably assert that Congress must have meant something different than what its statute plainly says.

It is also clear to this Court that Plaintiffs' reasoning with respect to how the Court's subject-matter jurisdiction is to be evaluated under the instant circumstances cannot be sustained.  As noted previously, Plaintiffs' primary contention is, in essence, that Congress intended for section 102(c)(2)(A) to preclude only judicial review of *non-meritorious* non-constitutional claims regarding DHS waivers—*i.e.*, that only challenges to *lawful* waiver determinations by the Secretary are barred.  (*See* Pls. Opp'n at 14; *see also* Pls. Mem. at 43 ("Plaintiffs do not dispute that Congress has limited judicial review of non-constitutional claims regarding a waiver properly issued pursuant to IIRIRA § 102(c)(1)[.]" (emphasis omitted)).)  But whether or not a federal court has the power to consider a plaintiff's claim does not, and cannot, depend upon the court's deciding, as a threshold matter, that the plaintiff's claim is a meritorious one.  *See Cause of Action Inst. v. IRS*, No. 16-cv-2354, 2019 WL 3225751, at *8–9 (D.D.C. July 17, 2019).  This Court recently rejected this same reasoning in a markedly different context, *see id.*, and Plaintiffs' version of that same argument is no more persuasive.

Plaintiffs' attempts to distinguish non-meritorious non-constitutional challenges to DHS waivers (*i.e.*, challenges to section 102(c) waivers that were lawfully issued) from those non-constitutional legal claims that have merit (*i.e.*, challenges to section 102(c) waivers that were not lawfully issued) is also flatly inconsistent with the

statutory text, insofar as Congress has made no effort whatsoever to suggest that it intended for only *non*-meritorious non-constitutional claims to be barred by section 102(c)(2)(A).  To the contrary, in that provision, Congress states plainly that "*only*" constitutional "causes or claims" are allowed, and that federal courts do have not jurisdiction to determine the merits of any non-constitutional claims, IIRIRA § 102(c)(2)(A) (emphasis added); there is no exception provided for potentially valid ones.

Finally, this Court notes that the mechanics of section 102(c)(2)(A) are such that even if the phrase "pursuant to" is read to mean "lawfully pursuant to," as Plaintiffs argue, that interpretation would, at most, indicate that Plaintiffs' *ultra vires* claims are viable causes of action—it says nothing about the distinct issue of this Court's power to consider and resolve such claims.  As explained above, section 102(c)(2) not only establishes that the only "cause[s] of action or "claim[s]" that can be brought to challenge a section 102(c)(1) waiver are those that "alleg[e] a violation of the Constitution of the United States," but it also states that "[t]he court shall not have jurisdiction to hear *any claim not specified in this subparagraph*."  *Id.* (emphasis added).  Congress certainly could have referenced subparagraph (1) with respect to this language, as it did when addressing the viable causes of action or claims—*e.g.*, by stating that the district courts' jurisdiction does not extend to "causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1) [section 102(c)(1)][,]" IIRIRA § 102(c)(2)(A)—and, if it had done so, perhaps Plaintiffs could reasonably contend that its "lawfully pursuant to" reading applies and permits district courts to retain jurisdiction to address unlawful

waivers.  But, instead, the last sentence of section 102(c)(2)(A) strips the Court of jurisdiction over "any claim not specified in this subparagraph[,]" *id.*, and the sole claims "specified in . . . subparagraph" (c)(2) are those that "alleg[e] a violation of the Constitution of the United States[,]" *id.*  Therefore, even if Plaintiffs were correct that *ultra vires* causes of action or claims are cognizable where a plaintiff challenges the DHS Secretary's alleged waiver as unlawful, given the language of the statute, this Court still would "not have jurisdiction" to entertain such claims.  *Id.*

*  *  *

In sums, this Court finds that section 102(c)(2)(A) plainly and unequivocally expresses Congress's intent with respect to restricting judicial review of legal challenges to section 102(c)(1) waiver determinations, in a manner that overcomes even the strong presumption that Congress ordinarily intends for agency actions to be subject to review by the federal courts.  Consistent with its desire "to ensure that judicial review . . . not delay the expeditious construction of border security infrastructure," H.R. Rep. No. 109-72, at 172, Congress has drafted section 102(c)(2)(A) to lead inexorably to the conclusion that there is neither a viable cause of action in federal court concerning section 102(c)(1) waiver determinations, nor federal court jurisdiction to review any such challenge, *unless* the claim alleges a violation of the United States Constitution.  Consequently, this Court cannot, and will not, address the merits of Plaintiffs' non-constitutional contentions that the New Mexico Waiver "exceeds the limited grant of authority for such waivers contained in IIRIRA Section 102[(c)(1)]" (Compl. ¶ 2), or that DHS acted unlawfully because it failed to satisfy the consultation prerequisite set forth in section 102(b)(1)(C) before the New Mexico Waiver issued.

Instead, the Court agrees with DHS that, even if Plaintiffs claims were valid, by virtue of section 102(c)(2)(A), these non-constitutional challenges must be dismissed. [18]

### B.  Plaintiffs Have Failed To State Viable Constitutional Claims

The IIRIRA's judicial review provision indisputably preserves this Court's authority to review a legal claim that "an[] action undertaken, or a[] decision made, by the Secretary of Homeland Security" with respect to the waiver of legal requirements under section 102(c)(1) violates the Constitution.  *See* IIRIRA § 102(c)(2)(A). Plaintiffs here assert generally that the IIRIRA's section 102(c)(1) waiver authority is "unconstitutional because it unlawfully vests Congress's lawmaking powers in the Executive Branch" (Pls.' Mem. at 45), and they maintain, in particular, that if section 102(c)(1) is interpreted to authorize waivers for border construction projects beyond those projects that are specifically delineated in section 102(b), then section 102(c)(1) violates the Presentment Clause (*see id.* at 45–48); the constitutional non-delegation doctrine (*see id.* at 48–52); and the Take Care Clause (*see id.* at 52–54).  Plaintiffs

---

[18] As it turns out, the supplemental briefing that the parties submitted on the impact of the DHS Secretary's sudden invocation of IIRIRA section 102(b), in addition to 102(a), as the agency's authority for undertaking the New Mexico Border Wall Project has no bearing whatsoever on the Court's analysis.  (*See supra* Part I.C.)  Regardless of whether DHS based its decision to commence the New Mexico construction project pursuant to section 102(a) or 102(b), Plaintiffs' *ultra vires* claims remain substantively the same—*i.e.*, that the Secretary acted outside his statutory authority because the New Mexico project does not fall within the 700 miles of construction specifically outlined in section 102(b)—and, more importantly, the Court's analysis of whether or not it has jurisdiction to consider such claims is entirely unaffected.  (*See* Pls.' Suppl. Br., ECF No. 31, at 18–27; Defs.' Suppl. Br., ECF No. 33, at 9–22.)

In addition, while Defendants do not distinguish between Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) as the basis for dismissal, the Court has concluded that Plaintiffs' claims are subject to dismissal under both Rules.  That is, given the plain language of section 102(c)(2)(A), Plaintiffs have failed to establish this Court's subject-matter jurisdiction, warranting dismissal under Rule 12(b)(1) for "lack of subject-matter jurisdiction[,]" Fed. R. Civ. P. 12(b)(1), and Plaintiffs have also failed to establish that there exists a cause of action by which they can bring these claims, warranting dismissal under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted[,]" Fed. R. Civ. P. 12(b)(6); *see also Eagle Trust Fund v. USPS*, 365 F. Supp. 3d 57, 63 (D.D.C. 2019) ("[A] plaintiff who fails to show that the law authorizes him to bring his lawsuit fails to state a claim upon which relief can be granted." (citations omitted)).

further insist that DHS must have relied on this unconstitutional interpretation of the agency's section 102(c)(1) waiver authority in order to issue the New Mexico Waiver, because the "the reinforced fencing along . . . 700 miles of the southwest border" that is outlined in section 102(b) had already been completed when the New Mexico waiver issued.  (Pls.' Mem. at 31 (quoting IIRIRA § 102(b)(1)(A)).)

The first potential impediment to the advancement of Plaintiffs' constitutional claims arose during this Court's motions hearing, when Defendants suddenly asserted, for the first time, that the New Mexico Waiver was issued *pursuant to* the terms of section 102(b) of the IIRIRA (which authorizes the construction of "at least 700 miles" of reinforced fencing along the southwest border, IIRIRA § 102(b)), and not *in spite of* that provision, as Plaintiffs had maintained (*see* Hr'g Tr. at 77:13–15).  A round of supplemental briefing ensued, as mentioned above (*see supra* Part I.C.), with Plaintiffs contending that "DHS in fact did *not* invoke § 102(b) in the Waiver notice" and instead relied solely on section 102(a) with respect to the New Mexico Waiver (Pls.' Suppl. Br., ECF No. 31, at 8 (emphasis in original)), while DHS asserted that "[t]he Secretary relied both on the general mandate set out in § 102(a) . . . and the specific call in § 102(b)(1) for additional infrastructure needed to gain operational control of the southwest border" (Defs.' Suppl. Br., ECF No. 33, at 7).

As a preliminary matter, this Court finds that any distinction between, on the one hand, the DHS Secretary's exercise of section 102(c)(1) waiver authority as applied to construction projects generally authorized under the IIRIRA's section 102(a), and, on the other, the invocation of section 102(c)(1) with respect to construction authorized under a differently interpreted section 102(b) that does not limit the DHS Secretary to

only 700 miles of construction, makes no difference with respect to the constitutional arguments that Plaintiffs have pressed here.[19]  Either way, the Court concludes that section 102(c)(1) sufficiently limits DHS's authority so as not to run afoul of the Constitution in the manner that Plaintiffs allege.

       1.    The constitutional limits on Congress's authority to delegate
                authority to the Executive Branch are well established

The Supreme Court has long recognized that "[t]he Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility."  *INS v. Chadha*, 462 U.S. 919, 951 (1983).  This hallowed division is reinforced by various constitutional provisions that delineate requirements for each branch in carrying out its duties, in order to maintain that separation of powers.  *Cf. id.* at 957–58 ("To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded.").  The Presentment Clause requires, for example, that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States[.]"  U.S. Const. art. I, § 7, cl. 2.  Such requirements "were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of

---

[19] Even Plaintiffs appear to admit that, regardless of whether DHS based its decision to commence the New Mexico construction project on section 102(a) or 102(b), their constitutional claims are unaltered. (*See* Pls.' Suppl. Br. at 11 ("Defendants' new position—that the authority to issue the New Mexico Waiver emanates not just from § 102(a) but also § 102(b)—only fortifies those constitutional concerns. Plainly, it would mean that even in § 102(b), Congress provided absolutely no limits on Executive action, but instead . . . granted the DHS Secretary a *carte blanche* to waive any law [he] deems an impediment to any project [he] decides to undertake anywhere in the vicinity of the southwest border.").)  Thus, this Court need only address the core of Plaintiffs' constitutional argument: that section 102(c)(1)'s waiver authority, unbounded by the specific projects outlined in section 102(b), is an overly broad grant of authority from Congress to the Executive Branch.

power by mandating certain prescribed steps." *Chadha*, 462 U.S. at 957.  Similarly, "repeal of statutes, no less than enactment, must conform with Art[icle] I[,]" *id.* at 954, and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes[,]" *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

"The nondelegation doctrine is [also] rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  The Supreme Court explains that doctrine this way:  because "[t]he Constitution provides that 'all legislative Powers herein granted shall be vested in a Congress of the United States,' and we long have insisted that 'the integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." *Id.* at 371–72 (quoting U.S. Const. art. I, § 1; *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892)).  But Congress *can* confer its powers within limits; specifically, "[s]o long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* at 372 (internal quotation marks, citation, and alteration omitted).  This means that a congressional delegation of power to the Executive Branch is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372–73 (internal quotation marks and citation omitted); *see also Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23, 30 (D.C. Cir. 2008); *Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1475 (D.C. Cir. 1998).

Finally, separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause, U.S. Const. art. II, § 3, because such analysis focuses specifically on the President's authority in relation to Congress's. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Id.*; *see also id.* ("The Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad[,] [a]nd the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute."). Thus, the Framers made clear that, far from *creating* laws that bind the people of the United States, the President "shall take care that the laws be faithfully *executed*." U.S. Const. art. II, § 3 (emphasis added); *see also Myers v. United States*, 272 U.S. 52, 117 (1926) (concluding that the Take Care Clause applies to the entire Executive Branch, rather than the President alone, because, "[a]s [the President] is charged specifically to take care that [the laws] be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were to act for him under his direction in the execution of the laws").

These separation-of-powers principles are the bedrock of many courts' analyses with respect to constitutional challenges to a federal statute that authorizes broad discretionary decision making by executive branch officials. However, constitutional claims are rarely successful in this context, because courts have construed the circumstances in which congressional action conferring authority to an executive agency transgresses the Constitution's separation-of-powers limits quite narrowly. *See,*

*e.g.*, *Mistretta*, 488 U.S. at 373 (noting that the Supreme Court has upheld "without deviation, Congress' ability to delegate power under broad standards"); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 210 n.14 (D.D.C. 2014) ("[A] finding of excessive delegation of authority is extremely rare.").  As relevant here, by this Court's count, prior plaintiffs have raised Presentment Clause, non-delegation doctrine, and Take Care Clause claims concerning the government's waiver of laws under the IIRIRA's section 102(c)(1) three times in cases in which published opinions have issued, *see In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018); *Save Our Heritage Org. v. Gonzales*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007)—and none have succeeded.  For the reasons that follow, the instant case is no exception.

> 2.   A persuasive prior opinion squarely rejects Plaintiffs' separation-of-powers claims in a nearly identical context, and this Court sees no reason to reach a different conclusion

In 2007, two animal welfare and environmental protection organizations filed a lawsuit in this district "alleg[ing] that the Secretary of Homeland Security's waiver of numerous federal environmental laws under section 102 of [the IIRIRA] is unconstitutional."  *See Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 120–21 (D.D.C. 2007).  The legal action concerned the DHS Secretary's invocation of his authority under section 102(c)(1) of the IIRIRA to waive NEPA and various other laws with respect to a border construction project in Arizona.  *See id.* at 121–22.  The plaintiffs alleged that, when invoked in such a manner, the IIRIRA's section 102(c) violates the Presentment Clause, "because it provides the DHS Secretary with a roving commission to repeal, in his sole discretion, any law in all 50 titles of the United States Code that he concludes might impede construction of a border wall[,]" *id.* at 123

(internal quotation marks and citation omitted), and they further maintained that "the waiver authority violates fundamental separation of powers principles because it is an unconstitutional delegation of legislative power to the Executive Branch[,]" *id.* at 126.

Notably, with respect to the Presentment Clause claim, the *Defenders of Wildlife* plaintiffs asserted that "the power granted by section 102 of the [IIRIRA] to the Secretary of DHS to waive the applicability of any law that would otherwise apply to border wall and fence construction projects is unmistakably the power partially to repeal or amend such laws," because "[t]he laws waived by the Secretary's federal register notice are repealed . . . to the extent that they otherwise would have applied to wall and road construction[.]" *Id.* at 124 (internal quotation marks, citations, and alterations omitted). But the court found such arguments "unavailing," *id.* (Huvelle, J.) (citing *Sierra Club v. Ashcroft*, Civ. No. 04–272, 2005 U.S. Dist. LEXIS 44244, *21 (S.D. Cal. Dec. 12, 2005)), because the IIRIRA's waiver provision did not bear the hallmarks of a partial repeal or amendment of a statute in violation of the Presentment Clause that the Supreme Court identified with respect to the Line Item Veto Act in *Clinton v. City of New York*, 524 U.S. 417 (1998).

As Judge Huvelle explained, "[i]n *Clinton*, the Supreme Court struck down the Line Item Veto Act of 1996, which gave the President the authority to 'cancel' certain federal spending items that had been passed by Congress, because the Court found that the Act—'[i]n both legal and practical effect'—allowed the President to amend Acts of Congress by repealing portions of them." *Id.* at 123 (alteration in original). Judge Huvelle reasoned that "[i]t was 'critical' to the *Clinton* Court's decision that the Line Item Veto Act essentially 'gave the President the unilateral power to change the text of

duly enacted statutes[,]'" *id.* (alterations omitted) (quoting *Clinton*, 524 U.S. at 437, 447), and that "[t]he line items cancelled by the President would no longer have any 'legal force or effect' under any circumstance[,]" *id.* (quoting *Clinton*, 524 U.S. at 437, 464). By contrast, under the IIRIRA's waiver provision, "[t]he Secretary has no authority to alter the text of any statute, repeal any law, or cancel any statutory provision, in whole or in part." *Id.* And, as Judge Huvelle pointed out, to assert otherwise would effectively transform *any* Executive Branch waiver (the U.S. Code contains "myriad examples" of such) into a violation of Article I, "no matter how limited in scope." *Id.* at 124–25.

In *Defenders of Wildlife*, Judge Huvelle further distinguished section 102(c) from the Line Item Veto Act on the grounds that the latter "authorized the President 'to effect the repeal of laws for his own policy reasons,' thereby 'rejecting the policy judgment made by Congress and relying on his own policy judgment.'" *Id.* at 125 (alteration omitted) (quoting *Clinton*, 524 U.S. at 444, 445). However, "when the DHS Secretary exercises his waiver authority under the [IIRIRA], he is acting as Congress has expressly directed—*i.e.*, to 'expeditious[ly]' construct 'physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry[.]'" *Id.* (second alteration and ellipsis in original) (quoting IIRIRA § 102(a), (c)(1)). Moreover, and finally, "[t]he [IIRIRA's] waiver provision . . . relates to foreign affairs and immigration control[,]" which are two "area[s] in which the Executive Branch has traditionally exercised a large degree of discretion." *Id.* at 126; *see also Clinton*, 524 U.S. at 445 (explaining that "the foreign affairs arena" is one in which the President has

"a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved").

Next, although the plaintiffs in *Defenders of Wildlife* did not specifically invoke the Take Care Clause, in support of their claim that the IIRIRA's section 102(c) waiver authority violates the non-delegation doctrine, they asserted that "[t]he fundamental constitutional role of the Executive Branch under Article II . . . is to faithfully execute—not selectively void—the laws[,]" 527 F. Supp. 2d at 126 (internal quotation marks and citation omitted), and argued that both "[t]he Secretary's attempt to repeal unilaterally nineteen laws that otherwise would have constrained his conduct, and the law that purports to authorize him in taking such improper action, thus squarely offend both Articles I and II[,]" *id.* (internal quotation marks and citation omitted).[20] These arguments also failed to persuade Judge Huvelle.

She persuasively explained that, "[i]n order to exercise the waiver authority under the [IIRIRA], Congress has required the Secretary to determine if the waiver is 'necessary to ensure expeditious construction of the barriers and roads under [section 102 of IIRIRA].'" *Id.* at 127 (second alteration in original) (quoting IIRIRA § 102 (c)(1)). Congress has further directed the Secretary "to construct fencing only 'in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.'" *Id.* (quoting IIRIRA § 102(a)). With these statutory limitations in mind, Judge Huvelle then concluded that "[t]his legislative directive meets the requirements of the Supreme Court's nondelegation cases[,]" *id.*, because

---

[20] Thus, in this context, non-delegation doctrine and Take Care Clause arguments are the same. *See* U.S. Const. art. II, § 3 (requiring that the President "shall take Care that the Laws be faithfully executed").

"[t]he 'general policy' is 'clearly delineated'—*i.e.* to expeditiously 'install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry[,]'" *id.* (ellipsis in original) (quoting *Mistretta*, 488 U.S. at 372–73; IIRIRA § 102(a)).  Moreover, "the 'boundaries' of the delegated authority are clearly defined by Congress's requirement that the Secretary may waive only those laws that he determines 'necessary to ensure expeditious construction.'"  *Id.* (quoting *Mistretta*, 488 U.S. at 372–73; IIRIRA § 102(c)(1)).

Judge Huvelle then compared the IIRIRA's waiver provision with delegations of power that the Supreme Court had previously upheld, *see id.* (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)), and observed that her conclusion that the IIRIRA's waiver provision does not constitute "an impermissibly standardless delegation" was "in accord with the only other decision to address the question of whether the [IIRIRA's] waiver provision is a constitutional delegation[,]" *id.* (citing *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *21).  Significantly for present purposes, Judge Huvelle further noted that "even if, as argued by plaintiffs, this waiver provision is unique insofar as the number of laws that may be waived is theoretically unlimited, the Secretary may only exercise the waiver authority for the 'narrow purpose' prescribed by Congress: 'expeditious completion' of the border fences authorized by IIRIRA in areas of high illegal entry."  *Id.* at 128 (quoting *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *20).

In the instant case, Plaintiffs have challenged the exact same statutory provision—the IIRIRA's section 102(c)(1)—on the exact same separation-of-powers

grounds, and they have done so by repackaging essentially the same constitutional arguments that Judge Huvelle found unpersuasive in *Defenders of* Wildlife.[21]

Nevertheless, Plaintiffs attempt to distinguish the instant case from *Defenders of Wildlife*, first, by asserting that that case "arose in the context of DHS carrying out activities specifically authorized under [IIRIRA section] 102(b)" (Pls.' Mem. at 48 (citing *Defs. of Wildlife*, 527 F. Supp. 2d at 128)), and, second, by insisting that the *Defenders of Wildlife* plaintiffs "narrowly challenged the constitutionality of the *scope* of laws that the Secretary may waive—and did not challenge, as is at issue here, the constitutionality of the waiver's *application* to types of construction, project geography, and time."  (Pls.' Opp'n at 36 (emphasis in original).)   Both of these contentions miss the mark.

To begin with, nothing about Judge Huvelle's analysis in *Defenders of Wildlife* turned on section 102(c)'s waiver authority's being limited by section 102(b).  *See* 527 F. Supp. 2d at 123–26 (never mentioning section 102(b) when assessing the plaintiffs' argument that the DHS Secretary's waiver violated the Presentment Clause, nor when

---

[21] For example, Plaintiffs argue that the IIRIRA's section 102(c)(1) waiver authority violates the Presentment Clause, because "the act of waiving a law's application to border wall construction effectively repeals a portion of that duly enacted statute and, in both 'legal and practical effect' amends into that statute an exemption provision for border wall construction."  (Pls.' Mem. at 46 (quoting *Clinton*, 524 U.S. at 438); *see also id.* (asserting that the DHS Secretary's waiver "functionally result[ed] in 'truncated versions of [25] bills that passed both Houses of Congress'" (second alteration in original) (quoting *Clinton*, 524 U.S. at 440)).)  Plaintiffs also argue that section 102(c)(1) is "devoid of intelligible principle" if that statute is interpreted as unbounded by the specific projects outlined in section 102(b) (Pls.' Mem. at 49.), and that, by invoking the section 102(c)(1) waiver, the Executive Branch is shirking its Article II responsibility to faithfully execute the law (*see id.* at 53–54); *cf. Defs. of Wildlife*, 527 F. Supp. 2d at 126 (maintaining that the Executive Branch is supposed to "faithfully execute—not selectively void—the laws" (internal quotation marks and citation omitted)).  As a final example, Plaintiffs reiterate the *Defenders of Wildlife* plaintiffs' argument that section 102(c)'s waiver authority is *exceptionally* broad, "as broad, if not broader, than prior delegations of legislative authority to the Executive Branch that the Supreme Court has deemed unconstitutional."  (Pls.' Mem. at 50 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).)

concluding that it had not, and quoting *only* from IIRIRA sections 102(c) and 102(a) when observing that the DHS Secretary acted "as Congress has expressly directed"). Furthermore, *Defenders of Wildlife* does not hold that Congress had provided a sufficiently intelligible principle to guide DHS's authority under the IIRIRA's waiver provision *by limiting section 102(c)'s waiver authority to section 102(b) projects*. Rather, as the opinion plainly states, Congress provided a guiding principle by specifying that "the Secretary may only exercise the waiver authority for the 'narrow purpose' prescribed by Congress: 'expeditious completion' of the border fences authorized by IIRIRA in areas of high illegal entry[,]" *Defs. of Wildlife*, 527 F. Supp. 2d at 128 (quoting *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *20), and this principle applies with respect to the New Mexico Waiver as well.  Therefore, this Court sees no reason to diverge from Judge Huvelle's reasoning or conclusions under the circumstances presented in this case.

Nor have Plaintiffs offered any other case that compels a different result.  As Judge Huvelle noted, *Sierra Club v. Ashcroft* does not stand for the proposition that "the geographic scope of the waiver authority" must be "limited" in order to be constitutional.  *Id.* at 128 n.7.[22]  "Rather, the court upheld the waiver because the 'necessity' standard provided an adequate intelligible principle to circumscribe the action the Secretary was permitted to take."  *Id.* (citing *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *20–21).  And, importantly, *that* intelligible principle derives from section 102(c), which authorizes the DHS Secretary to waive laws to the extent that the

---

[22] As *Defenders of Wildlife* puts it: "the *Sierra Club* court mistakenly believed that the [IIRIRA's] waiver provision applies only to the construction of a specific section of fencing near San Diego[,]" *id.* at 128 n.7 (citing *Sierra Club*, 2005 U.S. Dist. LEXIS 44244, at *21), but its "reasoning was not dependent on the belief that the geographic scope of the waiver authority was so limited[,]" *id.*

Secretary "determines" such waiver is "necessary to ensure expeditious construction of the barriers and roads under this section[,]" IIRIRA § 102(c), and also section 102(a), which authorizes the Secretary to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States[,]" *id.* § 102(a).  Therefore, section 102(b)'s further direction is functionally unnecessary for section 102(c)(1) to comport with constitutional separation-of-powers principles.  Put another way, from the standpoint of what suffices as guidance from Congress regarding how the Executive Branch is to exercise the authority granted in the statute for constitutional purposes, what is set forth in subsections 102(a) and 102(c) is enough. *See also Cty. of El Paso v. Chertoff*, No. EP-08-CA-196, 2008 WL 4372693, at * 4 (W.D. Tex. Aug. 29, 2008) ("[T]he Waiver Legislation clearly satisfies the intelligible principle standard."); *Save Our Heritage Org.*, 533 F. Supp. 2d at 64 ("[T]his Court finds no constitutional impediment to the Secretary's waivers because there is an intelligible principle that the Secretary must conform to in the exercise of his delegated power.").

> 3.  <u>Plaintiffs' Take Care Clause claim is another iteration of Plaintiffs' Presentment Clause and non-delegation doctrine arguments, and it fails for the same reasons</u>

Finally, "it is not at all clear that a claim under the Take Care Clause presents a justiciable claim for this Court's resolution." *Am. Fed. of Gov't Emps., AFL-CIO*, 318 F. Supp. 3d at 439 (citing *Citizens for Responsibility & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 138–40 (D.D.C. 2018)).  But even if it does, the Take Care Clause claim that Plaintiffs make in the instant action merely repackages their two other constitutional claims, and, therefore, it must suffer the same fate.

Plaintiffs maintain, for example, that "in issuing the [New Mexico] Waiver, [the DHS Secretary] is purporting to be a lawmaker . . . , leading to the effective repeals of portions of duly enacted statutes . . . without being confined and guided by the Congressional construction mandate in § 102(b)" (Pls.' Mem. at 53)—an argument that echoes, almost verbatim, their argument in support of the Presentment Clause claim (*see id.* at 46 ("[T]he act of waiving a law's application to border wall construction effectively repeals a portion of that duly enacted statute[.]")), as well as their argument in support of the non-delegation doctrine claim (*see id.* at 49 (arguing that summary judgment is appropriate because IIRIRA section 102(c) "lacks the requisite boundaries of this delegated authority"). (*See also* Pls.' Opp'n at 40 (clarifying that the Secretary's invocation of IIRIRA section 102(c) violates the Take Care Clause "because the New Mexico Waiver overreaches into Congress's lawmaking authority").) Plaintiffs have offered no basis for treating or viewing their Take Care Clause claim as anything other than a rehashing of the same concern that animates Plaintiffs' Presentment and non-delegation claims—*i.e.*, that Congress has delegated to DHS unlimited authority to exercise, in essence, legislative power, in a manner that the U.S. Constitution does not permit—and this Court has already explained why Plaintiffs have failed to establish that section 102(c)(1) and the New Mexico Waiver "overreach[] into Congress's lawmaking authority" in violation of the Constitution's separation-of-powers principles. (*See supra* Part III.B.2.)

Because Plaintiffs' underdeveloped Take Care Clause claim is founded on the legal arguments that this Court has already rejected, it requires nothing more in terms of

analysis.  Therefore, this Court's prior reasoning is the basis for its present conclusion that Plaintiffs' Take Care Clause claim must be dismissed as well.

## IV.    CONCLUSION

This Court finds that Congress has spoken in no uncertain terms about the limits of judicial review when it comes to legal claims that challenge on non-constitutional grounds the DHS Secretary's authority to waive otherwise-applicable legal requirements with respect to the construction of border barriers under the IIRIRA. Indeed, the IIRIRA's section 102(c)(2)(A) specifically states that, with respect to "causes of claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to [section 102(c)(1)]," such a "cause of action or claim may only be brought alleging a violation of the Constitution of the United States[,] [and] [t]he court shall not have jurisdiction to hear any claim not specified in this subparagraph."  IIRIRA § 102(c)(2)(A).  Thus, this Court has no authority to consider the merits of Plaintiffs' arguments that the New Mexico Waiver is *ultra vires* or otherwise unlawful.  And to the extent that Plaintiffs have proceeded to make Presentment Clause, non-delegation doctrine, and Take Care Clause claims regarding the impermissibility of the New Mexico Waiver, they have done so against the backdrop of a prior determination by a judge in this district that section 102 provides sufficient limitations on DHS's authority so as not to violate the Constitution's separation-of-powers principles.  This Court finds that precedent persuasive, and it compels the conclusion that Plaintiffs' complaint fails to state plausible constitutional claims as a matter of law.

Accordingly, and as set forth in the accompanying Order, Plaintiffs' motion for summary judgment must be **DENIED**, and Defendants' motion to dismiss, or, in the alternative, for summary judgment must be **GRANTED**.

DATE:  September 4, 2019

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge